1   Sebastian Rucci (State Bar #178114)

2   LAW OFFICES OF SEBASTIAN RUCCI, P.C.

3   16400 Pacific Coast Highway, Suite 212

    Huntington Beach, CA 92649

4   Tel:  (562) 901-0199

5   Cell: (330) 720-0398

6   Fax:  (562) 249-6910

    Sebastian@Rucci.Law

7   Attorney for Plaintiffs

8

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPERIAL VALLEY COMPUTER MANUFACTURING, LLC, a California limited liability company <br><br>   Plaintiff <br><br> vs. <br><br> CITY OF IMPERIAL, a California municipal corporation; KATHERINE BURNWORTH in her individual capacity; DENNIS MORITA in his individual capacity; KATIE TURNER in her individual capacity; and OTHON MORA in his individual capacity <br><br>   Defendants | Case No: **'26CV128  JLS  BJW** <br><br> Judge: <br><br> Magistrate: <br><br> **VERIFIED CIVIL RIGHTS COMPLAINT** <br> (1) Violation of Procedural Due Process; <br> (2) First Amendment Retaliation; <br> (3) Equal Protection Class of One Claim; and <br> (4) Municipal Liability (Monell) ; <br>   (42 U.S.C. § 1983) <br><br> PLAINTIFF DEMANDS TRIAL BY JURY |

## VERIFIED CIVIL RIGHTS COMPLAINT

COME NOW the Plaintiff and for their claims against defendants City of Imperial, Katherine Burnworth, Dennis Morita, Katie Turner, and Othon Mora, individually, jointly and severally state as follows:

# TABLE OF CONTENTS

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Jurisdiction and Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Plaintiffs and Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

City's Zoning Code and Ministerial Approval Framework . . . . . . . . . . . . . . . . . . . . . . . . 5

Project Inception and the Ministerial Mandate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

First Site Plan Application to the City . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Revised Plans Submitted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Reclaimed Water Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

First Application Deemed Approved by Operation of Law . . . . . . . . . . . . . . . . . . . . . . . . 12

City Refuses to Use available Streamlined Procedures . . . . . . . . . . . . . . . . . . . . . . . . . 13

Second Scaled-Down Application Only on Industrial Land. . . . . . . . . . . . . . . . . . . . . . . . 14

Second Application Deemed Approved by Operation of Law . . . . . . . . . . . . . . . . . . . . . . . 15

Ministerial Approval of Data Center by the County. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Third Application Deemed Approved by Operation of Law . . . . . . . . . . . . . . . . . . . . . . . 17

City Breached Reclaimed Water Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

City's Tortious Interference With El Centro Water Agreement . . . . . . . . . . . . . . . . . . . . . . 21

City Blocks Reclaimed Water to Salton Sea (Environmental Pretext). . . . . . . . . . . . . . . . . . . 22

Retaliatory Sham Litigation Filed for Sole Purpose of Delay. . . . . . . . . . . . . . . . . . . . . . . 24

Defendants Engage in Public Misrepresentation Campaign. . . . . . . . . . . . . . . . . . . . . . . . 27

Defendants and IID's Coordinated Misinformation Campaign . . . . . . . . . . . . . . . . . . . . . . 29

Conspiracy to Extort: Coordination with "Greenmail" Operatives . . . . . . . . . . . . . . . . . . . 36

Matrix Showing Coordinated Misinformation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Damages Sustained by the Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

COUNT 1 - VIOLATION OF PROCEDURAL DUE PROCESS (42 U.S.C. § 1983). . . . . . . . . . . . . . . . 41

COUNT 2 - FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983) . . . . . . . . . . . . . . . . . . . . 43

COUNT 3 - EQUAL PROTECTION CLASS OF ONE CLAIM (42 U.S.C. § 1983). . . . . . . . . . . . . . . . 47

COUNT 4 - MUNICIPAL LIABILITY (MONELL) (42 U.S.C. § 1983). . . . . . . . . . . . . . . . . . . . . 49

VERIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

TABLE OF EXHIBITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**INTRODUCTION**

1.    This civil rights action is brought under 42 U.S.C. § 1983 to redress deprivation of Plaintiff's First and Fourteenth Amendment rights by the City of Imperial ("City") and its senior officials. This case arises from a bad-faith campaign of administrative obstruction and targeted retaliation triggered by Plaintiff's refusal to submit to an unlawful discretionary approval process for a data center project that was, by law, a "permitted use by right."

2.    At all relevant times, the property was zoned I-2 (Rail-Served Industrial), the City's most intensive industrial classification. The City's review of the site plan was strictly ministerial, not discretionary and Imperial Municipal Code § 24.19.550 provides a self-executing mandate: if the City fails to act within fifteen (15) days of a complete application, the site plan is "deemed approved" by operation of law. Despite three compliant applications, the City willfully ignored its deadline, effectively pocket-vetoing a project it had no legal authority to deny.

3.    Plaintiff refused to proceed with Defendants unauthorized discretionary process, and relocated the data center to adjacent industrial land in the County of Imperial. The County following the law, granted ministerial approval and issued a CEQA exemption. In direct retaliation for Plaintiff's exercise of its legal rights and its avoidance of the City's unlawful discretionary hurdles, Defendants launched a coordinated campaign to sabotage the data center, not withstanding the many benefits in taxes and jobs for its citizens. Defendants unlawful campaign included:

(a).    Directing staff to circulate misleading flyers to incite public hostility;

(b).    Partnered with environmental groups

(c).    Partnered with Z-Global

(d).    Refusing to complete its agreement to provide reclaimed water eight months after expenses were paid by Plaintiff;

(e).    Pressuring the City of El Centro to terminate its reclaimed water service agreement;

(f).    Partnering with the Imperial Irrigation District to obstruct project utilities;

(g).    Filing meritless sham legal action based on outright misreading of the County's zoning code intended to delay and devalue a project outside the City's jurisdiction.

4.    Defendants' actions constitute an official municipal policy characterized by the knowing disregard of mandatory statutes and the weaponization of governmental power to punish Plaintiff for asserting its constitutional rights, and to punish the County for following the law.

Defendants' deliberate and ongoing pattern of misconduct, including the knowing disregard of Imperial Municipal Code and self-executing statutes, retaliation for protected activity, and abuse of governmental authority. These actions violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution and constitute official municipal policy and retaliation actionable under 42 U.S.C. § 1983.

5.  Plaintiff's $10 billion AI Data Center project is projected to generate over $22 million in net annual revenue for IID. The project would provide $72.5 million in one-time sales tax benefits and approximately $28.75 million in annual in real and personal property taxes to the County. The project will create over 1,688 construction jobs, 100 permanent jobs, and hundreds of indirect jobs.

## JURISDICTION AND VENUE

6.  This Complaint alleges violations of the Plaintiffs' rights under the United States Constitution, giving this court original "federal question" jurisdiction pursuant to 28 U.S.C. §1331 over those claims. This Complaint also alleges violations of the Plaintiff's rights under the Federal Civil Rights Act, 42 U.S.C. §1983, to redress the deprivation, under color of law, of rights secured by the United States Constitution, giving this court original jurisdiction under 28 U.S.C. §1343(a)(3) and (4) over those claims.

7.  There are multiple bases for this court's jurisdiction and venue, including 28 U.S.C. § 1391(b)(1) because defendants are located in and transact their affairs in Imperial County, California which is within the geographical area of this court. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in Imperial County, California which is located within the geographical area of this court. See 28 U.S.C. § 84(d) (Imperial County in Southern District of CA).

8.  Plaintiff's federal constitutional claims are asserted under federal law and not subject to California's Government Claims Act, Cal. Gov. Code §§ 810 *et seq*.

## PLAINTIFFS AND DEFENDANTS

9.  The Plaintiff, **Imperial Valley Computer Manufacturing LLC** ("Plaintiff") is a limited liability company incorporated in California and the applicant for the data center before the City of Imperial and later before Imperial County.

10.     The **City of Imperial** ("City"), is a municipal corporation organized under the laws of the State of California. Defendant **Katherine Burnworth**, was at all times relevant a City Council member and is sued in her individual capacity. Defendant **Dennis Morita** was at all relevant times the City Manager and is sued in his individual capacity. Defendant **Katie Turner** was at all relevant times the City Attorney and is sued in her individual capacity. Defendant **Othon Mora** was at all times relevant the City's community development director and is sued in his individual capacity (collectively referred to as "Defendants.")

11.     Whenever a reference is made to any act done by a defendant, the allegation means the act was done with the knowledge, consent, approval, and ratification of all defendants and is thereby attributed to each defendant individually, jointly and severally.

### CITY'S ZONING CODE AND MINISTERIAL APPROVAL FRAMEWORK

12.     Imperial's Municipal Code designates the I-2 Rail-Served Industrial Zone as its most intensive industrial classification, § 24.07.120(c) permits "business, professional, and research offices" by right in the I-2 Rail-Served Industrial Zone.

13.     Imperial's Site Plan Review procedure § 24.19.550, mandates the approval within 15 days of a completed application: "Within fifteen (15) days of the date that application is deemed complete by the Director, the Director shall approve, conditionally approve, or disapprove the application... **Failure of the Director to act within fifteen (15) days shall be deemed approval of the application**." The use of the mandatory term "shall" strips the Planning Director of discretion. Furthermore, § 24.19.550 provides for deemed approval after 15 days without referencing a public hearing; hence, site plan review does not require a public hearing, and the City is bound by its own legislative enactments.

14.     Imperial's Site Plan Review procedure § 24.19.500 is ministerial and requires staff to verify compliance with the proposed use and setbacks, height limits, and lot coverage. Staff checks plans against objective standards (permitted uses, setbacks, height limits).

15.     Unlike discretionary reviews, which allow officials to weigh subjective policy considerations, site plan review is ministerial and leave no room for personal judgment or political maneuvering. If the objective standards are met, the permit must be issued.

16.    CEQA is only triggered by discretionary approvals. "Ministerial projects are exempt from the requirements of CEQA." (14 Cal. Code Regs., § 15268(a).) "If the lead agency concludes a project is exempt . . . the agency may thereafter proceed without further consideration of CEQA." (*Union Med.M. v. City San Diego* (2019), 7 Cal. 5th 1171, 1186).

17.    CEQA exemption is immune of controversy: "It is entirely possible, if not common, for a controversial or unpopular project to be exempt from CEQA. Neighborhood sentiment is not an impact that must be directly considered in the environmental determination process." (*McCann v. City San Diego* (2021) 70 Cal. App. 5th 51, 86.)

18.    Imperial's Municipal Code provides that uses not specifically listed are treated as permitted based on similarity of use to other listed uses. (§§ 24.19.220 -- 250.) Similarity of use procedure states: "a use, not specifically listed as a permitted ... shall be deemed a permitted use...on the basis of similarity to uses specifically listed." (§ 24.19.220). The Director shall compare proposed use with uses listed and make findings to the Planning Commission (§24.19.230) and the Planning Commission "shall make a determination whether the use is 'similar' and should be a permitted use." (§24.19.250).

19.    Imperial's Municipal Code also provides: "If ambiguity arises concerning the appropriate zone or classification of a particular use" the Planning Director shall give his "findings and interpretations, to the Planning Commission for a recommendation and then transmit said recommendation to the Council" and if  "approved by the Council, thereafter such interpretation shall govern." (§24.01.150).

## PROCEDURAL CHRONOLOGY

### PROJECT INCEPTION AND THE MINISTERIAL MANDATE

20.    The development of the data center in the City was predicated on a clear regulatory understanding that the proposed use was permitted by right under existing zoning ordinances. In September 2024, the Plaintiff identified spare capacity on IID's 230 kV S-line, a critical component for the data center. Following this technical confirmation, Plaintiff engaged in preliminary discussions with the City to verify land use compliance.

21.    In late September 2024, Plaintiff met with Othon Mora, the City's Community Development Director ("Director Mora" or "Planning Director"). Plaintiff maintained--and the

Planning Director initially agreed--that the data center is a "permitted use" in the I-2 zone as "Business, professional, and research offices."

22.     The City's initial confirmation of the data center's ministerial status induced the Plaintiff to invest $12 million for the purchase of 95-acres and to spend millions in technical studies for three separate applications to the City.

23.     Separately, Plaintiff also contracted for 75-acres of industrial land in the County and 24-acres in the City of El Centro for $15 million more, both of which confirmed data centers are permitted as of right in their respective industrial zones.

24.     On January 17, 2025, Plaintiff emailed Director Mora plans for three contiguous data centers: (1) 95 acres in the City; (2) 75 acres in the County; and (3) 24 acres in the City of El Centro. All three sites were located on land zoned industrial with the 230 kV S-line bordering the land. The email asked Director Mora for "comments on any glaring issues" and noted that, as "our concept is being formulated your initial comments would be greatly appreciated" (**Exhibit 1**).

25.     On February 28, 2025, Plaintiff emailed the City stating: "I've attached our site plan for the . . . 95 acres at Imperial and Aten Road. Please schedule a pre-application meeting at your convenience to discuss compliance and **purchasing reclaimed water**, etc. . . . building sketches and animation videos are attached" (**Exhibit 2**). City Planner Yvonne Cordero replied: "We look forward to working with your team on this exciting project."

### FIRST SITE PLAN APPLICATION TO THE CITY

26.     On March 4, 2025, a meeting to discuss the data center was held at the City with several City representatives, including Director Mora and City Engineer David Dale ("City Engineer"). Plaintiff provided a copy of the City's zoning code and demonstrated that the data center is permitted in the industrial I-2 zone under "Business, professional, and research offices." Director Mora agreed the industrial zoning permitted the data center.

27.     Plaintiff also discussed the City selling reclaimed water for the data center with the City Engineer. The City expressed significant interest in the additional revenue, specifically conditioned upon Plaintiff's agreement to cover the cost of engineering, all upgrades, and the purchase of the reclaimed water.

28.    On March 4, 2025, Plaintiff filed an application for "site plan review for proposed imperial valley data center campus," paid the required fee, and received an email from the City of the executed planning application for Site Plan Review 25-03 (**Exhibit 3**).

29.    On March 5, 2025, the City encouraged the Plaintiff to hire Webb and Associates, and to decide which of two alternatives to secure reclaimed water for the data center: "We can do the Title 22 Report in two different ways. You can contract directly with Webb or deposit $30,000 with the City. Either way will work. The contract directly with Webb may work better since I may have to get legal to draft an agreement, and that may take some time" (**Exhibit 4**).

30.    Plaintiff contacted Webb and Associates and hired them to secure reclaimed water. On March 7, 2025, Plaintiff informed the City he asked "Webb do the engineering work to secure approval for the City to sell reclaimed water" (**Exhibit 4, pg. 5**).

31.    On March 17, 2025, City Planner Yvonne Cordero emailed that she "routed the project to our Development Review Committee and their comments should be received by the end of this week. Imperial County Fire Department which handles the City requested additional time for their review and I referred Andrew Loper to you for any questions. Once I have the departments' comments, I'll start formulating the Site Plan Review letter."

32.    On March 21, 2025, Engineering and Planning Project Manager Tom Dubose had an in-person meeting with Andrew Loper of the County Fire Department, which handles the City, to review the project, and was directed to make changes to the road width.

33.    On April 4, 2025, Director Mora emailed a site plan review letter seeking revised plans and technical studies (traffic, water, air, noise, and fire) and clarification on zoning because the "data center" and "substation" are not listed as uses. Director Mora asked for a new site plan with frontage on SR-86 for retail and for road improvements, and updates on utilities, parking, landscaping, and water (**Exhibit 5**).

34.    On April 4, 2025, Director Mora did not issue site plan determination requesting various technical studies until 31 days after site plan submission. Consequently, the March 4, 2025, application was deemed approved on March 19, 2025.

**REVISED PLANS SUBMITTED**

35.    On May 15, 2025, Plaintiff submitted revised plans comprising 17 pages responding to the City's comments, which included 8 acres of commercial retail space along SR-86 and a 25-foot landscape strip with a concrete wall around the perimeter (**Exhibit 6**). The letter noted that the project is "permitted by right" in the I-2 industrial zone and the battery storage is a subordinate "accessory use." The letter also noted that

> "The ministerial aspects of the Site Plan is also apparent from the 15 day limit for Site Plan Review: . . . Within 15 days of the date that application... the Director shall approve, conditionally approve, or disapprove the application, or shall request the applicant to revise said applications. **Failure of the Director to act within 15 days shall be deemed approval of the application** ... (§ 24.19.550)."

36.    Plaintiff informed the City its reclaimed water consultant had not responded and was looking to proceed. On May 19, 2025, City Engineer David Dale replied: "Let me try to contact Webb. If they don't respond, I can have our attorney prepare a quick contract for us to do the report." Throughout May 2025, the City Engineer facilitated the relationship between Plaintiff and Webb to ensure the report was completed, emailing on May 20, 2025: "I got word that Webb will provide you with a proposal within 2-3 days. If you don't hear from them, please let me know" (**Exhibit 7**).

37.    On May 27, 2025, twelve days after the revised plans were submitted, Director Mora stated in an email: "Thank you for your submission. We have received the documents and will begin our review. If we have any comments or require clarification, we'll be sure to let you know. Should a meeting be necessary, we'll coordinate with you to schedule one." Since that email did not ask for anything else, the application was deemed complete on May 15, 2025; hence, three days remained before deemed approval.

38.    On May 28, 2025, Plaintiff emailed IID's feasibility study which found the 250 MW will "not cause any buses to experience voltage exceedances or deviations."

39.    On May 30, 2025, Plaintiff emailed City Attorney Turner that "we have already agreed to conduct studies and provide mitigation", added "commercial retail development along Imperial Avenue to create a buffer zone" and the "zoning code supports approval of this facility as-of-right." The email continued:

"If the City chooses to require CEQA review and does not approve the project as of right, **we will pivot and focus on other data center sites in the region that can be approved as of right** and would reallocate that power to the new site." (**Exhibit 8**).

40.    The City did not act within 15 days of the May 15, 2025, submission. Instead, on May 27, 2025--twelve days into the review period--Director Mora sent a generic acknowledgment of receipt without deeming the application incomplete. The deemed approval deadline expired on May 30, 2025.

41.    It was not until June 23, 2025--39 days after submission--that City Planner Cordero attempted to issue an adverse site plan review letter, which she immediately recalled. The site plan was deemed approved by operation of law on May 30, 2025.

**RECLAIMED WATER AGREEMENT**

42.    On May 30, 2025, Brian Knoll, with Webb and Associates, emailed stating that he would get the agreement on the reclaimed water, copying the City Engineer.

43.    On June 2, 2025, Brian Knoll with Webb and Associates submitted a proposal to prepare the Title 22 report to purchase reclaimed water from the City. Relying on the City's promise that it intended to sell reclaimed water if the feasibility was proven, Plaintiff signed the contract with Webb and wired the initial deposit.

44.    On June 3, 2025, City Attorney Turner emailed Plaintiff stating she wanted "similar projects in terms of the permitting and entitlement process in another jurisdiction" to understand "similar projects and the litigation that follows."

45.    On June 3, 2025, Plaintiff emailed City Attorney Turner that "Data Center #2 is contiguous and located in Imperial County" and it is "a permitted use in Imperial County. See attached Imperial County § 90515 - 01 Permitted uses in the M-1 zone, see subsection bbb, 'Data center' uses are permitted in the M-1 Zone" (**Exhibit 9**).

46.    On June 4, 2025, Plaintiff emailed City Attorney Turner: "Data Center #2 is located in Imperial County and under § 90515-01, permitted uses in the M-1 zone include 'Data center' uses, which 'are permitted in the M-1 Zone' as of right. **I have attached a draft plan of the data center located on contiguous land in the County**." (**Exhibit 10**).

47.    On June 6, 2025, Plaintiff emailed City Attorney Turner a memo listing 25 data centers approved as of right in industrial zones, 14 were in California (**Exhibit 11**).

48.    On June 16, 2025, a video meeting regarding reclaimed water was held with the City Engineer and Chris Kemp, the City's water treatment manager. The City Engineer noted that the 750,000 gallons per day "are well within our capabilities of recycled water" further solidifying the promise of availability. The City confirmed Plaintiff will have to pay for all upgrades. Later that day, Plaintiff emailed the base flow and peak flow figures.

49.    On June 17, 2025, Plaintiff emailed the City Engineer stating he was "assembling a write-up of the benefits of the data center. . . . The daily cost for 500,000 gallons is $3,600 per day, or $109,500 per month, or $1.3 million per year. Is this correct?" (**Exhibit 12**). On June 17, 2025, City Engineer Dale emailed the Plaintiff stating:

> "By law, the city can not charge more than it costs the city to treat the water. To ensure fairness, the **cost of reclaimed water will need to be studied (after the Title 22 Report is complete** to know what is required). This would include the costs of potential additional wastewater treatment plant personnel and certifications, additional treatment to Title 22 standards (e.g., UV disinfection costs), pumping, pipeline maintenance, etc. The dollar figures you are quoting seem to be for wastewater treatment, which will be different than the reclaimed water cost. A closer estimate would be to use the potable water rate scale of $4.06 per CCF... but again, it would have to be studied to be certain. **$1.3 million per year sounds very high to me.** I'm pretty sure that the cost of the water would be part of a developer agreement." (**Exhibit 13**).

50.    On June 17, 2025, Plaintiff emailed City Engineer Dale: "I know this is all preliminary. I received an even higher estimate from [Hyperscale Tenant] for the projected cost of the water. They used $6 per 1,000 gallons and **set the annual cost at about $3 million per year in payment**. I appreciate your help. I've attached my memo outlining the benefits to the community and the environment of the data center campus" (**Exhibit 14**).

51.    The City directed Plaintiff to use Webb and Associates. Plaintiff followed through, hired Webb and Associates, signed the contract, and paid multiple invoices. The City acted as an active partner, held video meetings with the City Engineer and Water Treatment Manager to discuss technical feasibility.

52.     The City Engineer explicitly stated, "the latest numbers you just sent are well within our capabilities of recycled water." The City admitted it has the water and the capacity to deliver it. While a specific price wasn't concluded, the City Engineer established the legal framework for the price: "By law, the city can not charge more than it costs the city to treat the water." The Engineer corrected the Plaintiff's high estimate ($1.3 million), suggesting a lower cost basis tied to actual treatment expenses. The City Engineer's detailed explanation of how the price would be calculated (treatment costs + UV disinfection + pumping) confirms that a deal was done in principle.

53.     Plaintiff hired Webb, paid all invoices, and agreed to pay for all upgrades. The City stands to gain a new revenue stream and the environmental benefits of the extra reclaimed water. The City Engineer confirmed the agreement to sell. The "contract" is the mutual understanding that the water will be provided; the contract is just the paperwork. The City requested Plaintiff to hire a specific engineer, paid for by Plaintiff, confirmed water capacity, and negotiated pricing formulas (cost-recovery). This creates a reasonable expectation a contract was formed, conditioned only on the technical validation.

**FIRST APPLICATION DEEMED APPROVED BY OPERATION OF LAW**

54.     On June 23, 2025, Plaintiff emailed a letter to Director Mora and the City Attorney asserting that the data center fits under the classification of "business, professional, and research offices," as it is less intrusive than other uses, and that battery storage is a permitted accessory structure. The letter further noted that, under the code, unlisted uses are treated as permitted if they are similar to listed uses (**Exhibit 15**).

55.     On June 23, 2025, at 9:34 PM, Plaintiff emailed City Attorney Turner stating: "**During our first meeting** with Othon and others, **we shared the zoning code and our view that we were a permitted use**. I thought this was a non-issue and that the City agreed. If Othon believes that a data center is not a permitted use, based on my reading of the zoning code, in that case, **we should proceed with a similar use determination** by the Planning Commission under § 24.19.200 . . ." (**Exhibit 16**).

56.     On June 23, 2025, City Planner Cordero emailed an adverse site plan review letter at 11:36 AM. Five minutes later, at 11:41 AM, Ms. Cordero emailed that she "would like to recall"

the prior email. The sequence of the "adverse letter" being immediately "recalled" is an admission by the City that the denial was premature, erroneous, or procedurally flawed. As of that date, the amended site plans had been under review for 39 days. Pursuant to § 24.19.550, the amended site plans were deemed approve. By recalling the letter, the City effectively kept the clock ticking far past 15-day limit.

57.    Because the site plan review was withdrawn, the review continued to July 15, 2025, when **the City denied the application, 61 days had elapsed** from date of submission. Hence, the revised site plans were deemed approved as a matter of law.

58.    On July 2, 2025, a meeting was held at the City with Plaintiff, Project Manager Tom Dubose, Director Mora, City Attorney Turner, and City Manager Dennis Morita to discuss the data center and various paths to approval. During this meeting, Plaintiff reiterated his belief that the data center was a permitted use and that site plans required action within 15 days for approval.

59.    Plaintiff also suggested a Planning Commission similarity of use determination under § 24.19.20. Plaintiff noted that the I-2 industrial zone explicitly permits livestock sales, feed yards, animal grazing, building equipment storage, automobile storage, lumber yards, laboratories, bottling plants, and cement products manufacturing.

60.    Plaintiff emphasized that the data center generates minimal daily traffic, has limited on-site staff, has no retail foot traffic, and is quiet compared to other industrial uses. He noted the backup generators are subject to permits and monitoring. Director Mora confirmed a similarity of use determination would take two months and concluded by agreeing to submit as a path forward, suggesting an alternative path was possible with the Environmental Assessment Committee, which would take about one month.

### CITY REFUSES TO USE AVAILABLE STREAMLINED PROCEDURES

61.    On July 15, 2025, Director Mora emailed regarding the Environmental Assessment Committee path forward discussed at the July 2, 2025 meeting and that a Negative Declaration was likely but he wanted a text amendment and Conditional Use Permits which would "take approximately 6 to 9 months." (**Exhibit 17**).

62.    On July 18, 2025, Plaintiff emailed Director Mora asserting that "[t]he City was bypassing more streamlined procedures available under its code." The email continued:

"First, we should discuss shrinking the project to a smaller data center, along with all ancillary uses (substation, battery, and generator backup), all of which can be accommodated on the industrial-zoned land. If this is the option, we can proceed with new plans for **site plan review, which takes 15 days under § 24.19.500**. It seems to me that a building with no windows, used for public traffic with ancillary energy uses, should be permitted in the I-2 zone."

The email further explained the Plaintiff's reliance on the initial understanding and urged a return to the ministerial process, or a similarity of use determination:

"From the outset, I selected the City of Imperial because I believed that our **data center would be a permitted use and exempt from CEQA**. We revised the project to incorporate retail, demonstrating our commitment to collaboration. We are now many months into this process and must urgently consider more efficient procedural paths. Let's explore a project focuses solely on the industrially zoned portion, encompassing the datacenter and all its ancillary infrastructure, to expedite the process under the ministerial Site Plan Review procedure. We should also discuss the Similar Use Determination before the Planning Commission." (**Exhibit 18**).

63.    The City was bypassing its own streamlined codes, including the 15-day ministerial site plan review by shrinking the project to fit entirely within the industrial-zoned land, or by using the similarity of use determination.

### SECOND SCALED-DOWN APPLICATION ONLY ON INDUSTRIAL LAND

64.    Following continued obstruction, Plaintiff submitted a third, scaled-down application on July 22, 2025. The project was proposed entirely within the I-2 Rail-Served Industrial Zone, satisfying the use classification under § 24.07.120.C for "business, professional, and research offices." The application asserted the battery and backup generators are incidental to the data center, used exclusively to support its operations, and not designed for off-site distribution (**Exhibit 19**).

65.    On July 30, 2025, Director Mora emailed Plaintiff that he was reviewing the "revised site plan and detailed narrative" and acknowledged "the project is now proposed entirely within the I-2 zoning designation. The Planning Department is currently reviewing the revised site plan and supporting information, and we will provide formal comments shortly. In the meantime, if any

technical studies, . . . have already been completed, please forward them at your earliest convenience" (**Exhibit 20**).

66.    On August 14, 2025, the City Engineer emailed the reclaimed water report and stated that "the needed infrastructure, operations, and treatment are what were anticipated" (**Exhibit 21**). The report states on page 1 that the

> "City of Imperial is currently working with a few entities that are **interested in receiving recycled water from the City**. The objective is to identify the necessary upgrades the City of Imperial intends to complete in order to comply with water recycling requirements for cooling water." On pages 2–3, the report states that a "12 inch purple pipe, recycled water distribution line is proposed to be installed from the existing wastewater treatment plant along P Street down to its intersection with Aten Road, approximately 2 miles. Figure 2-1 shows this proposed alignment on the City's zoning map [the map shows the recycled water delivered to the data center site]."

67.    On August 16, 2025, Plaintiff emailed the City Engineer stating they "reviewed the Title 22 Report and have one suggestion. I've attached a map for the recycled water pipeline. This map could replace Figure 2-1. It accurately shows the recycled water going to the two sites for the recycled water: the site in the City and the site in Imperial County." The email asked: "Please get this concluded as soon as possible, as we are getting close with Site #1 [County], Site #2 [City] is before Othon, and we are certain he will approve the latest site plan with the project on Industrial land." (**Exhibit 22**).

68.    On August 18, 2025, City Engineer Dale confirmed the City was acting on the reclaimed water project, emailing: "On it. I just sent the pipeline route [recycled water to both datacenters] to Webb." (**Exhibit 23**).

### SECOND APPLICATION DEEMED APPROVED BY OPERATION OF LAW

69.    On August 20, 2025, Director Mora emailed a letter rejecting the data center proposed completely on industrial land. The email stated that the City "acknowledges that the revised site plan now depicts the entire project ... entirely within the I-2 Industrial zoning designation... the current zoning ordinance does not specifically identify 'data centers' as either a permitted or conditional use... the City finds that a Zoning Code Text Amendment is required ..." (**Exhibit 24**).

70.     This email was sent 29 days after the July 22, 2025, submission; hence, the second application was likewise deemed approved by operation of law.

71.     On August 21, 2025, at 11:35 am, Plaintiff emailed Director Mora "we exceed all zoning requirements for lot size, setbacks, building height, and lot coverage."

> "Regarding the lack of express listing of data centers. The industrial zoning provisions are written in broad terms and expressly include 'business, professional, and research offices,' alongside a wide range of other permitted uses such as livestock sales, feed yards, animal grazing, building equipment storage, automobile fleet storage, lumber yards, laboratories, bottling plants, cement products manufacturing, and more. To read the zoning code as requiring specific enumeration of every possible modern use--when the code was intentionally drafted with broad categories--is improper."

The email continued:

> "The category of 'business, professional, and research offices' comfortably includes datacenters, which are office based, research supportive facilities that require no retail activity, no windows, and no retail traffic. . . **From the beginning, we intended to proceed through the ministerial process**. Since we haven't been able to convince you of this interpretation, we are withdrawing our current request for a data center at the Imperial site. We nevertheless **look forward to continuing to work with the City on future opportunities like the reclaimed water purchase**. We are also available to help the City with recommendations if the City would like to amend its code on its own. Lastly, should the City reconsider, we are available to proceed with a ministerial data center project at any time." (**Exhibit 25**).

72.     On August 21, 2025, at 11:36 AM, Tom DuBose emailed City Attorney Turner: "that vacant property that has sat empty for many decades, might stay that way. My thinking, and I have told Dennis this a week or so ago that the City should . . . **go to the Planning Commission for a 'similarity of use determination'**. . . ."

73.     On September 3, 2025, Director Mora emailed Plaintiff: "We acknowledge your points regarding parcel size, zoning standards, and your interpretation of 'business, professional, and research offices.' While the City's interpretation of the code differs, we respect your thorough analysis and the professional manner in which you have presented your case. We also recognize and

value your continued interest in collaborating with the City, particularly in areas such as reclaimed water purchase, and potential code refinement. . . the City remains open to continued dialogue should you decide to pursue this project again in the future" (**Exhibit 26**).

### MINISTERIAL APPROVAL OF DATA CENTER BY THE COUNTY

74.     Following Defendants' refusal to honor the City's ministerial procedure or mandatory approval process, Plaintiff formally applied to the County for site plan approval for a 250 MW data center on 75-acres at the southeast corner of Aten and Clark Road.

75.     On September 4, 2025, the County issued a review of the data center site plan, concluding that it is a permitted use and that the substation, battery, and generator backup are permitted ancillary uses (**Exhibit 27**). The County properly determined that the data center on industrial land is a permitted use, stating:

> "The proposed project is consistent with the current zoning. Specifically, Pursuant to Division 5, Section 90515.01, Subsection (bbb) of the Imperial County Land Use Ordinance, a '**Data Center**' is a **permitted use** within the M-1 (Light Industrial) zoning district. Ancillary components directly incidental to the primary data center operation-such as long-term power backup generators, electrical substation, gen-tie lines, short-term power backup battery energy storage system (BESS), water treatment skid, and cooling yard-are likewise considered **permitted uses** within the M-1 zoning district."

### THIRD APPLICATION DEEMED APPROVED BY OPERATION OF LAW

76.     On September 6, 2025, Plaintiff was asked to apply again and email all relevant studies to Director Mora. On September 9, 2025, Plaintiff emailed Director Mora:

> "We will be applying again for a data center on the industrial land. To assist with that, attached are the following reports for the Imperial Ave. property: (1). Traffic Access Analysis Memo; (2). Air Pollution Constraints Memo; (3). Geotechnical Report; (4). Phase I Environmental Report; (5). Draft Reclaimed Water Report; (6). Alta Survey. The latest data center drawing for Imperial, an 80 MW facility located on industrial land, is attached." (**Exhibit 28**).

77.     On September 18, 2025, City Attorney Turner emailed Tom Dubose she was "working through the request to have the City of Imperial develop the reclaimed water system" and enter into an agreement to provide the reclaimed water:

"I have some questions regarding Prop 218, Prop 26 and the Regional and State Water Board permitting requirements. I have confidence Sebastian is familiar with these laws and I would request any guidance he could provide me to clarify the request he has and the hurdles he envisions. If he has examples or guidance, that would speed up my analysis. I am requesting this communication be confidential negotiation rather than public." (**Exhibit 29**).

78.     On October 7, 2025, Plaintiff emailed City Attorney Turner and City Manager Morita providing responses to the questions regarding Prop 218, Prop 26, and Regional Water Board permitting (**Exhibit 30**).

79.     On October 16, 2025, a meeting was held at the City to discuss the scaled-down data center located solely on the industrial parcel. Attendees included Tom Dubose, Director Mora, City Attorney Turner, and City Manager Morita. Sebastian Rucci attended via telephone and reiterated that the scaled-down data center was fully compliant and noted that a similarity of use process had not yet been exercised. The City representatives asked several questions and then requested Tom Dubose to leave the room to allow them to confer in private. Upon his return, City Manager Morita stated that it was their conclusion that a public process was necessary for a data center. **He also clarified that the City remained interested in selling reclaimed water**. Plaintiff informed them that he appreciated the reclaimed water cooperation and would proceed with the project on industrial land in the County.

80.     As of this filing, no formal written denial was ever received. The verbal rejection of the scaled-down data center entirely within the industrial zone was on that date 37 days past the application and since the City failed to act within 15 days, the **third application was deemed approved** by operation of law.

CITY BREACHED RECLAIMED WATER AGREEMENT

81.     On October 29, 2025, Tom Dubose texted City Attorney Turner: "Just checking to see if the City is interested in following through with selling recycled water from the WWTP to use at the Data Center site in the County on Aten Road. Please advise on the City's interest." City Attorney Turner replied to Tom Dubose:

"**I thought we were clear in our meeting that the City does have interest in reclaimed water** (especially in light of the state goals to move in that direction). Based on Sebastian's email, I also agree it would have to be authorized by the State or Regional Water Control Board. Are you asking for a specific commitment or communication? I also remember that Sebastian was also trying to get the City of El Centro to provide reclaimed water?"

Tom Dubose replied: "I guess just to confirm your interest and what next steps should we be taking with the city of Imperial."

82.     On November 6, 2025, Plaintiff emailed City Attorney Turner and City Manager Morita:

"We're eager to move this forward. **We plan to procure reclaimed water from both Imperial and El Centro, with most of that recycled water being directed to the Salton Sea**. This makes the project net water-positive by a factor of 6 to 1, meaning we are treating six times more water than we consume. The consultants we spoke with indicated that this approach could help address some of the environmental challenges affecting the Sea. If you need any more information to finalize the reclaimed water arrangements, please don't hesitate to let me know" (**Exhibit 31**).

83.     On Nov. 7, 2025, Plaintiff emailed City Attorney Turner and City Manager Morita:

"We have continued to assure our hyperscale tenant that the City of Imperial is genuinely interested in **providing reclaimed water for their data center** on Aten and Clark Road. Given the extended delay, we would appreciate a letter from the City confirming the sale of reclaimed water. The letter can state that **we will cover all costs associated with engineering and any required plant upgrades necessary to produce recycled water, and the city will then sell reclaimed water**, etc." (**Exhibit 32**).

84.     On November 7, 2025, at 2:57 PM, City Attorney Turner emailed Plaintiff: "Can you forward me those earlier email conversations to make sure we are looking at the same documents?" (**Exhibit 33**). At 4:20 pm that day, Plaintiff emailed the City Attorney twelve emails documenting the prior discussions regarding reclaimed water (**Exhibit 34**).

85.     On November 12, 2025, City Attorney Turner emailed Plaintiff: "Do you have any public meeting scheduled with the County?" (**Exhibit 35**).

86.     On November 12, 2025, Plaintiff emailed City Attorney Turner:

"There are no public hearings that I am aware of because our project--located on industrially zoned land--is a ministerial approval under the County's zoning code. Our applications to the City of Imperial were similarly exempted. As you are aware, after investing millions in engineering and site control, we shifted our focus to adjacent parcels in the County and the City of El Centro, **both of which recognized that a data center is permitted as of right on industrial land**. We remain confident in our legal position and the clarity of our rights, as outlined in multiple memos, and we are prepared to litigate this issue if necessary. Your email doesn't address our outstanding reclaimed water request, which has been pending for some time and may have taken an unexpected detour. If the City of Imperial does not wish to sell recycled water, please let us know directly." (**Exhibit 36**).

87.     On November 14, 2025, Tom Dubose sent a text to City Manager Morita: "I wanted to see if I can come in to see you about the reclaimed water from WWTP and how we can get that moving forward." City Manager Morita responded that he was getting his people together for Monday afternoon and would "confirm time on Monday morning."

88.     On November 20, 2025, at 12:22 PM, Tom Dubose texted City Manager Morita: "Checking to see how Katie is coming along with a draft Will Serve agreement for reclaimed water? Hoping to be able to have that before we meet. . . ." City Manager Morita replied: "I am given to understand **draft will be done shortly**. I will pass it along as long as I have it. We can meet early next week."

89.     On November 26, 2025, at 12:14 PM, City Manager Morita sent a text to Tom Dubose stating: "A quick note to let you know **we are working on the re-claimed water will-serve**. You had indicated you would reach out to Abraham for permission to provide us with a copy of the will-serve given to you. **We are also contacting El Centro**."

90.     On November 26, 2025, at 1:53 PM, the City posted on its Facebook page that the City "has recently become aware" the County is finalizing approval for a data center. The post stated "because this project is unprecedented in its magnitude and use, the City Council feels it is critical to notify our residents" and "to empower" residents to provide feedback:

"Notice regarding the County of Imperial potential approval associated with a large-scale Data Center Complex at the Southeast corner of Aten Blvd & Clark Road. **The City of Imperial has recently become aware** that the County of Imperial has approved, or is in the process of finalizing approval for, an approximately 950,000-square-foot data center (330 MW) and Energy Storage System (862 MWh). The project is planned to be built on 75 acres situated on the southeast corner of the intersection of Aten and Clark roads. The City of Imperial is not the permitting authority because the property is within the unincorporated County limits. Because this project is unprecedented in its magnitude and use, the City Council **feels it is critical to notify our residents of this project**. While the City supports development, economic progress, and job creation, it is important to **empower our residents to provide feedback** to the County when such larger projects are built in our neighborhood."

91.     On November 26, 2025, at 3:05 PM, Tom Dubose emailed City Manager Morita a copy of the will-serve letter after he "received permission from the city of El Centro" allowing him "to share this with you as you had requested earlier. Again, pointing out that this conditional will serve letter . . . for a site in El Centro that is being considered. Please confirm the City of Imperial's continued interest in doing the same..." (**Exhibit 37**).

92.     On December 12, 2025, two weeks after City Manager Morita contacted the City of El Centro, a post on El Centro's website stated:

"The City of El Centro is aware of information circulating regarding a privately proposed data center ... related to the use of reclaimed wastewater. ... no commitments or decisions have been made regarding any proposed data center... The City did receive a request for a will-serve letter from the data center developer ... A will-serve letter ... was issued... the City has not entered into any agreement or made any commitments related to a data center project."

### CITY'S TORTIOUS INTERFERENCE WITH EL CENTRO WATER AGREEMENT

93.     The above correspondence reveals a calculated pattern by the City of Imperial to renege on its implied contract to sell reclaimed water and, subsequently, to actively sabotage Plaintiff's alternative water arrangements with the City of El Centro.

94.     Despite Plaintiff funding studies and the City Engineer confirming capacity, City officials began a campaign of feigned ignorance and delay. On November 7, 2025, City Attorney Turner attempted to reset the clock, asking Plaintiff to "forward me those earlier email conversations," despite the long history of negotiations.

95.     On November 20 and 26, 2025, City Manager Morita misled Plaintiff, stating via text that a "draft will-serve [agreement] will be done shortly" and that "we are working on the re-claimed water will-serve." These statements induced the Plaintiff to believe the City was honoring its obligation, while in reality, no such draft was forthcoming.

96.     Under the false pretense of drafting Imperial's own agreement, City Manager Morita maneuvered to undermine the Plaintiff's relationship with the City of El Centro. On November 26, 2025, City Manager Morita requested a copy of the City of El Centro's Will-Serve letter, implying it was needed to finalize Imperial's own agreement. Relying on this representation Plaintiff provided the El Centro will serve letter in good faith.

97.     Instead of using the will serve letter to draft an agreement, the City used it to interfere. On November 26, 2025, Imperial posted a hostile notice on Facebook to rally opposition against the data center. Morita admitted he was "contacting El Centro."

98.     The City's interference yielded immediate negative results. The City of El Centro--which had previously issued a will-serve letter--publicly retreated.

99.     On December 12, El Centro posted a disclaimer stating "no commitments or decisions have been made," effectively destabilizing the Plaintiff's secondary water source.

100.    The City of Imperial did not merely breach its agreement to sell water; it used the promise of that agreement as bait to obtain information, which it then weaponized to interfere with the Plaintiff's contractual expectancy with the City of El Centro.

**CITY BLOCKS RECLAIMED WATER TO SALTON SEA (ENVIRONMENTAL PRETEXT)**

101.    As confirmed in the November 6, 2025 email (Exhibit 31), Plaintiff proposed a revolutionary water strategy: procuring 6 million gallons per day (MGD) of reclaimed water--2 MGD from Imperial and 4 MGD from El Centro. Plaintiff required only 0.75 MGD for cooling (12.5% of

the total). The remaining 5.25 MGD of treated freshwater would be released into the watershed feeding the Salton Sea.

(a).    For every 1 gallon consumed, Plaintiff would pay to treat and release 8 gallons into the environment.

(b).    Plaintiff offered to fund $20 million in upgrades to the Cities' aging wastewater infrastructure at no cost to ratepayers, while generating an estimated $3 million annually in new revenue for the City.

102.    CRITICAL LIFELINE FOR THE SALTON SEA: This project converted a municipal liability (wastewater) into a critical environmental asset.

(a).    DUST SUPPRESSION: By directing a consistent, high-volume flow of water into the Sea, the project would help submerge the exposed lakebed (playa), preventing the toxic dust storms that plague Imperial Valley's respiratory health.

(b).    SALINITY DILUTION: The massive infusion of treated freshwater acts as a diluent, lowering salinity in discharge areas to support endangered fish and bird populations.

(c).    POTABLE WATER PRESERVATION: By using 100% reclaimed water, the project explicitly preserved Colorado River allocations for residential and agricultural use.

103.    CITY'S REJECTION PROVES MALICE: If the City's opposition were truly motivated by environmental concern, they would have embraced this proposal. Instead they:

(a).    SABOTAGING THE ECOSYSTEM: By blocking the project, the City actively prevented the flow of millions of gallons of clean water into a dying ecosystem. They prioritized stopping the Plaintiff over the respiratory health of their own citizens.

(b).    PRETEXTUAL OBJECTIONS: The Defendants' sudden invocation of "environmental impact" is a calculated pretext. A genuine environmental steward would not torpedo a project that subsidizes regional water infrastructure and provides a massive, free infusion of freshwater to the Salton Sea.

(c).    INTENT TO DESTROY ENVIRONMENTAL PROTECTION: Defendants went further, weaponizing the "will-serve" process to attack El Centro's participation and cut off Plaintiff's alternative water supply. This obstructionism confirms that their goal was never environmental protection, but the intentional destruction of a permitted land use.

104.    Data centers are often criticized for using drinking (potable) water for cooling. Plaintiffs proposal uses recycled water, which preserves precious Colorado River allocation and creates a sustainable industrial model where "waste" is repurposed for cooling, supports the environment and Plaintiff cover all costs for engineering and any required plant upgrades.

105.    By reneging on the agreement, Defendants actively prevented the flow of millions of gallons of treated water into a dying ecosystem. Defendants sudden invocation of environmental concern are not genuine; it's a calculated pretext designed to obscure that Defendants are actively sabotaging one of the most significant private environmental investments in Imperial's history.

106.    Instead of facilitating this environmental win, Defendants sough to torch Plaintiff's alternative water supply. Defendants' actions are designed to block a permitted land use, regardless of the cost to the Salton Sea or the public health of the Valley's residents.

### RETALIATORY SHAM LITIGATION FILED FOR SOLE PURPOSE OF DELAY

107.    ESCALATION TO HOSTILITY: The Sham Petition (December 4, 2025) The City's opposition escalated from administrative delay to active hostility in late 2025. On December 4, 2025, the City filed a Petition for Writ of Mandamus (City of Imperial v. County of Imperial, Case No. ECU00457), seeking to invalidate the ministerial grading permit issued by the County. The Petition's central theory--that the project required discretionary Conditional Use Permits (CUPs) and a "zone change"--was a fabrication directly contradicted by the plain text of the County's ordinances.

108.    CITY MANAGER'S FALSE TESTIMONY: To support this baseless Petition, City Manager Morita falsely attested under penalty of perjury that the "data center project is not eligible for ministerial approval" because "discretionary approvals are required" alleging:

(a).    That the substation required "a CUP in the M-1 zone" (City Petition § 60);

(b).    That the Battery Energy Storage Systems (BESS) required "a CUP in the M-2 zone" (City Petition § 62); and

(c).    That the project required a "zone change" (City Petition § 56).

109.    OBJECTIVE FALSITY OF THE CLAIMS: City Manager Morita's sworn statements were objectively false and legally untenable at the time they were made. The County Land Use Ordinance expressly permits these uses by right:

(a).    Data Centers are permitted by right in M-1 and M-2 zones (§§ 90515.01(bbb), 90516.01(w));

(b).    Substations are permitted by right in the M-1 zone (§ 90515.01(vvvvvvv)); and

(c).    Battery Storage is permitted as accessory structures in the M-2 zone (§ 90516.01(hh)).

110.    Most importantly, the County had already issued a formal determination on September 4, 2025, confirming the Data Center is a permitted use--a fact **City Manager Morita admitted he was aware of the County's determination** in his declaration (City Petition §§ 34, 41).

111.    RETALIATORY MISUSE OF PROCESS: The filing of the December 2025 Petition exemplifies Defendants' retaliatory course of conduct. Having failed to block the project within its own jurisdiction, the City sought to export its obstructionist tactics to the County. The Petition was a "sham" litigation designed to interfere directly with Plaintiff's property rights. Defendants did not honestly believe the claim was meritorious; no reasonable litigant could expect success on a claim arguing that a "permitted use" requires a "zone change" when the zoning map already designates the land as industrial.

112.    INTENT TO HARASS AND DELAY: The City's goal was not to win the lawsuit--which was destined to fail on the law--but to use the pendency of the lawsuit to create uncertainty, delay construction, and force Plaintiff to abandon the project. This constitutes an abuse of the governmental process, distinct from the outcome of that process. The City's simultaneous social media campaign to "empower residents" against the project confirms the intent was political harassment rather than legitimate legal redress.

113.    ACTUAL KNOWLEDGE OF MINISTERIAL STATUS: The City's filing was not merely negligent; it was malicious. Plaintiff had repeatedly placed the City on actual notice that the project was a by-right, ministerial use under both City and County codes. The City's persistence in filing the lawsuit despite this knowledge demonstrates reckless indifference to Plaintiff's rights. The record of correspondence confirms the City's knowledge:

(a).    May 15, 2025 (Letter): Plaintiff cited § 24.19.550: "The ministerial aspects of the Site Plan is apparent from the 15 day limit for Site Plan Review ...Within 15 days...the Director shall approve ... or disapprove ... Failure of the Director to act within 15 days shall be deemed approval of the application." (Exhibit 6).

(b).  May 30, 2025 (Email): "The zoning code supports approval of this facility as-of-right. If the City chooses to require CEQA review... we will **pivot and focus on other data center sites in the region** that can be approved as of right." (Exhibit 8).

(c).  June 4, 2025 (Email): Plaintiff provided the County analysis: "Data Center #2 is located in Imperial County and under § 90515-01, permitted uses in the M-1 zone include 'Data center' uses, which 'are permitted... as of right. **I have attached a draft plan of the data center located on contiguous land in the County**." (Exhibit 10).

(d).  June 6, 2025 (Memo): Plaintiff provided the City Attorney a list of 25 data centers approved as-of-right in industrial zones, including 14 in California. (Exhibit 11).

(e).  June 23, 2025 (Email): "During our first meeting...we shared the zoning code and our view that we were a permitted use...If the City believes a data center is not a permitted use...proceed with a similar use determination..." (Exhibit 16).

(f).  July 18, 2025 (Email): "From the outset, I selected the City because... our data center would be a **permitted use and exempt from CEQA**." (Exhibit 18).

(g).  August 21, 2025 (Email): "We exceed all zoning requirements... From the beginning, we intended to proceed through the ministerial process." (Exhibit 25).

(h).  September 4, 2025 (County Determination): "[Under] 90515.01, Subsection (bbb) of the Imperial County Land Use Ordinance, a **Data Center** is a **permitted use** within the M-1 (Light Industrial) zoning district. Ancillary components directly incidental to the primary data center operation-such as long-term power backup generators, electrical substation, short-term power backup battery energy storage system ... are likewise considered **permitted uses** within the M-1 zoning district." (Exhibit 27).

(i).  November 12, 2025 (Email): In response to a City inquiry about public hearings, Plaintiff replied: "There are no public hearings... because our **project--located on industrially zoned land--is a ministerial approval under the County's zoning code**. . . after investing millions in engineering and site control, we shifted our focus to adjacent parcels in the County... **which recognized that a data center is permitted as of right on industrial land**.." (Exhibit 36).

114.  PUBLIC MISINFORMATION CAMPAIGN: Despite this overwhelming record, on December 29, 2025, the City posted a misleading statement on its website and social media: "After many months of staff-level review and the adherence to the City's commitment to public hearings and CEQA compliance, the developer voluntarily withdrew... the City did not mislead the public..." This post was a repeated act of bad faith, attempting to rewrite the history of the City's obstructionism and refusal to process a valid ministerial application.

115.    The City's goal was not to win the lawsuit but to use the pendency of the lawsuit to create uncertainty, delay construction, and force the Plaintiff to abandon the project. The social media campaign to "empower residents" confirms the intent was political harassment rather than legal redress. The conduct was motivated by reckless indifference to Plaintiff's protected rights.

**DEFENDANTS ENGAGE IN PUBLIC MISREPRESENTATION CAMPAIGN**

116.    The legal filing was accompanied by a public relations campaign. The City posted hyperlinks to the lawsuit and inflammatory commentary on its official website and Facebook page, urging residents to "provide feedback" and characterizing the project as "unprecedented in its magnitude." This coordinated effort to mobilize public opposition and use the judicial process to harass the Plaintiff is classic "sham litigation."

117.    On November 26, 2025 at 1:53 pm the City posted on its Facebook page that the City "has recently become aware" the County is finalizing approval for a data center and "because this project is unprecedented in its magnitude and use, the **City Council feels** it is critical to notify our residents" and "to empower" residents to provide feedback:

> "Notice regarding the County of Imperial potential approval associated with a large-scale Data Center Complex at the Southeast corner of Aten Blvd & Clark Road. The City of Imperial has **recently become aware** that the County of Imperial has approved, or is in the process of finalizing approval for, an approximately 950,000-square-foot data center (330 MW) and Energy Storage System (862 MWh). The project is planned to be built on 75 acres situated on the southeast corner of the intersection of Aten and Clark roads. The City of Imperial is not the permitting authority because the property is within the unincorporated County of Imperial limits. Because this project is **unprecedented in its magnitude and use**, the City Council feels it is critical to notify our residents of this project. While the City Council supports development, economic progress, and job creation, it is important to **empower our residents to provide feedback to the County** when such larger projects are built in our neighborhood."

118.    On December 15, 2025, at 11:49 pm, the City of Imperial posted on its Facebook page a hyperlink to its lawsuit, and stated in the post: "In our continued **commitment of transparency** and keeping our residents informed, the City of Imperial has posted the petition recently filed in the Superior Court by the City of Imperial on our website."

119.    On December 18, 2025, at 6:32 pm the City posted on its Facebook page a hyperlink to its 86-page letter to the County Planning Commission, located on the City's website. The posting stated that the "City of Imperial has submitted a letter to the Imperial County Planning Commission urging commissioners to deny the proposed lot merger for the Data Center Project."

120.    The City DID NOT post Plaintiff's response to that letter which was emailed to City officials and confirms the City's objections were based on patently false statements.

121.    On December 29, 2025, at 9:46 pm the City posted on its Facebook page a full copy of a hyperlink to its ten page objections to the lot merger, and appeal to Board of Supervisors. The City's posting stated:

> "The City supports responsible economic development. In fact, the City worked with this Developer who filed an application in the City of Imperial to develop a data center at a location . . . After many months of staff-level review and the **adherence to the City's commitment to public hearings and CEQA compliance**, the developer voluntarily withdrew his application with the City of Imperial. . .'"

> ". . . **the City did not mislead the public concerning** any substantive elements of the proposed development. Unfortunately, **the proponent** of the development has, by way of paid advertisements and presentations to local service clubs, **seen fit to attack the City**. Such **attacks run counter to our efforts to involve our citizens in the process** associated with reasoned, responsible development."

122.    Plaintiff had a property interest in the City processing the site plans as ministerial, and for approvals under § 24.19.550 which imposes a hard deadline and failure to timely deny the site plans "shall be deemed approval" of the three site plans.

123.    Plaintiff repeatedly submitted complete site plans, revised them and provided countless studies. The City manufactured "discretion" (text amendment) to arrive at CEQA.

124.    The decisions were being made by officials with final policymaking authority, and include the involvement by City Manager, City Attorney, Planning Director, Mayor and Council. The decisions to not process a compliant application were made/ratified by officials and employees at the highest level.

**DEFENDANTS AND IID'S COORDINATED MISINFORMATION CAMPAIGN**

125.    Plaintiff is informed and believes, and thereon alleges, that Defendants engaged in a parallel track of obstruction, misrepresentations, and harassment in concert with the Imperial Irrigation District ("IID"). Starting in late November 2025, the City and IID executed a coordinated media campaign of misinformation designed to incite public hostility and sabotage Plaintiff's data center project.

126.    The City and IID processed multiple applications for over a year by mid-November; however, the false media campaign disseminated to the public using government websites and social media pages portrayed them as "informing" the public of a data center that was moving quickly through approvals in the County without oversight, despite the Defendants' prior deep involvement. At no time did a single article identify the data center's ministerial rights for which it was securing approvals by the County.

127.    The motive underlying IID's obstruction was the prioritization of a competing project involving Z-Global, an energy consulting firm with a history of deep and improper entanglements with IID management. Following a year-long investigation by The Desert Sun, the engineering firm ZGlobal Inc. terminated its $9-million contract with IID, ending the relationship a year ahead of schedule.

128.    The termination followed revelations that ZGlobal, while acting as a public consultant for IID, had significant conflicts of interest by simultaneously working for private developers conducting business with the utility. The central issue identified was that ZGlobal was "working both sides of the street," advising the public utility on decisions that benefited its private-sector clients.

129.    In 2015, IID placed senior engineers on administrative leave based on ZGlobal's analysis and were subsequently replaced with ZGlobal consultants under a $9 million contract.

130.    ZGlobal ran IID's transmission and planning unit while consulting for solar developers seeking to connect to IID's grid. ZGlobal's founder, Ziad Alaywan, while acting as a public consultant for IID, maintained significant conflicts of interest by simultaneously working for private developers conducting business with IID and holding interests in multiple LLCs doing business with the utility.

131.    By way of example, ZGlobal advised IID to spend $9.4 million building a power line which enabled the construction of solar farms developed by ZGlobal's private clients. In another instance, IID awarded a $35-million contract to a company led by a former IID board member after rejecting cheaper bids from experienced firms; ZGlobal wrote the proposal for said company while simultaneously working for IID.

132.    Furthermore, ZGlobal's founder owned land where a community solar project was to be built while advising IID on that very project. In one case, IID agreed to sell 1,400 acres of farmland to a solar developer working with ZGlobal for $5.77 million; the property was shortly flipped to another company for $14.2 million, resulting in millions of dollars in lost revenue for IID.

133.    As a result of the investigation prompted by The Desert Sun, IID canceled a $75-million solar contract and a $7-million battery storage expansion. Former IID employees who were replaced by ZGlobal staff subsequently sued, alleging retaliation for raising concerns about the consultant.

134.    IID's General Manager, Jamie Asbury, unlawfully obstructed, delayed, and discriminated against Plaintiff's $10 billion AI Data Center project. This project is projected to generate between $22 million and $30 million in net annual revenue for IID.

135.    Between late 2024 and mid-2025, Plaintiff completed multiple technical studies required by IID, all of which confirmed the project's viability. A load injection study by Power Engineers in December 2024 established that IID's infrastructure possessed ample capacity, up to 557.8 MW, to accommodate the project. In May 2025, IID's own Feasibility Study for 250 MW demonstrated no thermal violations or voltage exceedances. Furthermore, the System Impact Studies completed by IID in July 2025 and September 2025 showed no thermal, voltage, or stability violations, deeming the project "feasible".

136.    Despite these technical clearances, IID General Manager Jamie Asbury actively sought to derail the project commencing in late August 2025. This most troubling because in early 2025, **IID implemented a whopping 69% increase in public electricity rates**, the highest increase in the utility's history spanning over a century.

137.    On August 22, 2025, Asbury cancelled critical meetings regarding power supply, citing a need for "internal conversations". Subsequently, on September 4, 2025, Asbury instructed IID staff to "put everything else aside" and prioritize six projects from "Z-Global"--a direct competitor with a competing data center project--thereby delaying Plaintiff's Facility Study.

138.    The Facility Study was the final technical prerequisite before entering into a power agreement. IID initially estimated it would be completed in six weeks (by Sept. 15, 2025), IID later claimed--once Jamie Asbury intervened--it could not perform the study. This forced Plaintiff, who had already paid IID for the study, to retain Power Engineers to complete the study. The study is now expected to be completed in mid-January. These acts delayed the project by six months. The prioritization of Z-Global projects over Plaintiff's Facility Study was improper, and discriminatory.

139.    On September 16, 2025, Asbury informed Plaintiff that IID would not provide service absent a 15-year prepayment of electric fees, totaling over $4 billion. This demand patently violates standard electric utility practices, FERC regulations, and IID's own open access transmission tariff.

140.    In an effort to mitigate IID's alleged risk, Plaintiff proposed a wholesale supply arrangement utilizing a cost-plus model. (**Exhibit 38**). Under this proposal, IID would receive a fee for scheduling coordinator time and expenses, its transmission rate, and an administrative markup. Plaintiff estimated **these fees would generate between $22 and $30 million in positive annual revenue to IID**. All economic and reliability risk is borne solely by the data center, which will absorb all energy, capacity, and administrative costs. This allowed the data center to proceed while long-term agreements are secured, generating permanent jobs and tax revenue.

141.    On October 14, 2025, Jamie Asbury, on behalf of IID, rejected the proposal and falsely claimed Plaintiff had misrepresented generator data, and therefore had to restart of the entire application process. (**Exhibit 39**).

142.    On October 17, 2025, Plaintiff emailed and called IID Board members Karin Eugenio, and Alex Cardenas (**Exhibit 40**). When Tom Dubose approached Alex Cardenas for assistance, text messages confirmed he was communicating with Z-Global senior managers while simultaneously feigning concerns that IID was delaying a $10 billion project for Z-Global's benefit. This conduct is in stark contrast to IID's repeated statements of "honesty, integrity, and transparency."

143.    After Plaintiff raised legitimate legal concerns, IID's General Manager Asbury's directive precluding Plaintiff from communicating with IID staff constituted clear retaliation against protected speech and a violation of IID and FERC regulations. Under Asbury's leadership, IID failed to process requests on a non-discriminatory, timely basis and obstructed the Facility Study despite receiving payment and executing the necessary agreements. IID's prioritization of Z-Global projects and the issuance of the baseless $4 billion prepayment demand constitute intentional interference with Plaintiff's business relationships and financing opportunities.

144.    On October 17, 2025, Plaintiff emailed IID's General Manager asserting its intent to exercise legal rights and seek remedies, submitting an arbitration brief (**Exhibit 41**) with relevant emails as exhibits. (**Exhibit 42**).

145.    This communication constituted protected activity. Asbury responded immediately by banning Plaintiff from communicating with IID staff, explicitly stating that this prohibition was a result of the mention of litigation. IID effectively barred Plaintiff from communicating directly with technical staff, restricting contact solely to Paul Rodriguez and IID's outside counsel, whose services are believed to cost ratepayers $1,000 per hour. Plaintiff immediately emailed IID withdrawing the arbitration, believing the incident was resolved. (**Exhibit 43**).

146.    The above conduct constitutes classic unconstitutional retaliation. IID cannot legally penalize Plaintiff for exercising its right to petition regarding Z-Global's preferential treatment. Nor can IID deny Plaintiff access to staff regarding an active application. By severing access to technical staff, IID imposed a penalty on Plaintiff in retaliation for the threat of litigation. This "chilling effect" is precisely the type of suppression prohibited by the First Amendment; the right to be free from retaliation for threatened litigation is a fundamental constitutional protection.

147.    Concurrent with these events, unknown text messages were sent to the County Board of Supervisors with derogatory information regarding Sebastian Rucci, Plaintiff's general manager. Plaintiff further recently discovered that a retaliatory campaign commenced at that time, with Asbury and various IID Board members using the utility's website and social media pages to attack the data center--a project positioned to provide over $30 million in net revenue to IID.

148.    Plaintiff also recently learned that the manager of the data center project, Jose-Said Ambriz, who disclosed that Jamie Asbury was holding up the project to benefit Z-Global had suddenly retired from IID.

149.    The parallel track of obstruction, misrepresentations, and harassment was further evidenced by the actions of Karin Eugenio, IID Board representative for District 5, which encompasses the City of Imperial. Eugenio, who is set to serve as Board Chair in 2026, served as the City of Imperial's Mayor in 2021, concurrent with Defendant Katherine Burnworth's service on the City Council. Plaintiff is informed and believes that Burnworth and Eugenio engaged in numerous discussions during November and December 2025 to coordinate the campaign against the data center.

150.    On November 26, 2025, IID launched a public information initiative purported to address community concerns regarding transparency, costs, and environmental factors. The stated effort claimed to aim for a balance between economic growth and the protection of ratepayers, resources, and system stability amidst a national trend of data center development.

151.    On November 26, 2025, IID, over one year after the first data center application, launched a public information campaign on data centers, stating that data centers: "may result in environmental impacts to natural resources close to their location, particularly if not appropriately mitigated through California's Environmental Quality Act required compliance... IID requires: Developers adhere to all environmental rules and regulations." The statement about CEQA was intended to force a ministerially compliant data center, exempt from CEQA, to proceed to CEQA under threat of withholding electricity. Fully aware that CEQA would provide an opportunity for Comite Civico Del Valle, an environmental group known to engage in public extortion through its founder, Jose Luis Olmedo Velez who is commonly known in Imperial County for obstructing development projects by abusing the CEQA process.

152.    On November 28, 2025, regarding a post on the Instagram account for "Concerned Imperial Residents" questioning energy sources, Karin Eugenio (identifying herself as IID Director Division 5) commented: "It is not a sound proposal. It is environmentally degrading, and it would raise all of our energy rates."

153.    IID stands to sell roughly $250 million in electricity per year to the data center and receive a recoupment cost of approximately $30 million annually. Yet, after imposing a 69% rate increase on customers in early 2025, Karin Eugenio appears willing to casually forfeit this revenue to protect Z-Global's interests. Discarding tens of millions of dollars in annual revenue is irreconcilable with her fiduciary duties to IID ratepayers.

154.    On December 5, 2025, IID issued a news release announcing a public workshop scheduled for December 9, 2025, to discuss general data center development and potential impacts on the District's service area. This workshop was ostensibly part of IID's ongoing commitment to transparency. Over one year, after Plaintiff had gone through four studies at IID, on December 9, 2025, IID hosted a public workshop to discuss general data center development and potential impacts on the District's service area. This workshop was ostensibly part of IID's ongoing commitment to transparency, and some of those in attendance were paid to attend by Comite Civico Del Valle.

155.    On December 10, 2025, IID issued a public statement on its website and social media pages that following the community workshop about data centers, to "ensure clear, factual information, IID provides the following clarifications: IID has not approved or endorsed the project ... Technical studies do not equal approval ... Public claims that the project poses no grid risk are not based on IID's findings ... Revenue claims ... have not been reviewed or validated by IID." This time IID was directly attacking the data center, but IID was not posting the data center's position on these issues. It was classic abuse by IID to provide false information using its government website and social media pages.

156.    The next day, on December 11, 2025, the City of Imperial hosted its general data center workshop; making specific attacks on the data center. This workshop was over one year after Plaintiff went through three plans with the City. In effect, the City found no need to hold workshops when actual applications were before it. But somehow found it proper to hold a workshop when applications not before the City, but approved by the County who had jurisdiction, were approved. The coordinated conspiracy jumps off the pages as to timing of the workshops.

157.    On December 13, 2025, Karin Eugenio provided a letter to the Editor in the Desert Review and the Calexico Chronicle titled "Why I Oppose the Proposed Imperial Data Center By Karin Eugenio, **IID Director – Division 5**" and stated:

> "I represent Imperial, where families have built their lives around quiet neighborhoods, nearby schools, and a sense of safety and wellbeing. That is why I deeply understand the **fear and frustration many residents are feeling about the proposed data center** in our community. Imperial is not opposed to progress. But residents are **rightly worried about what this project could mean for their homes**, their children, and their quality of life. They are asking fair and necessary questions: Will this change our neighborhood forever? **Will it strain our infrastructure**? Will the promised benefits truly reach the community that would bear the impacts? Those concerns deserve respect. As a public servant, my responsibility is not just to listen, but to advocate. While the Imperial Irrigation District is not the authority that decides if or where projects are built -- that responsibility lies with Imperial County -- I believe it is **my duty to speak up when a proposal raises serious concerns about ratepayers, reliability, and community well-being**. Economic opportunity matters. Jobs matter. Growth matters. But **growth without discretion can come at too high a cost**. **Development should enhance a community, not overwhelm it or make residents feel unheard or unsafe**. The people I represent are **asking for care, transparency, and common sense**. I believe they deserve nothing less."

158.    Eugenio's letter explicitly utilized her official title as "IID Director for Division 5." This constitutes a strategic editorial by a sitting IID Director (and incoming Chair) signaling that the $10 billion data center pending before IID is unwelcome. This opposition appears motivated by political calculus rather than legitimate energy concerns, as the project would alleviate, not aggravate, rate pressures.

159.    On December 24, 2025, the Desert Review published an article titled "IID board moves to protect ratepayers amid interest in data centers." The article noted that the IID Board of Directors adopted a resolution establishing "guideline principles" for data centers. Director Eugenio was quoted stating: "Our concern is for the overall well-being of our ratepayers by having proper parameters in place... We are not opposed to progress, but development should enhance the community..."

**CONSPIRACY TO EXTORT: COORDINATION WITH "GREENMAIL" OPERATIVES**

160.    On November 12, 2025, Defendant Katherine Burnworth attended a meeting at the Democratic United Group in El Centro where the data center was discussed publicly for the first time. She was accompanied by Kristian Salgado, who subsequently authored multiple anti-data center letters to various newspapers. Plaintiff recently discovered that Mr. Salgado works for, or in concert with, Comite Civico Del Valle ("CCV"), a California non-profit corporation. CCV's Executive Director, Jose Luis Olmedo Velez ("Luis Olmedo"), has an established history in Imperial County of utilizing the CEQA process to halt development projects to extract financial settlements.

161.    Luis Olmedo's and CCV's "Greenmail" business model were exposed in a Desert Sun investigation in 2025 titled "Nonprofit sought $83 million ahead of lawsuit that stalled Hells Kitchen lithium project." The article detailed Olmedo's modus operandi:

> "Closed-door negotiations over a long-stalled lithium project ... included a request by the nonprofit's head for more than $80 million in payments over 30 years ... Luis Olmedo, executive director of Comite Civico del Valle, **sought $2.75 million a year** ... according to a confidential settlement document seen by The Desert Sun ... Olmedo said 'the $2.75 million annual community impact fee was … intentionally crafted to be reasonable ... the proposed **payments would total $83 million over three decades** ..."

> "... after CTR declined to make the payments last year, Comite Civico del Valle ... sued rural Imperial County officials alleging that they and CTR violated CEQA ... After losing ... they challenged the defeat in appellate court ... [Olmedo] noted CEQA challenges of large projects are common ... Riverside County on May 7 **approved a $77 million payment** ... in exchange for its support of a controversial hydropower project ... [CTR tried] to negotiate with [Olmedo] in spring 2024 to avoid the initial lawsuit ..."

> "Critics of Olmedo say the lengthy litigation has thrown a monkey wrench not just into CTR's project, but the widely acclaimed Lithium Valley ... As for criticisms that the litigation is delaying the entire region's growth, [Olmedo] is unbowed, noting that state law allows anyone to challenge unfair or potentially harmful government actions ... he was aghast at what **added up to at least an $83 million** request, and told Olmedo there was no way they could or would pay so much ... Olmedo wouldn't budge ... the ensuing lawsuit badly delayed a thoroughly vetted project that would bring hundreds of jobs, tax dollars and other benefits to the area ..."

162.    Public tax records confirm that CCV has secured over $22 million in grants over the past five years. CCV has an extensive resume of using CEQA litigation as leverage to extract payments. The ministerial approval of Plaintiff's data center represents an existential threat to this business model because it eliminates the discretionary "hook" required to launch CEQA litigation and extort settlements.

163.    In 2022, California enacted Pub. Res. Code § 21169.17 (Assembly Bill 195) to curb the abuse of CEQA settlements by private entities. The statute imposes a "public benefit" nexus on settlements, requiring that funds be applied to "projects or programs that will produce environmental benefits... within the geographic area of the project" and mandating disclosure to the Attorney General to prevent "hush money" agreements.

164.    By engaging in litigation to collect funds that are statutorily mandated for public use, CCV acts not as a private litigant, but as a deputized environmental collector for the State, a "Private Attorney General." Under the "State Action" doctrine, when a private entity performs a traditionally exclusive public function (assessing and collecting mitigation fees), its actions are fairly attributable to the State. Consequently, CCV is subject to the constitutional limitations of the Fifth Amendment.

165.    On information and belief, Defendant Burnworth engaged in a parallel track of obstruction with Luis Olmedo and CCV. Following Plaintiff's efforts to enforce the City's zoning code and pursue ministerial approval in the County, Burnworth and Olmedo held multiple meetings to coordinate their opposition. Their shared objective was to force the ministerial data center into a discretionary CEQA process, thereby creating the leverage necessary for CCV to demand a settlement.

166.    A recent newspaper article in KPBS by Kori Suzuki states that the "city also accused county officials in the suit of violating the California Environmental Quality Act by evaluating individual components instead of the project as a whole."

167.    Threats and opposition at public hearings from CCV personnel--including Kristian Salgado and Gilbert Manzanarez--were coordinated with Defendants. Individuals associated with CCV appeared with uniform signage and utilized intimidation tactics against decision-makers. On information and belief, certain participants were compensated by CCV to amplify this opposition.

168.    Because the Defendants and CCV are acting under color of state law to enforce a "sham" requirement, their conduct is subject to the unconstitutional conditions doctrine.

169.    A demand to convert a vested ministerial project into a discretionary one solely to extract fees bears no nexus to any legitimate land use impact. As the Supreme Court held in (*Nollan v. California Coast Commission*, 483 U.S. 825, 837 (1987), where the condition is unrelated to the impact, the demand "is not a valid regulation of land use but 'an out-and-out plan of extortion.'"

170.    The City's Petition for Writ of Mandate (the "Sham Petition") is the vehicle for this extortion. The Petition is founded on the objectively false claim that a Conditional Use Permit and rezoning are required for a project on industrial land. Despite knowing the zoning is correct, the City filed the lawsuit to manufacture a dispute. This was confirmed when, notwithstanding Plaintiff's intention to file a motion for judgment on the pleadings, the City immediately demanded a settlement meeting. The lawsuit is a pretext to force a financial settlement in exchange for rights the Plaintiff already possesses.

171.    EVIDENCE OF BAD FAITH AND MALICE. Defendants' refusal to process the ministerial application is malicious, not negligent. Defendants were repeatedly informed of the project's ministerial status, yet persisted in obstruction. Specific evidence of bad faith includes: (a) Repeated acknowledgments by City staff that the industrial zoning was compliant; (b) Detailed negotiations regarding reclaimed water and pipeline routing, which imply acceptance of the use; (c) Receipt of multiple memos articulating the "as-of-right" entitlement; (d) The City's sudden pivot to demanding a "text amendment" while refusing to process a "similarity of use" determination; and (e) The subsequent filing of the Sham Petition based on a "fake rezoning" theory.

172.    CONSPIRACY TO DEPRIVE RIGHTS. The City's actions--orchestrating a misinformation campaign, collaborating with a known "greenmail" operative, and filing a factually baseless lawsuit-- demonstrate an arbitrary, punitive, and conspiratorial intent. Defendants have weaponized the CEQA process not for environmental protection, but to deprive Plaintiff of vested property interests and to facilitate a scheme of extortion in violation of 42 U.S.C. § 1983.

## MATRIX SHOWING COORDINATED MISINFORMATION

| Date | Actor | Action |
|------|-------|--------|
| Nov 26 | City | Website & Facebook posts: City "has recently become aware" the County is finalizing approval for a data center and "because this project is unprecedented in its magnitude and use, the City Council feels it is critical to notify our residents" and "to empower" residents to provide feedback against the data center |
| Nov 26 | City | Contacting El Centro to block the Plaintiff's reclaimed water deal. |
| Nov 26 | IID | IID launched public information on data center: "may result in environmental impacts to natural resources close to their location, particularly if not appropriately mitigated through California's Environmental Quality Act required compliance... IID requires: Developers adhere to all environmental rules and regulations." |
| Nov 28 | IID | Instagram Concerned Imperial Residents. Karin Eugenio - IID Director stated: "It is not a sound proposal. It's environmentally degrading, and would raise all of our energy rates." |
| Dec 1 | Senator | Senator Steve Padilla sent a letter to Imperial County |
| Dec 4 | City | City Filed "Sham" Petition ECU00457 to block permits. |
| Dec 4 | KPBS | Senator Steve Padilla called for public review of data center |
| Dec 5 | IID | Schedules Public Workshop on Data Centers. "The workshop is part of the District's ongoing commitment to transparency." |
| Dec 9 | IID | Hosted general data center workshop; making specific attacks. |
| Dec 10 | IID | IID issued a statement following the community workshop about data centers ... To ensure clear, factual information, IID provides the following clarifications: IID has not approved or endorsed the project ... Technical studies do not equal approval ... Public claims that the project poses no grid risk are not based on IID's findings ... Revenue claims ... have not been reviewed or validated by IID." |
| Dec 10 | IID | Karin Eugenio wrote on Facebook Rants and Raves: "I am the IID director for Imperial. We had a meeting last night at the IID headquarters to discuss data centers ... IID is establishing extensive criteria for any future developments, in this realm, to avoid projects that can potentially degrade our community fiscally and/or environmentally... I am fighting every day to keep predatory development out of our neighborhoods." |

| Date | Actor | Action |
|------|-------|--------|
| Dec 11 | City | Hosted general data center workshop; making specific attacks. |
| Dec 12 | El Centro | Post on City website: "aware of information. . . related to the use of reclaimed wastewater. . . . no commitments or decisions have been made regarding any proposed data center..." |
| Dec 13 | IID | IID Director Eugenio letter to the editor: "understand the fear and frustration many residents are feeling about the data center ... residents are rightly worried about what this project could mean ... when a proposal raises serious concerns about ratepayers, reliability, and community well-being ... growth without discretion can come at too high a cost. Development should enhance a community, not overwhelm it or make residents feel unheard or unsafe ..." |
| Dec 15 | City | Website & Facebook posts linking to sham litigation: "commitment of transparency and keeping our residents informed, the City of Imperial has posted the petition" |
| Dec 18 | City | Website & Facebook post linking 86-page Planning commission letter. The letter falsely claims rezoning and CUP are required. |
| Dec 23 | IID | IID press release adopting guideline principals for data centers |
| Dec 29 | City | Website & Facebook post linking objections to lot merger: "City did not mislead the public concerning any substantive elements of the development" Plaintiff "seen fit to attack the City. Such attacks run counter to our efforts" |

### DAMAGES SUSTAINED BY THE PLAINTIFF

173.    The damages sustained by Plaintiff are multifaceted and severe, comprising direct delay costs, unnecessary redesign expenses, and lost business opportunities. Plaintiff expended millions of dollars in engineering, architectural, and legal fees to prepare three separate site plan applications, technically complex studies: Traffic, Air Pollution, Soils Report, Phase I Environmental Report, Reclaimed Water Reports, Alta Survey, and Multiple Site Plans, and revised the site plans to appease the City's shifting and arbitrary demands. These costs were incurred for a project that the City had no intention of approving, representing a total loss of capital.

174.    Plaintiff has secured letters of intent and preliminary agreements with a "hyperscale" tenant to lease the facilities. The value of this lease agreement over the life of the project is estimated

in the billions of dollars. The City's intentional delays and public disparagement campaign have jeopardized this relationship, threatening the loss of the entire income stream from the development.

175.    The City's tortious interference with the City of El Centro caused the loss of a secured secondary water source, necessitates the identification and procurement of alternative, likely more expensive, water sources, effectively increasing the project's long-term operational costs by millions of dollars over the facility's life-span.

176.    In reliance on the City's initial confirmation in September 2024 that the data center was a permitted use by right, Plaintiff invested over $1 million to secure approval for the $12 million purchase for the 95-acres within the City of Imperial.

177.    On June 2, 2025, plaintiff wired the initial deposit to Webb, on July 14, 2025, the second payment and September 5, 2025, the third payment. These payments were made in direct reliance on the City's implied contract to sell reclaimed water and the City Engineer's assurance that the project was feasible and desired. By subsequently refusing to sell the water and interfering with the El Centro supply, the City rendered these expenditures entirely futile.

178.    Defendant's Katherine Burnworth, Dennis Morita, Katie Turner, and Othon Mora's conduct, as described above, was intentional, malicious, fraudulent, and undertaken with a conscious and deliberate disregard of Plaintiff's rights. Defendant's Katherine Burnworth, Dennis Morita, Katie Turner, and Othon Mora knew, or recklessly disregarded the fact, that their actions were substantially certain to cause harm, yet proceeded in order to advance its own interests.

**COUNT 1 - VIOLATION OF PROCEDURAL DUE PROCESS (42 U.S.C. § 1983)**
(Against defendants City of Imperial, Katherine Burnworth, Dennis
Morita, Katie Turner, and Othon Mora, Jointly and Severally)

179.    The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

180.    Defendants conduct gives rise to constitutional claims under 42 U.S.C. § 1983 which allows for the recovery of compensatory and punitive damages against individual officials who, acting under color of law, deprive Plaintiff of its federally protected rights.

181.    Plaintiff seeks to vindicate its protected property rights and expose the underlying bad faith obstruction of the data center project.

182.    At all times relevant hereto, Defendants acted under color of state law to deprive Plaintiff of rights, privileges, and immunities secured by the Constitution of the United States. Defendants engaged in a pattern of verifiable misconduct, ranging from ignoring self-executing municipal code provisions to retaliating against the exercise of property rights.

183.    Imperial's Site Plan Review procedure, codified at § 24.19.500, is a ministerial process. It limits the City's authority to a technical verification of compliance with objective standards, such as permitted uses, setbacks, height limits, and lot coverage. It does not grant Defendants the discretion to subjectively evaluate the "magnitude" or political desirability of a project that complies with zoning ordinances.

184.    Plaintiff possesses a legally protected property interest in the approval of its site plans. This interest derives from the mandatory language of the City's own ordinances. Specifically, Plaintiff holds a protected property interest in the strict enforcement of the 15-day review deadline prescribed by § 24.19.550. Under this statute, the City's failure to act within the statutory window results in automatic approval by operation of law.

(a).    First Application: Deemed approved on March 19, 2025

(b).    Second Application: Deemed approved on August 19, 2025

(c).    Third Application: Deemed approved on October 16, 2025

185.    Once these statutory deadlines had passed, the Plaintiff's entitlement to the permits vested. Defendants deprived Plaintiff of this protected property interest by refusing to acknowledge the ministerial status of the applications and by refusing to honor the deemed-approval mechanism. Instead of issuing the permits as required by law, Defendants arbitrarily treated the vested approvals as void, without providing Plaintiff notice or an opportunity to be heard regarding the revocation of these vested rights.

186.    Defendants, acting under color of state law, deprived Plaintiff of its protected property interest through actions that were arbitrary, irrational, and undertaken in bad faith, including:

(a).    Intentionally demanding the ministerial application be process under discretionary procedures in an effort to create public hearings and CEQA review;

(b).    Intentionally allowing deadlines to lapse and then ignoring the legal consequences;

(c).    Inventing new discretionary requirements (e.g., text amendments and conditional use permits) for uses already permitted by right; and

(d).    Soliciting confidential information under false pretenses to interfere with third-party contracts, as a means to block the entitlement.

187.    Defendants' actions violate Plaintiff's rights to Procedural Due Process as provided by the Fourteenth Amendment to the United States Constitution. The City's refusal to follow its own mandatory, non-discretionary statutes deprived Plaintiff of a multi-million dollar entitlement without due process of law and is compensable under 42 U.S.C. § 1983.

WHEREFORE, Plaintiff prays for judgment against Defendants City of Imperial, Katherine Burnworth, Dennis Morita, Katie Turner, and Othon Mora, individually, jointly and severally:

A.    For compensatory damages against Defendants City of Imperial, Katherine Burnworth, Dennis Morita, Katie Turner, and Othon Mora, individually, jointly and severally, in an amount to be determined upon trial of this action;

B.    Defendant Katherine Burnworth's conduct constitutes oppression, fraud, and malice within the meaning of applicable law and justifies the imposition of punitive and exemplary damages. Plaintiff seeks punitive damages in an amount sufficient to punish Defendant Katherine Burnworth for her misconduct, to deter others from engaging in similar conduct in the future, and to promote respect for the Constitution and laws of the United States;

C.    For costs of suit and reasonable attorneys' fees in accordance with 42 U.S.C. § 1988; and

D.    For such other and further relief as this Court may deem just and proper.

**COUNT 2 - FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983)**
(Against defendants City of Imperial, Katherine Burnworth, Dennis Morita, Katie Turner, and Othon Mora, Jointly and Severally)

188.    The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

189.    Defendants' conduct gives rise to constitutional claims under 42 U.S.C. § 1983, which allows for the recovery of compensatory and punitive damages against individual officials who, acting under color of state law, deprive Plaintiff of its federally protected rights.

190.    The First Amendment guarantees the right to petition the government for a redress of grievances. This right is broad and encompasses not only filing lawsuits but also applying for government permits, communicating with public officials, criticizing government delays, and advocating for one's business interests in public forums.

191.    Plaintiff engaged in clearly established protected activity by:

(a).    Insisting on strict compliance with the Imperial Municipal Code's ministerial review process;

(b).    Petitioning the County of Imperial for land use approvals after the City's obstruction;

(c).    Speaking at service club meetings to counter the City's false narrative in public forums; and

(d).    Threatening litigation regarding the City's delays and regarding conflicts of interest involving Z-Global with IID.

192.    In response to this protected activity, Defendants took severe adverse actions designed to punish Plaintiff and chill the exercise of these rights. These actions included:

(a).    Refusing to honor the mandatory § 24.19.500 Site Plan Review Procedure and the § 24.19.550 "deemed approved" status;

(b).    Suddenly demanding a discretionary CEQA process and text amendments for a project that is permitted by right, solely to force Plaintiff into a regulatory morass;

(c).    Distributing City-authored flyers containing false statements and posting hostile messages on the City's official social media pages to incite public opposition;

(d).    Soliciting confidential documents to sabotage Plaintiff's water agreement with the City of El Centro; and

(e).    Filing baseless lawsuits and administrative appeals against the County's approvals.

193.    While the City possesses a general right to petition the courts, that right is not absolute when used as a weapon against a citizen. Defendants' litigation and administrative appeals against the County fall under the sham litigation exception to the Noerr-Pennington doctrine. These legal actions are "objectively baseless" because the City lacks jurisdiction over County land use decisions, and they are subjectively motivated by a desire to harass the Plaintiff and drain its resources rather than a legitimate expectation of success on the merits.

194.    The retaliatory motive is evidenced by the temporal proximity of the adverse actions. The harassment campaign began immediately after Plaintiff asserted its rights under the City code and moved the project to the County. The City was content to ignore the project until Plaintiff sought redress elsewhere; once the County approval appeared imminent, Defendants escalated their obstruction from passive delay to active tactics, including the smear campaign and the sham litigation.

195.    Defendants' adverse actions--specifically the public disparagement, the interference with the El Centro water contract, and the filing of a lawsuit--would chill a person of ordinary firmness from continuing to engage in the protected activity. Indeed, the City's actions were calculated to force the Plaintiff to abandon the project entirely or submit to an extra-legal discretionary process.

196.    Defendants' actions were substantially motivated by Plaintiff's protected conduct. But for Plaintiff's persistence in asserting its "by-right" status and its successful petitioning of the County, Defendants would not have engaged in this extraordinary campaign of interference.

197.    The actions alleged above violate Plaintiff's rights under the First Amendment to the United States Constitution. Any violation of these rights is compensable under 42 U.S.C. § 1983.

WHEREFORE, Plaintiff prays for judgment against Defendants City of Imperial, Katherine Burnworth, Dennis Morita, Katie Turner, and Othon Mora, individually, jointly and severally:

A.    For compensatory damages against Defendants City of Imperial, Katherine Burnworth, Dennis Morita, Katie Turner, and Othon Mora, individually, jointly and severally, in an amount to be determined upon trial of this action;

B.    Defendant Katherine Burnworth's conduct constitutes oppression, fraud, and malice within the meaning of applicable law and justifies the imposition of punitive and exemplary damages. Plaintiff seeks punitive damages in an amount sufficient to punish Defendant Katherine Burnworth for her misconduct, to deter others from engaging in similar conduct in the future, and to promote respect for the Constitution and laws of the United States;

C.    For costs of suit and reasonable attorneys' fees in accordance with 42 U.S.C. § 1988; and

D.    For such other and further relief as this Court may deem just and proper.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    **COUNT 3 - EQUAL PROTECTION CLASS OF ONE CLAIM (42 U.S.C. § 1983)**
2    (Against defendants City of Imperial, Katherine Burnworth, Dennis Morita, Katie Turner, and Othon Mora, Jointly and Severally)

3    198.    The previous paragraphs of this Complaint are incorporated into this cause of action
4    by this reference as though fully set forth herein.

5    199.    The Equal Protection Clause of the Fourteenth Amendment protects individuals from
6    intentional and arbitrary discrimination, even if they do not belong to a protected class. Under the
7    "Class of One" theory established in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), a
8    plaintiff states a claim by alleging they were intentionally treated differently from others similarly
9    situated and that there was no rational basis for the difference in treatment. As the Supreme Court
10    held: "The allegations that this was 'irrational and wholly arbitrary' was enough to make an equal
11    protection case." (*Id*. at 1075).

12    200.    Plaintiff is similarly situated to other property owners and developers in the I-2
13    Rail-Served Industrial Zone. Defendants routinely process site plans for these similarly situated
14    entities ministerially under § 24.19.500. Specifically, the City Code and Defendants' past practices
15    permit heavy industrial uses--including livestock sales, feed yards, bottling plants, cement product
16    manufacturing, and lumber yards--to proceed by right or with minimal administrative review. For
17    example, Vilore Foods, a 289,000 square foot warehouse, located at 2421 Vilore Way, in the City,
18    and Alford Distributing, located at 344 Crown Court, in the City, are both large Industrial buildings
19    approved under the ministerial site plan review procedure.

20    201.    Despite Plaintiff's project being less intrusive than these permitted heavy industrial
21    uses (producing less traffic, no retail foot traffic, and contained entirely indoors), Defendants
22    intentionally treated Plaintiff differently. While similarly situated industrial applicants are granted
23    permits through objective staff verification, Defendants singled out Plaintiff, demanding that it
24    submit to a discretionary "Conditional Use Permit" process, text amendments, and environmental
25    reviews not required of others.

26    202.    Defendants further demonstrated disparate treatment regarding the "Similarity of Use"
27    provision (§ 24.19.200). Defendants have historically utilized § 24.19.200 to administratively
28    classify unlisted uses as permitted when they are similar in character to listed uses. Plaintiff

repeatedly requested Defendants to apply the similarity of use standard to the data center. Defendants arbitrarily refused to exercise the similarity of use procedure, instead insisting on a legislative text amendment which would take 6 to 9 months.

203.    There is no rational basis for this difference in treatment. It is irrational and wholly arbitrary to require a lengthy discretionary review and legislative amendment for a low-impact data center while ministerially approving high-impact uses like cement manufacturing or feed yards in the same zone. The distinction was not based on any legitimate government interest, such as public health or safety, but was motivated by a malicious intent to obstruct Plaintiff's project and retaliate against Plaintiff's assertion of rights.

204.    The actions alleged above violate Plaintiff's rights to Equal Protection as provided by the Fourteenth Amendment to the United States Constitution. Any violation of the Fourteenth Amendment is compensable under 42 U.S.C. § 1983.

WHEREFORE, Plaintiff prays for judgment against defendants City of Imperial, Katherine Burnworth, Dennis Morita, Katie Turner, and Othon Mora, individually, jointly and severally:

A.    For compensatory damages against Defendants City of Imperial, Katherine Burnworth, Dennis Morita, Katie Turner, and Othon Mora, individually, jointly and severally, in an amount to be determined upon trial of this action;

B.    Defendant Katherine Burnworth's conduct constitutes oppression, fraud, and malice within the meaning of applicable law and justifies the imposition of punitive and exemplary damages. Plaintiff seeks punitive damages in an amount sufficient to punish Defendant Katherine Burnworth for her misconduct, to deter others from engaging in similar conduct in the future, and to promote respect for the  Constitution and laws of the United States; and

C.    For costs of suit and reasonable attorneys' fees in accordance with 42 U.S.C. § 1988; and

D.    For such other and further relief as this Court may deem just and proper.

//

//

**COUNT 4 - MUNICIPAL LIABILITY (MONELL) (42 U.S.C. § 1983)**
(Against defendant City of Imperial)

205.    The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

206.    Defendant City of Imperial is a municipality and a "person" subject to suit under 42 U.S.C. § 1983. Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the City is liable for constitutional deprivations caused by the implementation of its official policies, customs, or practices, or by the decisions of officials with final policymaking authority.

207.    The constitutional violations alleged herein--including the denial of Procedural Due Process, First Amendment Retaliation, and Equal Protection violations--were not the result of rogue actions by low-level employees. Rather, they were the direct result of deliberate decisions made by officials with final policymaking authority for the City regarding land use and code enforcement. Specifically:

(a).    Planning Director Othon Mora: Possesses final authority over Site Plan Reviews and the interpretation of the Zoning Code. His decision to refuse to process the ministerial application and demand text amendments constitutes the official policy of the City.

(b).    City Manager Dennis Morita: Possesses final administrative authority. His direct involvement in the meetings, his direction to withhold the "will-serve" water agreement, and his authorization of the interference with the City of El Centro represent official municipal acts.

(c).    City Council/Katherine Burnworth: The involvement of Council members and the use of the City's official social media channels confirm that the legislative body ratified the obstructionist strategy.

208.    The City established and maintained an unconstitutional custom or usage of ignoring mandatory ministerial duties in favor of arbitrary discretionary review when politically expedient. Despite the clear language of the I-2 Rail-Served Industrial Zone permitting "business, professional, and research offices," the City adopted a policy of manufacturing "discretion" (via demands for CUPs, text amendments, and CEQA) to delay and obstruct Plaintiff's vested rights. This practice is so permanent and well-settled as to constitute a "custom or usage" with the force of law.

209.    Furthermore, the public smear campaign on Facebook were not isolated incidents. These were deliberate municipal actions ordered by senior City officials, printed with City resources, and distributed by City employees during working hours. This concerted use of government machinery to disparage a private applicant and incite public opposition constitutes an official policy of retaliation ratified by the City's highest officials.

210.    The City, through its policymakers, had actual or constructive knowledge of the constitutional deprivations being foisted upon Plaintiff and failed to take corrective action, thereby ratifying the unconstitutional conduct.

211.    By failing to override the Planning Director's arbitrary refusal to follow the code, and by actively participating in the interference with the City of El Centro reclaimed water contract, the City Council and City Manager approved the unconstitutional acts.

212.    As a direct and proximate result of the City of Imperial's official policies, customs, and ratified acts, Plaintiff has suffered significant damages, including the loss of use of its property, the cost of futile studies, the destruction of its contractual relationship with the City of El Centro, and impact to the potential economic benefit of the relationship between Plaintiff and the Hypercale Tenant valued in the hundred of million of dollars.

WHEREFORE, Plaintiff prays for judgment against the City of Imperial as follows:

A.    For compensatory damages against the City of Imperial in an amount to be determined upon trial of this action, which amount is estimated to exceed One Million Dollars;

B.    For costs of suit and reasonable attorneys' fees in accordance with 42 U.S.C. § 1988; and

C.    For such other and further relief as this Court may deem just and proper.


PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE


LAW OFFICES OF SEBASTIAN RUCCI, P.C.


Date: January 9, 2026            Sebastian Rucci (SBN 178114)
                                 Attorney for Plaintiff

**VERIFICATION**

STATE OF CALIFORNIA    )
                       )
COUNTY OF RIVERSIDE    )

I, Sebastian Rucci, declare as follows:

I, Sebastian Rucci, am the managing member of Imperial Valley Computer Manufacturing, LLC, the entity which filed for the data center permits at issue. I have read the foregoing Verified Complaint and know the contents to be true and that the same are true of my own knowledge, except as to matters which are therein stated upon my information or belief, and as to those matters that I believe it to be true.

I declare under penalty of perjury, under the laws of the United States and under the laws of California that the foregoing is true and correct.

Executed on January 9, 2026 at Riverside, California.


IMPERIAL VALLEY COMPUTER MANUFACTURING, LLC

Sebastian Rucci, managing member

**TABLE OF EXHIBITS**

Exhibit 1 Email to City Site Plans (1-17-25)
Exhibit 2 Email to City - Meeting Plans; Reclaimed Water (2-28-25)
Exhibit 3 City email - Site Plan Application (3-04-25)
Exhibit 4 Reclaimed Water Emails (3-07-25)
Exhibit 5 Site Plan Review Letter (4-04-25)
Exhibit 6 Letter to City Amended Plans (5-14-25)
Exhibit 7 City email Reclaimed Water (5-20-25)
Exhibit 8 Email to City on Zoning (5-30-25)
Exhibit 9 Email to City about County Zoning (6-03-25)
Exhibit 10 Email to City Copy of County Plans (6-04-25)
Exhibit 11 Email to City - As of Right Memo (6-06-25)
Exhibit 12 Email to City - Reclaimed Water Cost (6-17-25)
Exhibit 13 Email from City - Reclaimed Water Cost (6-17-25)
Exhibit 14 Email to City - Reclaimed Water Cost (6-17-25)
Exhibit 15 Letter to Imperial - Permitted Use (6-23-25)
Exhibit 16 Email to City - Data Center Permitted Use (6-23-25)
Exhibit 17 City email - Path Forward (7-15-25)
Exhibit 18 City to email - Alternative Suggestions (7-18-25)
Exhibit 19 Email to City - Revised Plans on Industrial (7-22-25)
Exhibit 20 Email from City - Working on Plans (7-30-25)
Exhibit 21 Email from City - Reclaimed Water Report (8-14-25)
Exhibit 22 Email to City - Reclaimed Water Site Plan (8-16-25)
Exhibit 23 Email from City - Forwarding Site Plan to Engineer (8-18-25)
Exhibit 24 Email from City - Rejecting Site Plan on Industrial Zone (8-20-25)
Exhibit 25 Email to City - Withdrawing Project (8-21-25)
Exhibit 26 Email from City - Continued Cooperation (9-03-25)
Exhibit 27 County Letter - Data Center is Permitted Use (9-04-25)
Exhibit 28 Email to City - Copies of Six Studies (9-09-25)
Exhibit 29 Email from City Attorney - Reclaimed Water Questions (9-18-25)
Exhibit 30 Email to City - Reclaimed Water Answers (10-07-25)
Exhibit 31 Email to City - Reclaimed Water Questions (11-06-25)
Exhibit 32 Email to City - Reclaimed Water (11-07-25)
Exhibit 33 Email from City - Reclaimed Water emails (11-07-25)
Exhibit 34 Email to City - Reclaimed Water emails (11-07-25)
Exhibit 35 Email from City - County Hearings (11-12-25)
Exhibit 36 Email to City - No County Hearings (11-12-25)
Exhibit 37 Email from Tom to City of Imperial (11-26-25)
Exhibit 38 Wholesale Market Proposal to IID (10-02-25)
Exhibit 39 Email from IID Rejecting Proposal (10-14-25)
Exhibit 40 Email to Director Eugenio and Cardenas (10-14-25)
Exhibit 41 Arbitration Statement (10-20-25)
Exhibit 42 Arbitration Statement Exhibits
Exhibit 43 Email to IID Board - Arbitration Withdrawn and Case Close (10-22-25)