# EXHIBIT 42
# Arbitration Statement Exhibits (10-20-25)

**TABLE OF EXHIBIT**

Ex. 1 Load Injection Memo by Power Engineer (12-04-24)

Ex. 2 Application for Sensitivity for Data Center #1 (4-15-25)

Ex. 3 Feasibility Study Agreement by IID for Data Center #1 (3-11-25)

Ex. 4. Feasibility Study Report by IID for Data Center #1 (5-22-25)

Ex. 5 System Impact Study Agreement for Data Center #1 (6-12-25)

Ex. 6 System Impact Study Report by IID for Data Center #1 (7-25-25)

Ex. 7 Application for System Impact Study for Data Center #2 (3-05-25)

Ex. 8 System Impact Study Agreement by IID for Data Center #2 (4-28-25)

Ex. 9 System Impact Study Report by IID for Data Center #2 (9-23-25)

Ex. 10 Facilities Study Agreement by IID for Data Center #1 and #2 (9-03-25)

Ex. 11 Email to Jamie Asbury - Wholesale Market Proposal (10-02-25)

Ex. 12 Email from Jamie Asbury - Rejecting Proposal and Reconfiguring Project (10-14-25)

Ex. 13 Email to Jamie Asbury - Project is Being Reconfigured Improperly (10-14-25)

Ex. 14 Email from Jamie Asbury - Illegal Reconfiguration of Project (10-17-25)

Ex. 15 Email to Jamie Asbury - Identifying Misstatements (10-17-25)

Ex. 16 Email from Jamie Ashbury - No Contact With Staff (10-17-25)

Ex. 17 Email Response to Jamie Ashbury - Rejecting Retaliatory Request (10-17-25)



**POWER ENGINEERS, INC.**

1060 MAITLAND CENTER COMMONS
SUITE 110
ORLANDO, FL 32751 USA

**PHONE** 321-214-3800
**FAX** 321-214-3899

# MEMORANDUM

| | |
|---|---|
| **DATE:** | December 4, 2024 |
| **TO:** | Sebastian Rucci<br>Imperial Valley Computer Manufacturing |
| **C:** | Hector Casas (IVCM)<br>Christopher Nicolai (POWER-SAN)<br>Jeff Varness, P.E. (POWER-PHX)<br>PW 0255861_0000.1.2<br>24-0151-12712 |
| **FROM:** | Christopher Goulet, P.E. (POWER-ORL) |
| **SUBJECT:** | 0255861_0000    IVCM Data Center Load Injection Analysis |

**MESSAGE**

Sebastian,

POWER has analyzed Imperial Valley Computer Manufacturing's (IVCM) potential data center sites in Imperial County, California to determine potential load capacity at each site as well as to provide a high-level cost estimate for potential system upgrades. One Point of Interconnection (POI) was a tap of the 230 kV S-Line between El Centro 230 kV Substation and Imperial Valley 230 kV Substation. The other POI was the Central 92 kV Substation. Study assumptions were as follows:

- The identified POIs were studied up to 1,100 MW loading under N-1 and N-1-1 contingency scenarios to determine their maximum load serving capabilities.
- Contingencies were created by compiling all transmission lines or transformers within 7 buses of each POI.
- A distribution factor cutoff of 3% was utilized to remove any non-significant results.
- The WECC 2027 Heavy Summer and Heavy Winter planning base cases were used.
  - No additional generation, system upgrades, or path stressing was considered.
- Generation was dispatched from Imperial Irrigation District (IID), San Diego Gas & Electric (SDGE), Arizona Public Service (APS), Salt River Project (SRP), and Southern California Edison (SCE) to the POIs.
  - This dispatch was chosen to reflect system wide generation growth as well as to represent large queued generation projects near IID's system boundaries.

WWW.POWERENG.COM

*MEMORANDUM*                                                    *POWER ENGINEERS, INC.*

**POI Site Map**



Please refer to Table 1 for load injection analysis results.

| TABLE 1: IVCM LOAD INJECTION ANALYSIS RESULTS - 2027 | | | | |
|---|---|---|---|---|
| SITE | SUMMER N-1 CAPACITY [MW] | SUMMER N-1-1 CAPACITY [MW] | WINTER N-1 CAPACITY [MW] | WINTER N-1-1 CAPACITY [MW] |
| 230 kV S-LINE TAP | 557.8 | 342.0 | 823.1 | 528.9 |
| CENTRAL 92 kV SUBSTATION | 108.3 | 83.5 | 99.8 | 60.2 |

If desired, upgrades to local grid infrastructure can allow higher load injection than shown in Table 1. The high-level cost estimate provided below is based on values across the country and is not inherently specific to interconnections in California.

Please note that rebuilding 92 kV transmission lines cost around $1,500,000 per mile[1] at present. Substation expansion costs are utility dependent and can vary significantly, as such, these costs are not included in the below cost estimate.

**230 kV S-Line Tap**
Network upgrade cost to interconnect 750 MW: $13,350,000

**Central 92 kV Substation**
Network upgrade cost to interconnect 150 MW: $33,000,000

Christopher Goulet, P.E. (POWER-ORL)

---

[1]  https://cdn.misoenergy.org/MISO%20Transmission%20Cost%20Estimation%20Guide%20for%20MTEP24337433.pdf

REV. A

| Load Capacity of IVCM Sites - 2027 | | | | |
|---|---|---|---|---|
| Site | Summer N-1 capacity [MW] | Summer N-1-1 capacity [MW] | Winter N-1 capacity [MW] | Winter N-1-1 capacity [MW] |
| 230 kV S-Line Tap | 557.8 | 342.0 | 823.1 | 528.9 |
| Central 92 kV Sub | 108.3 | 83.5 | 99.8 | 60.2 |

Capacity before upgrades to existing facilities using WECC transmission planning base cases

ORL 24-0151-12712 0255861 0000 (2024-12-04) CG

IID-792 (R1 07-23)



## Customer Project Development Services





## Customer Project Application for Services of 34.5 kV and Above

**Coachella Valley**
Mail/Physical Address: 81-600 Avenue 58, La Quinta, CA 92253
Office Hours: 7:00 a.m. - 5:00 p.m. (closed every other Friday) 760-398-5841

**Imperial Valley**
333 S. Waterman Ave., El Centro, CA
Mail: Customer Project Dev., PO Box 937, Imperial, CA 92251
Office Hours: 7:30 a.m. - 5:30 p.m. (closed every other Friday) 760-482-3300

**Submit completed form to the above corresponding addresses.**
**EMAIL: Submit completed and signed form or address any questions or concerns to: TCSP@iid.com**



## Developer Customer Account Application
## Customer Development Operations
### 333 South Waterman • El Centro, CA  92243 • (800) 303-7756
**Electrical Services**

☒ New Account    ☐ Account Transfer/Change of Name    ☐ Existing Account

### Project Information

Name: IMPERIAL VALLEY HYPERSCALE DATA CENTER

Service Address: 2300-2360 Imperial Avenue and 219-269 West Aten Road

| City: Imperial | State: California | Zip Code: 92243 |
|---|---|---|

Valley (Imperial or Coachella): Imperial

### Applicant Information

Name: Imperial Valley Computer Manufacturing, LLC

Doing Business As (DBA):

Street Address: 16400 Pacific Coast Highway, Suite 212

Mailing Address (if different):

| Phone: (562) 901-0199 | E-mail: Sebastian@RucciLaw.com | Fax: (562) 249-6910 |
|---|---|---|
| City: Huntington Beach | State: CA | Zip Code: 92649 |

Affiliation to Project: Equitable Owner of Land (Owner Under Contract)

### Account Information

| Contract Account No: | Business Partner No: |
|---|---|

| Mail Bill Attention To: Sebastian Rucci | Address: 16400 Pacific Coast Highway, Suite 212 |
|---|---|

| City: Huntington Beach | State: CA | Zip Code: 92649 | Phone: (562) 901-0199 |
|---|---|---|---|

Affiliation to Project: Equitable Owner of Land (Owner Under Contract)

If Account was Previously Under Another Name, please list here:

Is there Proof of Dissolution for Previous Account Holder : ☐ Yes  ☒ No  If Yes, please attach:

### Commercial Information

Is this Business A Sole Proprietorship? (If Yes, please include name):

Is this Business a Corporation: ☒ Yes  ☐ No

If Yes, Please indicate State of Incorporation: California

If No, Business Entity Type:

| President/Member: Sebastian Rucci | Signature: *Sebastian Rucci* |
|---|---|
| Vice-President : | Signature: |
| Secretary: Sebastian Rucci | Signature: *Sebastian Rucci* |

☒ Articles of Incorporation/Entity Formation Docs.: (please attach):

| Place of Business: Imperial Valley | Type of Business: Data Center Development |
|---|---|
| Federal Tax ID No. 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 | ☒ Letter of Authorization (please attach): |

*Sebastian Rucci*
**Authorized Signature**

Sebastian Rucci
**Print Name**

01/17/2025
**Date**

HB-782 (R1 07-23)



# SYSTEM PLANNING
## *IID SYSTEM IMPACT STUDY DATA REQUIREMENTS*

A typical System Impact Study includes Power Flow, Transient Stability, Post-Transient Stability, and Short Circuit Analysis. Depending on project characteristics IID System Planning may recommend expanding or reducing the scope of the study.

IID uses the last version of **G.E. PSLF** software approved by WECC to perform Power Flow, Transient Stability and Post-Transient Stability analyses. For the Short Circuit analysis the latest version of **ASPEN** software will be used.

## Power Flow (project's data)
Please provide the following information. (Additional sheets or documents can be added)

1. Project Name: IMPERIAL DATA CENTER CAMPUS
   What is the name of the project? (please provide three different alternative names)

   a. Alternative 1: _____

   b. Alternative 2: _____

   c. Alternative 3: _____

   **Note:** If the name of the project represents a potential conflict for IID's staff, IID will suggest/request a new name for your project to prevent the potential concern. This is not intended to create any legal or commercial issues on the development of your project.

2. Project One-Line Diagram and Project Site Plan
   Please provide a simplified one-line diagram and site plan in (PDF) of the facility(ies) to be studied.

3. Provide a Google Earth map (.kmz file) with geographical location of the new project requiring IID service.

4. Will this project be completed in phase? Yes ☐   No ☒
   If Yes, provide a description and estimate timelines for each phase.

5. Provide proof of site control.

6. Provide the in-service date for the total completion of the project or per phase.

   Date: 01/01/2027

3

7. The System Planning group usually studies the Heavy Summer (PEAK) and Light Winter (OFF-PEAK) conditions to determine the most critical operating conditions for the IID System. Do you consider the need for studying another season or year for your project?

Yes ☐    No ☒

Which season or year?: _____

Reason?: _____

**Note:** Notice that any additional season or year to be studied for a new generation project would potentially represent additional costs for the study.

8. Propose Point of Interconnection (POI) to the IID System. The POI is the electrical point where you propose to connect your project to the existing IID grid. Provide the Station's Name or Line's Name and kV. IID may provide/propose a different POI if the orginal location is deemed problematic for project development.

Station name or line's name: S-Line at Southern Property Line    kV: 230

Include APN# 044220066

9. Is your project load conforming or non-conforming? If non-conforming, please provide a description of planned operation.

Data Center (Permitted Use in Existing Zone)

10. Provide the company owner's name.

Imperial Valley Computer Manufacturing, LLC

11. Total MW input/service required of your project? 500 MW, 250 MW, 200 MW and 150 MW

12. System Step-Down Transformer

| Low Side Voltage (kV) | 34.5 | High Side Voltage (kV) | 230 |
|---|---|---|---|
| MVA Base (MVA) | 175 | Reactance (p.u.) or % | 0.104973 pu |
| Continuous Normal Rating (MVA) | 280 | Emergency Rating (MVA) | 280 |
| Number of Tranformers | 3 | Winding Config. (Delta, Y, etc.) | Delta-WYE-GND |

4

13. Please provide project models in .epc format (PSLF) that accurately represents the electical configuration of your project. Models must include, but not limited to the following:
   a. Bus data
   b. Transformer data
   c. Load data
   d. Generator data, if applicable (behind the meter)

14. Please provide dynamic model representation via a WECC approved composite load model that accurately represents the dynamic behavior of your project. Projects must use the WECC composite load model (cmpldw). *See Attachment A for instructions.*

15. Provide the contact person name, telephone number and email address for questions on the Power Flow analysis data provided.

   a. Name:        Chris Goulet

   b. Title:       Transmission Planning

   c. Company:     Power Engineers, Inc.

   d. Address:     1060 Maitland Center Commons Blvd., Maitland, Florida 32751

   e. Telephone:   (913) 408-5311

   f. Email:       Christopher.Goulet@PowerEng.com

**A hard copy or scanned document of the completed template should be provided back to IID including data, and signed by the person(s) responsible for the data provided.**

Responsible Person Signature: *Sebastian Rucci*

Responsible Person Name: Sebastian Rucci

Responsible Person Title: Managing Member          Date: 01/17/2025

If you have any questions regarding the data requested, please contact Jesus Martinez, Imperial Irrigation District System at (760) 339-0574.

5



## CUSTOMER PROJECT DEVELOPMENT SERVICES
### *REGULATIONS GOVERNING SALE AND USE OF ELECTRIC ENERGY*

**Excerpts from Regulation No. 6**

The customer shall, at his own risk and expense, furnish, install and keep in good and safe condition all electric wires, lines, machinery and apparatus of any sort which may be required for receiving electric energy from the District, and for applying and utilizing such energy, including all necessary protective appliances and suitable housing therefor. The District shall not be responsible for any loss or damage occasioned or caused by the negligence or want of proper care or wrongful act of the customer or any of his agents, employees or licensees on the part of the customer in installing, maintaining, using, operating or interfering with any such wires, lines, machinery or apparatus.

**Excerpts from Regulation No. 11**

The district shall, at its option, have the right to disconnect its services until the customer has complied with all the terms of the agreement and of the District's regulation.

**Excerpts from Regulation No. 15**

The District will construct, own, operate and maintain lines only along public streets, roads and highways which the District has the legal right to occupy and on public lands and private property across which rights-of-way satisfactory to the District may be obtained without cost or condemnation by the District.

All Imperial Irrigation District Regulations Governing the Sale and Use of Electric Energy are available for viewing at all IID Division Offices, Imperial Operating Headquarters and online at www.iid.com.

☒  I have read and agree to the Regulations listed above.

Signature: *Sebastian Rucci*    Title: Managing Member

Print Name: Sebastian Rucci    Date: 01/17/2025

6



# CONTRACTOR INFORMATION SHEET

If applicable, please select the level of authorization for communication with your contractor.

| |
|---|
| Contractor Name: |
| Contractor Address: |
| Contact person: |
| Contractor Contact Phone: |
| Contractor Email Address: |

☐ Attend meetings and/or respond to correspondence regarding this project.
☐ Receive electronic files for this project, including energy account information.
☐ Obtain approvals, to complete this project.

Signature: _____   Title: _____

Print Name: _____   Date: _____

7

IID-792 (R1 07-23)



# PROJECT DEVELOPMENT SERVICES
## *TERMS & CONDITIONS*

## Indemnification Agreement

In consideration for the provision of electrical utility service by IID for the development project identified in the Standards Specifications and Contractor Information Sheet, Applicant and IID agree as follows: The provision of electric utility service to Applicant is conditioned on compliance by Applicant with all applicable laws including the Imperial Irrigation District Regulations Governing the Sale and Use of Electric Energy and Rate Schedules.

Applicant shall defend and indemnify IID, from any liability, claims, suite or actions; losses, expenses, fees, or costs of any kind, so long as such things are in relation to, as a consequence of, arising out of, or in any way attributable actually, allegedly or impliedly, in whole or in part, to the provision of electrical service by IID to Applicant for the development project identified in the Standards Specifications and Contractor Information Sheet; however, Applicant shall not be required to indemnify and hold harmless IID as set forth above for liability attributable to the sole fault of IID.

*Customer Initials* _____ *S R* _____

## Environmental Impact Information

The work IID has to undertake to provide the electric service requested may cause impacts to the environment. Since the work is customer-driven and not a system upgrade, it is IID's policy that any environmental impacts created by new, relocated, modified or reconstructed IID facilities (which can include, but are not limited to, substations, transmission and distribution lines, IID-owned canals and drains, etc.) required to provide electric service to the customer need to be assessed in accordance with the California Environmental Quality Act and National Environmental Policy Act, if applicable, and, if required, mitigated. Failure to comply with such requirements will result in the postponement of the service requested until the appropriate environmental documentation is obtained by the customer from the lead agency having jurisdiction to permit the customer's project and the environmental impacts are fully assessed and mitigated. Any and all mitigation necessary as a result of the impacts on the environment caused by the construction, relocation and/or update of the IID facilities is the responsibility of the customer. At its discretion IID will verify, via its field crews and project inspectors, if impacts are being mitigated per customer's environmental document and if customer is providing on-site mitigation monitoring. If not, customer will be advised of this and IID work will be halted until the appropriate mitigation measures and monitoring are in place.

*Customer Initials* _____ *S R* _____

## Engineering Fee

I acknowledge that failure to complete and return all pertinent forms to IID could cause a delay in electric service. I agree and understand that the Engineering Fee will be paid to begin engineering a project and will be applied as a credit toward the construction cost of the project. The Engineering Fee is non-refundable. Any design changes that result in the redesign of the project, and therefore alters prior schedule IID commitments will require an additional non-refundable Engineering Fee and may cause delays in construction schedules(s).

*Customer Initials* _____ *S R* _____

Signature: _Sebastian Rucci_          Title: Managing Member

Print Name: Sebastian Rucci          Date: 01/17/2025

8

IID-792 (R1 07-23)



# SYSTEM PLANNING
## *WECC COMPOSITE LOAD MODEL*
## *EXAMPLE*
## (ATTACHMENT A)

| | |
|---|---|
| **Model Name:** | cmpldw |
| **Description** | WECC Composite load model |
| **Prerequisites:** | Load in load flow solved case |
| **Inputs:** | Voltage at bus to which the composite load is connected |
| **Invocation:** | cmpldw [<n>] {<name> <kv>} <id> : #rmva=<mvabase> |

**Parameters:**

| EPCL Variable (see Note b) | Default Data | Description |
|---|---|---|
| Bss | 0.0 | Substation shunt capacitor susceptance, p.u. |
| Rfdr | 0.0 | Feeder equivalent resistance, p.u. |
| Xfdr | 0.0 | Feeder equivalent reactance, p.u. |
| Fb | 0.0 | Fraction of feeder shunt capacitance at substation bus end |
| Xxf | 0.0 | Substation transformer reactance, p.u. |
| Tfixhs | 1. | Transformer high side fixed tap, p.u. |
| Tfixls | 1. | Transformer low side fixed tap, p.u. |
| LTC | 0 | = 1 for automatic tap adjustment (low side variable tap) |
| Tmin | 0.9 | Minimum variable tap, p.u. |
| Tmax | 1.1 | Maximum variable tap, p.u. |
| step | 0.00625 | Variable tap step size, p.u. |
| Vmin | 1.02 | Minimum low-side voltage, p.u. |
| Vmax | 1.04 | Maximum low-side voltage, p.u. |
| Tdel | 30. | Time delay to initiate tap adjustment, sec. |
| Ttap | 5. | Time delay between tap steps, sec. |
| Rcmp | 0.0 | Transformer LTC compensating resistance, p.u. |
| Xcmp | 0.0 | Transformer LTC compensating reactance, p.u. |
| FmA | 0.0 | Motor A fraction of load P |
| FmB | 0.0 | Motor B fraction of load P |
| FmC | 0.0 | Motor C fraction of load P |
| FmD | 0.0 | Motor D fraction of load P |
| Fel | 0.0 | Electronic load fraction of load P |
| PFel | 0.0 | Electronic load power factor |
| Vd1 | 0.0 | Voltage below which electronic load decreases, p.u. |
| Vd2 | 0.0 | Voltage below which electronic load is zero, p.u. |
| frcel | 0.0 | Fraction of electronic load that recovers from low voltage trip **(see note n)** |
| PFs | 0.8 | Power factor of static load component |
| P1e | 1.0 | Static load – exponent of first P term |
| P1c | 1.0 | Static load – coefficient of first P term |
| P2e | 2.0 | Static load – exponent of second P term |

9

| P2c | 0.0 | Static load – coefficient of second P term |
| Pfrq | 0.0 | Frequency sensitivity factor for P |
| Q1e | 1.0 | Static load – exponent of first Q term |
| Q1c | 0.0 | Static load – coefficient of first Q term |
| Q2e | 2.0 | Static load – exponent of second Q term |
| Q2c | 1.0 | Static load – coefficient of second Q term |
| Qfrq | 0.0 | Frequency sensitivity factor for Q |
| Mtypa | 0.0 | First motor type: = 3 -- three-phase motor |
| | | = 1 -- 1-phase air conditioner |
| Mtypb | 0.0 | Second motor type |
| Mtypc | 0.0 | Third motor type |
| Mtypd | 0.0 | Fourth Motor type |

The following motor parameters must be included (**see Note a**) for each motor with Fm > 0.:

For Type 3 motor, the following parameters must be input: (see below for Type 1)

| LFm$n$ | 0.8 | Motor g lfoaacdtoinr |
| Ra$n$ | 0.02 | Stator resistance, p.u. |
| Ls$n$ | 2.0 | Ssynchronous reactance, p.u. |
| Lp$n$ | 0.2 | Transient reactance, p.u. |
| Lpp$n$ | 0.2 | Subtransient reactance, p.u. |
| Tpo$n$ | 0.16 | Transient open circuit time constant, sec. |
| Tppo$n$ | 0.02 | Subtransient open circuit time constant, sec. |
| H$n$ | 0.3 | Inertia constant, sec. |
| Etrq$n$ | 2.0 | Mechanical torque exponent |
| Vtr1$n$ | 0.0 | First low ge tvroiplt alevel, p.u. V |
| Ttr1$n$ | 9999. | First low gev torlitpa delay time, sec. |
| Ftr1$n$ | 0.0 | First low ge tvroiplt faraction |
| Vrc1$n$ | 9999. | First low gev oreltcaonnection level, p.u. V |
| Trc1$n$ | 9999. | First low gev oreltcaonnection delay time, sec. |
| Vtr2$n$ | 0.0 | Second low voltage trip level, p.u. V |
| Ttr2$n$ | 9999. | Second low voltage trip delay time, sec. |
| Ftr2$n$ | 0.0 | Second low voltage trip fraction |
| Vrc2$n$ | 9999. | Second low voltage reconnection level, p.u. V |
| Trc2$n$ | 9999. | Second low voltage reconnection delay time, sec. |

For Type 1 A/C load, the following parameters must be input:

| LFm$n$ | 1.0 | Motor g lfoaacdtoinr |
| CompPF$n$ | 0.97 | Power rfacto |
| Vstall$n$ | 0.6 | Stall voltage, p.u. |
| Rstall$n$ | 0.124 | Stall resistance, p.u. |
| Xstall$n$ | 0.114 | Stall reactance, p.u. |
| Tstall$n$ | 0.033 | Stall time delay, sec. |
| Frst$n$ | 0.5 | Fraction of load that can restart after stalling |
| Vrst$n$ | 0.6 | Voltage at which restart can occur, p.u. |
| Trst$n$ | 0.4 | Restart time delay, sec. |
| Fuvr$n$ | 0. | Fraction of load with undervoltage relay protection |
| Vtr1$n$ | 0.0 | First undgeer tvroiplt alevel, p.u. |
| Ttr1n | 0.2 | First undervoltage trip delay time, sec. |
| Vtr2n | 0.0 | Second undervoltage trip level, p.u. |
| Ttr2n | 5.0 | Second undervoltage trip delay time, sec. |

| Vc1offn | 0.5 | Contactor voltage at which tripping starts, p.u. |
| Vc2offn | 0.4 | Contactor voltage at which tripping is complete p.u. |
| Vc1onn | 0.6 | Contactor voltage at which reconnection is complete, p.u. |
| Vc2onn | 0.5 | Contactor voltage at which reconnection starts, p.u. |
| Tthn | 20. | Thermal time constant, sec. |
| Th1tn | 0.7 | Thermal protection trip start level, p.u. temperature |
| Th2tn | 1.3 | Thermal protection trip completion level, p.u. temperature |
| Tvn | .05 | Voltage measurement lag, sec. |

**Note**: Input parameters through **Mtypd** must be included. If, at any point after that, the remaining parameters are omitted, the default values shown in the table will be used.

**Note**: If a motor is to be omitted, but a motor after it is to be included, the motor fraction, e.g. Fmc, must be set to a non-zero value <= 0.0001. If it is set to zero, data for the later model(s) will not be read.

**Notes:**

a) The following global (dypar) parameters have been added in V21 of PSLF:

| | Default values | | **cmpldw** model will not be used if: |
|---|---|---|---|
| **dypar.cmp_pmin** | 0 MW | | Pload < dypar.cmp_pmin |
| **dypar.cmp_pqmin** | 0.0 | | Pload / Qload < dypar.cmp_pqmin |
| **dypar.cmp_vmin** | 0.0 p.u. | | System bus V < dypar.cmp_vmin |

Warning messages are written if any of these conditions occur. The values of these parameters can be changed by entering different values in the javaini.p file.

b) For all motor input parameters, the trailing "$n$" is to be replaced by "a", "b", "c", or "d" corresponding to the motor fractions Fma, Fmb, Fmc, Fmd. If Fm$n$ = 0., the data for that motor must be omitted. If it is desired to include motor data for a motor with Fm$n$ = 0., Fm$n$ must be set to a small positive value (<= 0.0001) – the data will be read, but the motor fraction will be set to zero.

c) To reference the motor parameters in the epcl functions **getmodpar** and **setmodpar**, both names (if different), separated by a underscore, must be used. For example, for the first motor, the following are the parameter names:

    LFma
    Raa_CompPFa
    Lsa_Vstalla
    Lpa_Rstalla
    Lppa_Xstalla
    Tpoa_Tstalla
    Tppoa_Frsta
    Ha_Vrsta
    Etrqa_Trsta
    Ftr1a_Fuvra
    Vtr1a
    Ttr1a
    Vtr2a

11

IID-792 (R1 07-23)

> Ttr2a
> Ftr2a_Vc1offa
> Vrc1a_Vc2offa
> Trc1a_Vc1ona
> Vrc2a_Vc2ona
> Trc2a_Ttha
> Th1ta
> Th2ta
> Tva

For PSLF version 17.0_07 and later, capitalization is optional (getmodpar/setmodpar are no longer case sensitive). For previous versions, the parameters must be entirely lower case.

d)  The composite load model is represented by a load in the load flow solution. After initialization, all the load P and Q are included in the cmpldw model and are shown in the Pmot, Qmot columns of the load table. The original load values are set to zero.

e)  During initialization, the low-side bus and far-end bus are added to the system Y matrix and are given numbers equal to the original (high-side) bus plus 800,000 and 900,000, respectively. If more than one load is connected to the same high-side bus, the bus numbers for the second and subsequent loads will have (n-1) * 1,000,000 added. After initialization, the new buses and added transformer, feeder, and shunts can be viewed with SCAN. **Note: A history (sav) file should not be saved after initialization. The load flow program will not recognize the new buses.**

f)  The MVA base for the elements (transformer, equivalent feeder, shunt capacitors) in the load model depends on the value entered for "**mva=<mvabase>**" as follows:
1)  If **<mvabase> > 0.**, the entered value is used as the MVA base.
2)  If **<mvabase> < 0.**, the entered value is used as a "loading factor". The MVA base is set equal to the load P divided by the loading factor.
3)  If **<mvabase> = 0.** or if "mva=<mvabase>" is omitted, a loading factor of 0.8 is assumed. That is, the MVA base is set equal to the load P / 0.8.

Note: The input value of **mvabase** is shown in the edmd table as **MbaseR** and may be modified there prior to initialization. The **Mbase** column in edmd shows the acutal MVA base used for the load, e.g. if a "loading factor" was entered, **Mbase** is the computed value of MVA base. This is set by the model during initialization.

g)  The static load model uses the following formulas:

$$P = Po*(P1c*V/Vo^{P1e}+P2c*V/Vo^{P2e}+P3)*(1+Pf*\Delta f)$$

$$Q = Qo*(Q1c*V/Vo^{Q1e}+Q2c*V/Vo^{Q2e}+Q3)*(1+Qf*\Delta f)$$

$$Po = Pload(1.-Fma-Fmb-Fmc-Fmd)$$

$$Qo = Po*tan(acos(PFs)) = Po*sqrt(PFs^{-2}-1.)$$

$$P3 = 1.-P1c-P2c$$

$$Q3 = 1.-Q1c-Q2c$$

h)  The electronic load model is constant P, Q with the power factor **Pfel**. The P and Q are decreased linearly to zero between voltages **Vd1** and **Vd2**. If **frcel** is greater than zero, that fraction of the load that was tripped will be reconnected linearly as the voltage recovers.

i)  Any of the four motors can be represented by an equivalent of a group of three-phase motors or by an equivalent of a group of single-phase air conditioners:

IID-792 (R1 07-23)

1) The three-phase motor model uses the same electrical flux model as the **motorw** model in the PSLF dynamic model library. The mechanical torque is computed using the following formula:

$$\mathbf{Tm = Tmo*\omega^{Etrq}}$$

2) The single-phase air conditioner model in the composite load model uses essentially the same model as the **ld1pac** model in the PSLF dynamic model library. Some of the parameters of that model are hard-wired to the following values:

| | | |
|---|---|---|
| Tv = 0.02 | voltage sensing time constant, sec. |
| Tf = 0.05 | frequency sensing time constant, sec. |
| Kp1 = 0. | real power coefficient for runing state 1, pu W/ pu V |
| Np1 = 1.0 | real power exponent for runing state 1 |
| Kq1 = 6.0 | reactive power coefficient for runing state 1, pu VAr/ pu V |
| Nq1 = 2.0 | reactive power exponent for runing state 1 |
| Kp2 = 12.0 | real power coefficient for runing state 2, pu W/ pu V |
| Np2 = 3.2 | real power exponent for runing state 2 |
| Kq2 = 11.0 | reactive power coefficient for runing state 2, pu VAr/ pu V |
| Nq2 = 2.5 | reactive power exponent for runing state 2 |
| CmpKpf = 1.0 | real power frequency sensitivity, pu W / pu freq. |
| CmpKqf = -3.3 | reactive power frequency sensitivity, pu VAr / pu freq. |
| Trstrt = 0.4 | restart delay time, sec. |
| Lfadj = 0. | stall voltage sensitivity to loading factor |

j) If the transformer reactance (**Xxf**) is less than the jumper threshold, the transformer is omitted. If the transformer is included and **Vmax** > **Vmin** + 2\***step**, the (low- side) variable tap will be adjusted to set the low-side voltage at approximately the mid-point cf **Vmin** -- **Vmax** unless **Tmin** or **Tmax** is exceeded. If **LTC** = 1, The transformer tap moves in discrete steps during the dynamic simulation to control the low-side voltage. If the voltage is less than **Vmin** or greater than **Vmax** for a time period greater than **Tdel**, the transformer tap moves in steps until the voltage is within range. **Ttap** is the delay time between successive tap step movements.

k) If **Xfdr** is less than the jumper threshold, the feeder equivalent is omitted.

l) If, during initialization, the far end voltage is computed to be less than 0.95 p.u., **Rfdr** and **Xfdr** are reduced to bring it above 0.95.

m) After the load components are initialized to determine their reactive power consumption, shunt capacitance is added to make the Q at the original load bus equal the value from the load flow solution. If **Fb** = 0., all of this capacitance is added at the far end of the feeder (**Bf2**). If this capacitance is negative (inductive), the substation capacitor (**Bss**) is reduced to make **Bf2** zero or slightly positive.

n) **Cmpldw** responds to the **load[ ].shed** signal from any of the load sheddding relay models as follows:
   1) Static and electronic load P and Q values are multiplied by **load[ ].shed**.
   2) Motor (Type 1 and 3) MVA bases are multiplied by **load[ ].shed** to reduce the motor MW without changing the internal variables.
   3) Feeder R and X values are increased by 1. / **load[ ].shed** and feeder B values decreased by **load[ ].shed** to simulate tripping of an equivalent fraction of the feeders from the substation.
   4) Transformer and substation shunt B values are not changed.
   5) The change in MW at the substation high side bus due to the load shedding action is recorded

in the variable **load[ ].pshed** for use by the **lsmon** model in accumlating MW shed for the system and by area.

o) The parameter **frcel** was added in Version 17.0_07. Earlier data sets must be updated to include this parameter in the specified location.

p) The output channels have been modified in V19 to include load trip MW values, which may be summed for areas, zones, etc. using the LDTRPMON model. See manual page for LDTRMON for definition of these outputs.

## Output Channels:

| Record Level | Name | Description |
|---|---|---|
| 1 | Pld | Total load active power at high side bus, MW |
| 1 | Qld | Total load reactive power at high side bus, MVAr |
| 2 | Vls | Voltage magnitude at substation low-side bus, p.u. |
| 2 | Vld | Voltage magnitude at far end bus, p.u. |
| 2 | xshn | Nominal value load shed, MW |
| 2 | xton | Nominal total load tripped, MW |
| 2 | xtoi | Instantaneous total load tripped, MW |
| 2 | Pst | Static load P, MW |
| 2 | Pel | Electronic load P, MW |
| 2 | xeln | Nominal electronic load tripped, MW |
| 2 | xeli | Instantaneous electronic load tripped, MW |

For each motor in use:

| | | |
|---|---|---|
| 2 | Pm$n$ | Motor $n$ P, MW |
| 2 | xm$n$n | Nominal motor $n$ load tripped, MW |
| 2 | xm$n$i | Instantaneous motor $n$ load tripped, MW |
| 3 | tap | transformer tap ratio |
| 3 | Qst | Static load Q, MVAr |
| 3 | Qel | Electronic load Q, MVAr |

For each motor in use:

| | | |
|---|---|---|
| 3 | Qm$n$ | Motor Q, MVAr For |

each Type 3 motor in use:

| | | |
|---|---|---|
| 4 | spd$n$ | Motor speed, p.u. |
| 4 | Tm$n$ | Motor mechanical torque, p.u. |
| 4 | Te$n$ | Motor electrical torque, p.u. |
| 4 | fuv$n$ | Fraction of motor not tripped by UV relay |
| 4 | fsh$n$ | Fraction of motor not tripped by load shedding relays |

For each Type 1 motor in use:

| | | |
|---|---|---|
| 4 | fuv$n$ | Fraction of motor not tripped by UV relay |
| 4 | fcn$n$ | Fraction of motor not tripped by contactor |
| 4 | crA$n$ | Current in non-restarting part of load, p.u. |
| 4 | crB$n$ | Current in restarting part of load, p.u. |
| 4 | fsh$n$ | Fraction of motor not tripped by load shedding relays |
| 9 | tmpA | "Temperature" in non-restarting part of load, p.u. |

14

IID-792 (R1 07-23)

| 9 | fthA | Fraction of non-restarting part of load not tripped by thermal prot. |
| 9 | tmpB | "Temperature" in restarting part of load, p.u. |
| 9 | fthB | Fraction of restarting part of load not tripped by thermal prot. |

Note: Most motor channel names have "a", "b", "c", or "d" added in place of "$n$" to indicate which of the four motors they are associated with.

**Sample data record:**

```
cmpldw 1234 "XXXX" 115.00 "1": #1 mva=1.1 /
    "Bss"     0 "Rfdr" 0.04 "Xfdr" 0.04 "Fb" 0.75/
    "Xxf" 0.08 "TfixHS" 1 "TfixLS" 1 "LTC" 0  "Tmin"     0.9 "Tmax" 1.1 "step" 0.00625 /
    "Vmin"    1.025 "Vmax" 1.04 "Tdel" 30  "Ttap"    5 "Rcomp" 0 "Xcomp" 0 /
    "Fma"     0.146246 "Fmb" 0.147222 "Fmc" 0.036521 "Fmd" 0.367004 "Fel" 0.106286   /
    "PFel" 1 "Vd1" 0.7 "Vd2" 0.5 "Frcel" 0.8 /
    "Pfs"    -0.99771 "P1e" 2 "P1c" 0.557361 "P2e" 1 "P2c"    0.442639 "Pfreq" 0 /
                "Q1e" 2 "Q1c" -0.5 "Q2e" 1 "Q2c"    1.5 "Qfreq" -1 /
"MtpA" 3 "MtpB" 3 "MtpC" 3 "MtpD" 1 /
"LfmA" 0.75 "RsA" 0.04 "LsA" 1.8 "LpA" 0.12 "LppA"    0.104 /
    "TpoA" 0.095 "TppoA" 0.0021 "HA"    0.1 "etrqA" 0 /
    "Vtr1A" 0.7 "Ttr1A" 0.02 "Ftr1A" 0.2 "Vrc1A" 1 "Trc1A" 99999 /
    "Vtr2A" 0.5 "Ttr2A" 0.02 "Ftr2A" 0.7 "Vrc2A" 0.7 "Trc2A" 0.1 /
"LfmB" 0.75 "RsB" 0.03 "LsB" 1.8 "LpB" 0.19 "LppB"    0.14 /
    "TpoB" 0.2 "TppoB" 0.0026 "HB"    0.5 "etrqB" 2 /
    "Vtr1B" 0.6 "Ttr1B" 0.02 "Ftr1B" 0.2 "Vrc1B" 0.75 "Trc1B" 0.05 /
    "Vtr2B" 0.5 "Ttr2B" 0.02 "Ftr2B" 0.3 "Vrc2B" 0.65 "Trc2B" 0.05 /
"LfmC" 0.75 "RsC" 0.03 "LsC" 1.8 "LpC" 0.19 "LppC"    0.14 /
    "TpoC" 0.2 "TppoC" 0.0026 "HC"    0.1 "etrqc" 2 /
    "Vtr1C" 0.65 "Ttr1C" 0.02 "Ftr1C" 0.2 "Vrc1C" 1 "Trc1C" 9999 /
    "Vtr2C" 0.5 "Ttr2C" 0.02 "Ftr2C" 0.3 "Vrc2C" 0.65 "Trc2C" 0.1 /
"LfmD" 1 "CompPF" 0.98 /
    "Vstall" 0.56 "Rstall" 0.1 "Xstall" 0.1 "Tstall" 0.03  /
    "Frst" 0.2 "Vrst" 0.95 "Trst" 0.3 /
    "fuvr" 0.1 "vtr1" 0.6 "ttr1" 0.02 "vtr2" 1 "ttr2" 9999 /
    "Vc1off" 0.5 "Vc2off" 0.4 "Vc1on" 0.6 "Vc2on" 0.5 /
    "Tth" 15 "Th1t" 0.7 "Th2t" 1.9 "tv" 0.025
```

15

IID-792 (R1 07-23)

**Schematic Diagram:**



16



**Imperial Irrigation District**
*Protecting the flow of progress.*

# IMPERIAL IRRIGATION DISTRICT
## Feasibility Study Agreement
### Imperial Valley Computer Manufacturing, LLC

**THIS AGREEMENT** is made and entered into this 11th day of March, 2025 by and between Imperial Valley Computer Manufacturing, LLC, a company organized and existing under the laws of the State of California and registered to do business in the state of California ("Interconnection Customer"), and the Imperial Irrigation District an irrigation district organized under the Water Code of the State of California, ("Transmission Provider"). Interconnection Customer and Transmission Provider each may be referred to as a "Party" or collectively as the "Parties."

## RECITALS

**WHEREAS,** Interconnection Customer is proposing to develop a Facility or capacity addition to an existing Facility consistent with the submitted documentation by Interconnection Customer or its authorized representative on January 17, 2025; and

**WHEREAS,** Interconnection Customer desires to interconnect the Facility with Transmission Provider's Transmission System; and

**WHEREAS,** Interconnection Customer has requested Transmission Provider to perform an Interconnection Feasibility Study to assess the impact of interconnecting the proposed Facility to the Transmission Provider's System;

**NOW, THEREFORE,** in consideration of and subject to the mutual covenants contained herein the Parties agree as follows:

1.0    When used in this Agreement, unless otherwise defined herein, terms with initial capitalization shall have the meaning specified in the Transmission Provider's Distributed Generations Interconnection Process which Interconnection Customer acknowledges it has reviewed.

2.0    Interconnection Customer requests that Transmission Provider prepare an Interconnection Feasibility Study consistent with the terms of this Agreement.



FEASIBILITY STUDY AGREEMENT

Imperial Irrigation District

*Protecting the flow of progress.*

3.0   The scope of the Feasibility Study shall be subject to the assumptions set forth in the Customer Project Application.

4.0   The Feasibility Study shall be based on the technical information provided by Interconnection Customer in the Interconnection Request. Transmission Provider reserves the right to request additional technical information from Interconnection Customer as may reasonably become necessary consist with Good Utility Practice during the course of the Feasibility Study. If, after the designation of the Point of Interconnection, Interconnection Customer modifies its Interconnection Request, the time to complete the Feasibility Study may be extended.

5.0   The Feasibility Study report shall provide the following information:

-   identification of any thermal overload or voltage limit violations resulting from the interconnection or, when Clustering is used, resulting from the interconnections of the group of Generating Facilities studied in the cluster;

-   a description and non-binding, good faith estimate of the cost and time to construct facilities projected to be required to interconnect the Generating Facility to the Transmission System or Distribution System, or, when Clustering is used, to interconnect of the group of Generating Facilities studied in the cluster, and to address the identified short circuit, instability, and power flow issues.

6.0   Concurrent with the execution of this Agreement, Interconnection Customer shall provide a deposit of $50,000 for the performance of the Feasibility Study.

Upon receipt of the Feasibility Study Transmission Provider shall charge and Interconnection Customer shall pay the actual costs of the Feasibility Study.



**Imperial Irrigation District**
*Protecting the flow of progress.*

FEASIBILITY STUDY AGREEMENT

Any difference between the deposit and the actual costs of the study shall be paid or refunded to Interconnection Customer as appropriate.

7.0 Each Party makes the following representations, warranties and covenants:

(a) Good Standing. Interconnection Customer is duly organized, validly existing and in good standing under the laws of the state in which it is organized, formed, or incorporated, as applicable; that it is qualified to do business in the state or states in which it is located, and that it has the corporate power and authority to own its properties, to carry on its business as now being conducted and to enter into this Agreement and carry out the transactions contemplated hereby and perform and carry out all covenants and obligations on its part to be performed under and pursuant to this Agreement.

(b) Authority. Interconnection Customer has the right, power and authority to enter into this Agreement, to become a Party hereto and to perform its obligations hereunder. This Agreement is a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforceability is sought in a proceeding in equity or at law).

(c) No Conflict. The execution, delivery and performance of this Agreement does not violate or conflict with the organizational or formation documents, or bylaws or operating agreement, of the Party, or any judgment, license, permit, order, material agreement or instrument applicable to or binding upon such Party or any of its assets.

(d) Consent. Interconnection Customer has sought or obtained, or in accordance with this Agreement will seek or obtain, each consent, approval, authorization, order, or acceptance by any



**Imperial Irrigation District**

*Protecting the flow of progress.*

Governmental Authority in connection with the execution, delivery and performance of this Agreement, and it will provide to any Governmental Authority notice of any actions under this Agreement that are required by Applicable Laws and Regulations.

8.0    Miscellaneous

a.     Binding Effect. This Agreement and the rights and obligations hereof, shall be binding upon and shall inure to the benefit of the successors and assigns of the Parties hereto.

b.     Conflicts. In the event of a conflict between the body of this Agreement and any attachment, appendices or exhibits hereto, the terms and provisions of the body of this Agreement shall prevail and be deemed the final intent of the Parties.

c.     Rules of Interpretation. This Agreement, unless a clear contrary intention appears, shall be construed and interpreted as follows: (1) the singular number includes the plural number and vice versa; (2) reference to any person includes such person's successors and assigns but, in the case of a Party, only if such successors and assigns are permitted by this Agreement, and reference to a person in a particular capacity excludes such person in any other capacity or individually; (3) reference to any agreement (including this Agreement), document, instrument or tariff means such agreement, document, instrument, or tariff as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof; (4) reference to any Applicable Laws and Regulations means such Applicable Laws and Regulations as amended, modified, codified, or reenacted, in whole or in part, and in effect from time to time, including, if applicable, rules and regulations promulgated thereunder; (5) unless expressly stated



**Imperial Irrigation District**
*Protecting the flow of progress.*

otherwise, reference to any Attachment is to an Attachment to this Agreement; (6) "hereunder", "hereof", "herein", "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Section or other provision hereof or thereof; (7) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; and (8) relative to the determination of any period of time, "from" means "from and including", "to" means "to but excluding" and "through" means "through and including".

d.  Entire Agreement. This Agreement, including the assumptions in the Customer Project Application, constitutes the entire agreement between the Parties with reference to the subject matter hereof, and supersedes all prior and contemporaneous understandings or agreements, oral or written, between the Parties with respect to the subject matter of this Agreement. There are no other agreements, representations, warranties, or covenants which constitute any part of the consideration for, or any condition to, either Party's compliance with its obligations under this Agreement.

e.  No Third-Party Beneficiaries. This Agreement is not intended to and does not create rights, remedies, or benefits of any character whatsoever in favor of any persons, corporations, associations, or entities other than the Parties, and the obligations herein assumed are solely for the use and benefit of the Parties, their successors in interest and, where permitted, their assigns.

f.  Waiver. The failure of a Party to this Agreement to insist, on any occasion, upon strict performance of any provision of this Agreement will not be considered a waiver of any obligation, right, or duty of, or imposed



FEASIBILITY STUDY AGREEMENT

upon, such Party.

Any waiver at any time by either Party of its rights with respect to this Agreement shall not be deemed a continuing waiver or a waiver with respect to any other failure to comply with any other obligation, right, duty of this Agreement. Termination or Default of this Agreement for any reason by Interconnection Customer shall not constitute a waiver of Interconnection Customer's legal rights to obtain an interconnection from IID. Any waiver of this Agreement shall, if requested, be provided in writing.

g.      Headings. The descriptive headings of the various Sections of this Agreement have been inserted for convenience of reference only and are of no significance in the interpretation or construction of this Agreement.

h.      Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which is deemed an original but all constitute one and the same instrument.

i.      Amendment. The Parties may by mutual agreement amend this Agreement by a written instrument duly executed by the Parties.

j.      Modification by the Parties. The Parties may by mutual agreement amend the Attachments to this Agreement by a written instrument duly executed by the Parties. Such amendment shall become effective and a part of this Agreement upon satisfaction of all Applicable Laws and Regulations.

k.      No Partnership. This Agreement shall not be interpreted or construed to create an association, joint venture, agency relationship, or partnership between the Parties or to impose any partnership obligation or partnership liability upon either Party. Neither Party shall have any right, power or authority to enter into any agreement or undertaking for, or



**Imperial Irrigation District**

*Protecting the flow of progress.*

act on behalf of, or to act as or be an agent or representative of, or to otherwise bind, the other Party.

9.0  **Assignment.** This Agreement may be assigned by a Party only with the written consent of the other Party; provided that a Party may assign this Agreement without the consent of the other Party to any Affiliate of the assigning Party with an equal or greater credit rating and with the legal authority and operational ability to satisfy the obligations of the assigning Party under this Agreement; and provided further that the Interconnection Customer shall have the right to assign this Agreement, without the consent of the other Party, for collateral security purposes to aid in providing financing for the generating unit, provided that the Interconnection Customer will require any secured party, trustee or mortgagee to notify the other Party of any such assignment. Any financing arrangement entered into by the Interconnection Customer pursuant to this Article will provide that prior to or upon the exercise of the secured party's, trustee's or mortgagee's assignment rights pursuant to said arrangement, the secured creditor, the trustee or mortgagee will notify the other Party of the date and particulars of any such exercise of assignment right(s). Any attempted assignment that violates this Article is void and ineffective. Any assignment under this Agreement shall not relieve a Party of its obligations, nor shall a Party's obligations be enlarged, in whole or in part, by reason thereof. Where required, consent to assignment will not be unreasonably withheld, conditioned or delayed

10.0  Equipment Release Disclaimer. Transmission Provider's Feasibility Study shall not be construed as confirming or enclosing the design, or as any warranty of safety, durability, reliability or suitability of Interconnection Customer's Generating Facility or installation thereof for any use, including the use intended by Interconnection Customer.

11.0  All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing, unless otherwise agreed by the Parties, and shall be delivered in person or



FEASIBILITY STUDY AGREEMENT

Imperial Irrigation District

*Protecting the flow of progress.*

sent by certified mail, postage prepaid, by overnight delivery, or by electronic mail or electronic facsimile transmission with an original sent immediately thereafter by postage prepaid mail, and properly addressed as follows:

When delivered to Transmission Provider:

Energy Contracts
IMPERIAL IRRIGATION DISTRICT
333 Barioni Blvd.
P.O. Box 937
Imperial, CA 92251
Email: Energycontracts@iid.com

When delivered to Interconnection Customer:


Address: 16400 Pacific Coast Highway, Suite 212
City, State, Zip code: Huntington Beach, CA 92649
Email: Sebastian@RucciLaw.com


12.0    Either Party may, from time to time, change its representative or address for the purpose of notices to that Party by a similar notice specifying a new representative or address, but no such change shall be deemed to have been given until such notice is actually received by the Party being so notified.

13.0    This Agreement may be assigned and, if so assigned, the Agreement, and the rights and obligations thereof, shall be binding upon and shall insure to the benefit of the successors and assigns of the Parties hereto.

14.0    This Agreement may be executed in two or more counterparts, by facsimile signature or an e-mail of a PDF signature, each of which is deemed an original but all constitute one and the same instrument.

15.0    The Parties may, by mutual agreement, amend this Agreement by a written instrument duly executed by the Parties.

8



FEASIBILITY STUDY AGREEMENT

**Imperial Irrigation District**

*Protecting the flow of progress.*

16.0   This Agreement is subject to Transmission Provider's Tariff, as may be amended from time-to-time.

IN WITNESS THEREOF, the Parties have caused this Agreement to be duly executed by their duly authorized officers or agents on the day and year first above written.

**Imperial Irrigation District**

Signature: _____

Print
Name:       Jesus Martinez

Title:        Sup. Gen. Planning and Engineering

Date:        3/11/2025

**Imperial Valley Computer Manufacturing, LLC**

Signature: _____

Print
Name:       Sebastian Rucci

Title:        Managing Member

Date:        March 5, 2025

9



VERSION: DRAFT

MAY 22, 2025



# IMPERIAL VALLEY COMPUTER MANUFACTURING LLC, (DATA CENTER #1) FEASIBILITY STUDY

TRANSMISSION PLANNING



## EXECUTIVE SUMMARY

The Imperial Irrigation District (IID) received a request from Imperial Valley Computer Manufacturing LLC (Customer) for the interconnection of their Imperial Data Center Campus (Project) in the Imperial Valley. The facility's proposed Point of Interconnection (POI) to the IID System is at the 230kV 'S' line between IID's El Centro switching station (ECSS) and SDG&E's Imperial Valley substation. As part of this feasibility study, IID evaluated the interconnection of different load scenarios at 150 MW, 200 MW, 250 MW, and 500 MW to assess potential system impacts and infrastructure requirements. Commercial Operation Date (COD) is planned to be in service by January 2027.

IID's Transmission Planning Department performed a high-level feasibility study to evaluate the potential impact of integrating this Project into the IID transmission system. The study included power flow (steady-state) analysis to identify any thermal violations caused solely by the addition of this load.

**Note:** IID assumed that the majority of the power required to serve this load would be imported. IID currently does not have the capability to reliably support a large-scale load requiring continuous 24-hour service. As such, this report does not represent a commitment by IID to serve the requested load.



## PROJECT DESCRIPTION

The proposed Project consists of a large-scale data center campus, upwards of 500MW, that is to be placed in a land parcel near the 230kV 'S' line between IID's El Centro switching station and SDG&E's Imperial Valley substation, which will serve as the POI for the Project. The Project had an assumed power factor of 0.95. The Figures 1, 2, & 3 below indicate the single line diagram, geographical location, and site plan of the Project.



**FIGURE 1: PROJECT SINGLE LINE DIAGRAM**



**FIGURE 2: PROJECT GEOGRAPHICAL LOCATION**





**FIGURE 3: PROJECT SITE PLAN**

| IVCM DATA CENTER BREAKDOWN | | | |
|---|---|---|---|
| MW | MVAR | MVA | PF |
| 150MW | 49MVAR | 158MVA | 0.95 |
| 200MW | 65MVAR | 210MVA | 0.95 |
| 250MW | 82MVAR | 263MVA | 0.95 |
| 500MW | 164MVAR | 526MVA | 0.95 |

**TABLE 1: PROJECT BREAKDOWN PER LOADING SCENARIO**



## STUDY DATA ASSUMPTIONS AND METHODOLOGY

Various base cases were developed for this assessment with the intent to cover all critical operating scenarios, and to document all potential impacts that could be caused by the implementation of the Project. No queue generation was included unless the project has an executed Generator Interconnection Agreement (GIA), a Power Purchase Agreement (PPA), or a Tolling Agreement with the IID and the project is in accordance with section 4.0 of IID's Planning Standards. Distribution projects were included with either an executed Joint Power Agreement (JPA) or system impact studies were finalized. The base cases were developed to represent the Heavy Summer operating conditions and the early Spring operating conditions. For the early Spring assessments, an early Spring time frame of 0600-0800 was analyzed.

Table 1 below lists the WECC approved base cases that were used to model the IID system for steady-state analysis:

| WECC Seed Case | PSLF Base Case Name | Description |
|---|---|---|
| **Heavy Summer Peak Scenarios** | | |
| 25HS4a.sav | 27HS_IVCM_Peak_pre.sav | 2027 Heavy Summer without Project (pre-case) |
| | 27HS_IVCM_150MW_Peak.sav | 2027 Heavy Summer with Project (150MW) |
| | 27HS_IVCM_200MW_Peak.sav | 2027 Heavy Summer with Project (200MW) |
| | 27HS_IVCM_250MW_Peak.sav | 2027 Heavy Summer with Project (250MW) |
| | 27HS_IVCM_500MW_Peak.sav | 2027 Heavy Summer with Project (500MW) |
| **Heavy Summer Solar Reduced Scenarios** | | |
| 25HS4a.sav | 27HS_IVCM_Solar_Reduced_pre.sav | 2027 Heavy Summer without Project (pre-case); 20% solar |
| | 27HS_IVCM_150MW_Solar_Reduced.sav | 2027 Heavy Summer with Project (150MW); 20% solar |
| | 27HS_IVCM_200MW_Solar_Reduced.sav | 2027 Heavy Summer with Project (200MW); 20% solar |
| | 27HS_IVCM_250MW_Solar_Reduced.sav | 2027 Heavy Summer with Project (250MW); 20% solar |
| | 27HS_IVCM_500MW_Solar_Reduced.sav | 2027 Heavy Summer with Project (500MW); 20% solar |
| **Light Spring Early Morning Solar Reduced Scenarios** | | |
| 26LSP1Sa.sav | 27LSP_IVCM_Solar_Reduced_pre.sav | 2027 Light Spring without Project (pre-case); 40% solar |
| | 27LSP_IVCM_150MW_Solar_Reduced.sav | 2027 Light Spring with Project (150MW); 40% solar |
| | 27LSP_IVCM_200MW_Solar_Reduced.sav | 2027 Light Spring with Project (200MW); 40% solar |
| | 27LSP_IVCM_250MW_Solar_Reduced.sav | 2027 Light Spring with Project (250MW); 40% solar |
| | 27LSP_IVCM_500MW_Solar_Reduced.sav | 2027 Light Spring with Project (500MW); 40% solar |

TABLE 2: SUMMARY OF BASE CASES ANALYZED

The GE PSLF version 23.0.8.2 software was used to analyze the pre and post Project study cases, with respect to the North American Electric Reliability Corporation (NERC) revised NERC TPL-001-5.1 standard, reflecting the use of P0-P7 outage categories and the corresponding WECC system performance criteria. GE PSLF was also used to check for system performance criteria violations in each of the post-Project cases when comparing to the corresponding pre-Project case. GE ProvisoHD was utilized to accumulate the power flow results in order to facilitate the comparison between pre and post Project cases. The base cases developed are designed to reflect the IID electrical system via loads, resources, topology and conditions expected when the project starts operation. While it is impossible to study all the IID transmission system flows and generation levels during all seasons, these pre-Project base cases represent extreme generation and transmission flows that will potentially expose any transmission constraints at the POI. However, the IID cannot guarantee that the Project can operate at its maximum rating year-round without impacting the transmission system, during times and seasons not studied.



**Steady State Contingency Analysis:**

The assessment considered all of IIDs credible single and multiple contingencies, as well as the most severe multiple contingencies within the IID system. External contingencies that are known to cause the most severe impacts to the IID transmission system were analyzed also. The scope of the steady-state analysis consisted of thermal, voltage magnitude and angle difference violations. The full suite of NERC standard TPL-001-5.1 contingency sets, P1-P7, was analyzed.

## STUDY RESULTS AND CONCLUSION

The Imperial Irrigation District (IID) conducted a high-level feasibility study for the proposed Project at various loading levels, with the POI located on the 230kV 'S' Line between IID's El Centro substation and SDG&E's Imperial Valley substation. The study evaluated multiple loading and generation scenarios for the Project's target year, using Heavy Summer and Light Spring cases. Below are the findings and results for each loading scenario:

**150 MW load**
- Results showed there were no thermal violations in IID's transmission system under P0-P7 contingencies. Project did not cause any buses to experience voltage exceedances or deviations.

**200 MW load**
- Results showed there were no thermal violations in IID's transmission system under P0-P7 contingencies. Project did not cause any buses to experience voltage exceedances or deviations.

**250 MW load**
- Results showed there were no thermal violations in IID's transmission system under P0-P7 contingencies. Project did not cause any buses to experience voltage exceedances or deviations.

**500 MW load**
- Thermal and voltage violations were found under the following outage:
  - P1: Loss of 230kV 'S' Line between 230kV Imperial Valley Substation and 230kV IVCM Substation.

- The outage mentioned above shows the Project poses a significant risk of voltage collapse due to its heavy reliability on imported power and the limited transmission capacity of IID's system to support such demand. In order to avoid this risk and for the project to be feasible, a new independent 230kV circuit from Imperial Valley Substation to IVCM Substation will be needed.

Please note that this is based on high-level assumptions and does not represent the final results of the study, as conceptual models and designs were used to verify that the proposed maximum output at the point of interconnection is feasible.



**Imperial Irrigation District**

*Protecting the flow of progress.*

# IMPERIAL IRRIGATION DISTRICT

## System Impact Study Agreement

### Imperial Data Center #1 - 250 MW

**THIS AGREEMENT** is made and entered into this 3rd day of June, 2025 by and between Imperial Valley Computer Manufacturing, LLC, a company organized and existing under the laws of the State of Delaware and registered to do business in the state of California ("Interconnection Customer"), and the Imperial Irrigation District an irrigation district organized under the Water Code of the State of California, ("Transmission Provider"). Interconnection Customer and Transmission Provider each may be referred to as a "Party" or collectively as the "Parties."

### RECITALS

**WHEREAS,** Interconnection Customer is proposing to develop a Generating Facility or generating capacity addition to an existing Generating Facility consistent with the Interconnection Request submitted by Interconnection Customer dated January 17, 2025; and

**WHEREAS,** Interconnection Customer desires to interconnect the Generating Facility with Transmission Provider's Transmission System or Distribution System; and

**WHEREAS,** Transmission Provider has completed a Scoping Meeting with Interconnection Customer; and

**WHEREAS,** Interconnection Customer has requested Transmission Provider to perform an Interconnection System Impact Study to assess the impact of interconnecting the Generating Facility to the Transmission System or Distribution System.

**NOW, THEREFORE,** in consideration of and subject to the mutual covenants contained herein the Parties agree as follows:

1.0　　When used in this Agreement, unless otherwise defined herein, terms with initial capitalization shall have the meaning specified in the Transmission Provider's Tariff.

1



IID-693 (10-08)
SYSTEM IMPACT STUDY AGREEMENT

**Imperial Irrigation District**
*Protecting the flow of progress.*

2.0 Interconnection Customer requests that Transmission Provider prepare an Interconnection System Impact Study consistent with Section 7 of the GIP in accordance with the Tariff. At Transmission Provider's option, Interconnection Customer's Interconnection Request may be studied serially or in a cluster with Interconnection Requests submitted by other Interconnection Customers.

3.0 The Interconnection System Impact Study will be based upon the results of the Scoping Meeting and the technical information provided by Interconnection Customer in the Interconnection Request, subject to any modifications in accordance with Sections 4.4.1 and 7.2 of the GIP. When Clustering is used to perform the Interconnection System Impact Study, the Interconnection System Impact Study also will be based upon the results of Scoping Meetings and technical information provided by other interconnection customers in their Interconnection Requests, subject to any modifications in accordance with Sections 4.4.1 and 7.2 of the GIP. Transmission Provider has the right to request additional technical information from Interconnection Customer that Transmission Provider determines is reasonably necessary, consistent with Good Utility Practice, during the course of the Interconnection System Impact Study.  Upon request by Transmission Provider, Interconnection Customer shall provide such additional information to Transmission Provider within seven (7) Calendar Days.

4.0 Transmission Provider's non-binding, good faith estimate for the time of completion of the Interconnection System Impact Study is December 2024 and Transmission Provider's non-binding, good faith estimate of the cost for completing the Interconnection System Impact Study is $50,000.00.

5.0 If Interconnection Customer, or any other interconnection customer with an Interconnection Request in the same study cluster as the Interconnection Customer's Interconnection Request, modifies its designated Point of Interconnection,

CRITICAL BUSINESS & REGULATORY AFFAIRS
P.O. BOX 937, IMPERIAL, CA 92251
TEL: (760) 482-34547 REV 6/9/2017



**Imperial Irrigation District**

*Protecting the flow of progress.*

Interconnection Request, or the technical information provided therein is modified, the time to complete the Interconnection System Impact Study may be extended. Similarly, if the Interconnection Request of another interconnection customer is withdrawn from Transmission Provider's queue or removed from the cluster, the time to complete the Interconnection System Impact Study may be extended.

6.0   Following the completion of the Interconnection System Impact Study, the Transmission Provider shall provide an Interconnection System Impact Study report to Interconnection Customer. Subject to the confidentially provisions of Section 13.1 of the GIP, this report shall provide the following information:

–   identification of any circuit breaker short circuit capability limits exceeded as a result of the interconnection or, when Clustering is used, as a result of the interconnections of the group of Generating Facilities studied in the cluster;

–   identification of any thermal overload or voltage limit violations resulting from the interconnection or, when Clustering is used, resulting from the interconnections of the group of Generating Facilities studied in the cluster;

–   identification of any instability or inadequately damped response to system disturbances resulting from the interconnection or when Clustering is used, resulting from the interconnections of the group of Generating Facilities studied in the cluster; and

–   a description and non-binding, good faith estimate of the cost and time to construct facilities projected to be required to interconnect the Generating Facility to the Transmission System or Distribution System, or, when Clustering is used, to interconnect of the group of Generating Facilities studied in the cluster, and to address the identified short circuit, instability, and power flow issues.



**Imperial Irrigation District**
*Protecting the flow of progress.*

7.0    When the Interconnection System Impact Study report is provided to Interconnection Customer, Transmission Provider shall invoice Interconnection Customer for the actual costs of the Interconnection System Impact Study, including Transmission Provider's administrative costs, if any, that are in excess of the applicable deposit amount paid previously by Interconnection Customer in accordance with Section 3.3.1(b)of the GIP. Interconnection Customer shall pay such invoice within thirty (30) Calendar Days of its receipt of the invoice.

8.0    Transmission Provider's Interconnection System Impact Study shall not be construed as confirming or endorsing the design, or as any warranty of safety, durability, reliability or suitability of Interconnection Customer's Generating Facility or installation thereof for any use, including the use intended by Interconnection Customer.

9.0    This Agreement shall be interpreted and enforced in accordance with the substantive and procedural laws of the State of California. All actions or proceedings arising in connection with this Agreement shall be tried and litigated exclusively in State court located in the County of Imperial, California and/or Federal court located in the County of San Diego, California. The aforementioned choice of venue is mandatory, thereby precluding the possibility of litigation between the Parties with respect to or arising out of this Agreement in any jurisdiction other than that specified in this section. Each Party hereby waives any right it may have to assert the doctrine of *forum non conveniens* or a similar doctrine or to object to venue with respect to any proceeding brought in accordance with this section, and stipulates that the State court located in Imperial County, California, and/or a Federal court located in the Counties of Imperial and San Diego, respectively, California, shall have *in personam* jurisdiction and venue over each of them for the purpose of litigating any dispute or proceeding arising out of or related to this Agreement.   Each Party hereby authorizes service of process sufficient for personal jurisdiction

CRITICAL BUSINESS & REGULATORY AFFAIRS
P.O. BOX 937, IMPERIAL, CA 92251
TEL: (760) 482-34547 REV 6/9/2017



in any action against it at the address and in the manner for the giving of notice as set forth in this Agreement.

10.0 Interconnection Customer shall at all times indemnify, defend, and save Transmission Provider harmless from, any and all damages, losses, claims, including claims and actions relating to injury to or death of any person or damage to property, demands, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third parties, arising out of or resulting from Transmission Provider's performance of its obligations under this Agreement on behalf of Interconnection Customer, except in cases where Transmission Provider is solely negligent.

11.0 Transmission Provider shall not be considered to be in default of the provisions of this Agreement if delays in or failure of performance shall be due to uncontrollable forces, the effect of which, by the exercise of reasonable diligence, Transmission Provider could not avoid. The term uncontrollable forces shall mean any event which results in the prevention or delay of performance by Transmission Provider of its obligations under this Agreement and which is beyond the control of Transmission Provider. The term uncontrollable forces includes, but is not limited to, fire, acts of God, flood, earthquakes, storms, lightning, epidemic, pandemic, war, riot, civil disturbance, sabotage, inability to procure permits, licenses, or authorizations from any state, local, or federal agency, or person for any of the supplies, materials, accesses, or services required to be provided by Transmission Provider under this Agreement, strikes, work slowdowns, or other labor disturbances, and judicial constraint. The provisions of this section shall not be interpreted or construed to require Transmission Provider to prevent, settle, or otherwise avoid a strike, work slowdown, or other labor action. Transmission Provider shall give timely written notice to Interconnection Customer describing the circumstances of uncontrollable forces which prevent the fulfillment of obligation of this Agreement. Transmission Provider shall give timely written notice to the Interconnection



**Imperial Irrigation District**
*Protecting the flow of progress.*

Customer that the uncontrollable forces which prevented the fulfillment of obligations of this Agreement are no longer present and work has resumed on those obligations.

12.0    Each Party makes the following representations, warranties and covenants:

12.1    Such Party is duly organized, validly existing and in good standing under the laws of the state in which it is organized, formed, or incorporated, as applicable; that it is qualified to do business in the state or states in which it is located, and that it has the corporate power and authority to own its properties, to carry on its business as now being conducted and to enter into this Agreement and carry out the transactions contemplated hereby and perform and carry out all covenants and obligations on its part to be performed under and pursuant to this Agreement.

12.2    Such Party has the right, power and authority to enter into this Agreement, to become a Party hereto and to perform its obligations hereunder. This Agreement is a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforceability is sought in a proceeding in equity or at law).

12.3    The execution, delivery and performance of this Agreement does not violate or conflict with the organizational or formation documents, or bylaws or operating agreement, of the Party, or any judgment, license, permit, order, material agreement or instrument applicable to or binding upon such Party or any of its assets.

6

IID-693 (10-08)
SYSTEM IMPACT STUDY AGREEMENT

Imperial Irrigation District
*Protecting the flow of progress.*

12.4    The Party has obtained each consent, approval, authorization, order, or acceptance by any Governmental Authority in connection with the execution, delivery and performance of this Agreement, and it will provide to any Governmental Authority notice of any actions under this Agreement that are required by Applicable Laws and Regulations.

13.0    All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing, unless otherwise agreed by the Parties, and shall be delivered in person or sent by certified mail, postage prepaid, by overnight delivery, or by electronic mail or electronic facsimile transmission with an original sent immediately thereafter by postage prepaid mail, and properly addressed as follows:

When delivered to Transmission Provider:

Energy Contracts
IMPERIAL IRRIGATION DISTRICT
333 Barioni Blvd.
P.O. Box 937
Imperial, CA 92251
Email: Energycontracts@iid.com

When delivered to Interconnection Customer:

Imperial Valley Computer Manufacturing, LLC
16400 Pacific Coast Highway, Suite 212
Huntington Beach, CA 92649
Email: sebastian@ruccilaw.com

14.0    Either Party may, from time to time, change its representative or address for the purpose of notices to that Party by a similar notice specifying a new representative or address, but no such change shall be deemed to have been given until such notice is actually received by the Party being so notified.

7



**Imperial Irrigation District**
*Protecting the flow of progress.*

IID-693 (10-08)
SYSTEM IMPACT STUDY AGREEMENT

15.0    Where authorized in accordance with Section 4.3 of the GIP, this Agreement may be assigned and, if so assigned, the Agreement, and the rights and obligations thereof, shall be binding upon and shall insure to the benefit of the successors and assigns of the Parties hereto.

16.0    This Agreement may be executed in two or more counterparts, by facsimile signature or an e-mail of a PDF signature, each of which is deemed an original but all constitute one and the same instrument.

17.0    The Parties may, by mutual agreement, amend this Agreement by a written instrument duly executed by the Parties.

18.0    This Agreement is subject to Transmission Provider's Tariff, as may be amended from time-to-time.

IN WITNESS THEREOF, the Parties have caused this Agreement to be duly executed by their duly authorized officers or agents on the day and year first above written.

**Imperial Irrigation District**

Signature: _____

Print Name:    Jesus Martinez

Title:    Sup. Gen. Sys. Planning and Engineering

Date:    6/12/2025

8



**Imperial Irrigation District**
*Protecting the flow of progress.*

IID-693 (10-08)
SYSTEM IMPACT STUDY AGREEMENT

### Imperial Valley Computer Manufacturing, LLC

| | |
|---|---|
| Signature: | *Sebastian Rucci* |
| Print Name: | Sebastian Rucci |
| Title: | Managing Member |
| Date: | June 3, 2025 |

CRITICAL BUSINESS & REGULATORY AFFAIRS
P.O. BOX 937, IMPERIAL, CA 92251
TEL: (760) 482-34547 REV 6/9/2017



VERSION: DRAFT

JULY 25, 2025



# IMPERIAL VALLEY COMPUTER MANUFACTURING LLC, (DATA CENTER #1) SYSTEM IMPACT STUDY

TRANSMISSION PLANNING



TABLE OF CONTENTS

1.  Executive Summary ..................................................................................................... 4

2.  Project Description ...................................................................................................... 5

3.  Study Data Assumptions and Methodology .............................................................. 7

   3.1 Base Cases and Assumptions ................................................................................. 7

   3.2    Methodology ................................................................................................. 8

      3.2.1    Steady State Contingency Analysis ................................................... 8

      3.2.2 Transient Stability Analysis .......................................................................... 8

      3.2.3 Post-Transient Analysis (Reactive Margin) ................................................ 10

      3.3.1    Power Flow Modeling .................................................................... 10

      3.3.2 Dynamic Models ........................................................................................ 11

      3.3.3 Remedial Action Scheme Modeling ........................................................... 11

   3.4 System Upgrades/Mitigations ............................................................................. 12

4.  Study Criteria ............................................................................................................ 12

   4.1 NERC Reliability Standards ................................................................................... 12

   4.2 WECC Reliability Criteria ...................................................................................... 12

   4.3 Steady State Study Criteria .................................................................................. 12

      4.3.1 Normal Overloads ..................................................................................... 13

      4.3.2 Emergency Overloads ................................................................................ 13

      4.3.3 Voltage Criteria ......................................................................................... 14

   4.3 Transient Stability Data ....................................................................................... 14

      4.4.1 Bus Voltage ............................................................................................... 14

      4.4.2 Bus Frequency .......................................................................................... 16

   4.5 Reactive Margin Criteria ...................................................................................... 16

5.  Study Results ............................................................................................................. 16

   5.1 Power Flow Analysis: ........................................................................................... 16

      5.1.1 (2027) Heavy Summer Peak ...................................................................... 17

      5.1.2 (2027) Heavy Summer Peak Solar Reduced 20% ...................................... 17

      5.1.3 (2027) Light Spring Solar Reduced 40% .................................................... 17

   5.2 Transient Stability Analysis .................................................................................. 17

      5.2.1 (2027) Heavy Summer Transient Stability Results..................................... 17

      5.2.2 (2027) Heavy Summer Solar Reduced Transient Stability Results............. 17

      5.2.3 (2027) Light Spring Solar Reduced Transient Stability Results .................. 17

   5.3 Post Transient Stability and Reactive Power Margin: Heavy Summer ................. 17



6. Conclusion ................................................................................................................ 18



## 1. EXECUTIVE SUMMARY

The Imperial Irrigation District (IID) received a request from Imperial Valley Computer Manufacturing LLC (Customer) for the interconnection of their Imperial Data Center Campus (Project) in the Imperial Valley. The facility's proposed Point of Interconnection (POI) to the IID System is at the 230kV 'S' line between IID's El Centro switching station (ECSS) and San Diego Gas & Electric's (SDG&E's) Imperial Valley substation. As part of this study, IID evaluated the interconnection of 250 MW of load to assess potential system impacts and infrastructure requirements. Commercial Operation Date (COD) is planned to be in service by the year 2027.

IID's Transmission Planning Department performed a System Impact Study (SIS) to evaluate the potential impact of integrating this Project into the IID transmission system. The study included power flow (steady-state), transient stability, and post-transient stability analysis. The scope of the analyses is to identify the transmission system impacts caused solely by the addition of the project and reinforcements necessary to mitigate the adverse impact of the Project under different system operating conditions. The following scenarios were studied accordingly:

> ➢ 2027 Heavy Summer
> ➢ 2027 Heavy Summer (Solar reduced)
> ➢ 2027 Light Spring (Early morning solar reduced)

Each scenario includes two versions, a pre-case and a post-case including the project load. All cases include all generation with an executed Generation Interconnection Agreement (GIA), planned IID transmission upgrades, as well as anticipated distribution projects as identified in the IID 2024-33 Capital Investment plan. The project was modeled as a new load with a value of 250 MW for the year 2027. The analysis tested the impact of the load addition on the reliability of IID's electrical system.

**Note:** IID Transmission Planning assumed that the majority of the power required to serve this load would be imported for the purposes of this study. IID currently does not have the capability to reliably support a large-scale load requiring continuous 24-hour service with existing resources. As such, this report does not represent a commitment by IID to serve the requested load.



## 2. PROJECT DESCRIPTION

The proposed Project consists of a large-scale data center campus, upwards of 250MW, that is to be placed in a land parcel near the 230kV 'S' line between IID's El Centro switching station and SDG&E's Imperial Valley substation, which will serve as the POI for the Project. The Project had an assumed power factor of 0.95. The Figures 1, 2, & 3 below indicate the single line diagram, geographical location, and site plan of the Project.



**FIGURE 1: PROJECT SINGLE LINE DIAGRAM**

*Note: Based on a feasibility study, the initial proposed project at 500MW has now been reduced to 250MW. The single line has not been updated and serves as a high-level electrical representation.





**FIGURE 2: PROJECT GEOGRAPHICAL LOCATION**



**FIGURE 3: PROJECT SITE PLAN**

## 3. STUDY DATA ASSUMPTIONS AND METHODOLOGY

### 3.1 BASE CASES AND ASSUMPTIONS

Various base cases were developed for this assessment with the intent to cover all critical operating scenarios, and to document all potential impacts that could be caused by the implementation of the Project. Any generation that had an executed Generation Interconnection Agreement (GIA), a Power Purchase Agreement (PPA), or a Tolling Agreement with the IID, and the project is in accordance with section 4.0 of IID's Planning Standards was included in the base cases. Distribution projects were included with either an executed Joint Power Agreement (JPA) or a finalized system impact study. The base cases were developed to represent the Heavy Summer operating conditions, representing high load with high generation output. A Heavy Summer sensitivity during the time frame of 1900-2100, representing high load with reduced solar output. Finally, Light Spring sensitivity, during the time frame of 0600-0800, representing moderate load with reduced solar output.

Table 1 below lists the WECC approved base cases that were used to model the IID system:

| WECC Seed Case | PSLF Base Case Name | Description |
|---|---|---|
| Heavy Summer Peak Scenarios | | |
| 25HS4a.sav | 27HS_IVCM_Peak_pre.sav | 2027 Heavy Summer without Project (pre-case) |
| | 27HS_IVCM_250MW_Peak.sav | 2027 Heavy Summer with Project (250MW) |
| Heavy Summer Solar Reduced Scenarios | | |
| 25HS4a.sav | 27HS_IVCM_Solar_Reduced_pre.sav | 2027 Heavy Summer without Project (pre-case); 20% solar |
| | 27HS_IVCM_250MW_Solar_Reduced.sav | 2027 Heavy Summer with Project (250MW); 20% solar |
| Light Spring Early Morning Solar Reduced Scenarios | | |
| 26LSP1Sa.sav | 27LSP_IVCM_Solar_Reduced_pre.sav | 2027 Light Spring without Project (pre-case); 40% solar |
| | 27LSP_IVCM_250MW_Solar_Reduced.sav | 2027 Light Spring with Project (250MW); 40% solar |

TABLE 1: SUMMARY OF BASE CASES ANALYZED

The GE PSLF version 23.0.8.2 software was used to analyze the pre and post Project study cases, with respect to the North American Electric Reliability Corporation (NERC) revised NERC TPL-001-5.1 standard, reflecting the use of P0-P7 outage categories and the corresponding WECC system performance criteria. GE PSLF was also used to check for system performance criteria violations in each of the post-Project cases when comparing to the corresponding pre-Project case. GE ProvisoHD was utilized to accumulate the power flow results in order to facilitate the comparison between pre and post Project cases. The base cases developed are designed to reflect the IID electrical system via loads, resources, topology and conditions expected when the project starts operation. While it is impossible to study all the IID transmission system flows and generation levels during all seasons, these pre-Project base cases represent extreme generation and transmission flows that will potentially expose any transmission constraints at the POI. However, the IID cannot guarantee that the Project can operate at its maximum rating year-round without impacting the transmission system, during times and seasons not studied.



## 3.2  METHODOLOGY

Steady state, transient stability and post-transient reactive margin analysis were performed for this assessment. Table 2 describes the type of analysis completed on each base case.

| PSLF Base Case Name | Steady State | Transient Stability | Post Transient |
|---|---|---|---|
| 27HS_IVCM_Peak_pre.sav | X | X | X |
| 27HS_IVCM_250MW_Peak.sav | X | X | X |
| 27HS_IVCM_Solar_Reduced_pre.sav | X | X | |
| 27HS_IVCM_250MW_Solar_Reduced.sav | X | X | |
| 27LSP_IVCM_Solar_Reduced_pre.sav | X | X | |
| 27LSP_IVCM_250MW_Solar_Reduced.sav | X | X | |

TABLE 2: DESCRIPTION OF THE ANALYSIS COMPLETED ON DEVELOPED BASE CASES VIA PSLF

### 3.2.1  Steady State Contingency Analysis

The assessment considered all of IIDs credible single and multiple contingencies, as well as the most severe multiple contingencies within the IID system. External contingencies that are known to cause the most severe impacts to the IID transmission system were analyzed also. The scope of the steady-state analysis consisted of thermal, voltage magnitude and angle difference violations. The full suite of NERC standard TPL-001-5.1 contingency sets, P1-P7, was analyzed.

### 3.2.2 Transient Stability Analysis

Transient stability analysis is a time-based simulation that assesses the performance of the power system shortly before, during, and after a transient disturbance. Initial conditions are characterized by the power flow case and model equations are used to simulate expected behavior from dynamic elements, such as generators and loads over time. Bus voltage and frequency plots are developed with an emphasis on all BES buses, and various non-BES buses in the IID system.  These buses are the following:

➢ **BES Buses**
- Alhambra Switching Station 161kV
- Arkansas Switching Station 161kV
- Avenue 58 161kV
- Calipatria Switching Station 230kV
- Coachella Switching 92kV
- Coachella Valley 92kV
- Coachella Valley 161kV
- Coachella Valley 230kV
- El Centro Switching Station 161kV
- El Cento Switching Station 230kV
- El Centro Switching Station 92kV

- Highline 230kV
- Hudson Ranch 230kV
- Midway 230kV
- Midway 92kV
- Nelson Switching Station 230kV
- Niland 161kV
- Pilot Knob 161kV
- Ramon 230kV
- Sonora Switching Station 230kV
- Yucca 161kV



- **Non-BES Buses**
  - o   Ave 42 92kV
  - o   Niland 92kV
  - o   Ramon 92kV
  - o   Ave. 58 92kV
  - o   El Centro 34.5kV
  - o   Blythe 161kV

Bus voltage plots provide a means of detecting out-of-step conditions and are useful to assess the magnitude and duration of post-disturbance voltage dips and peak-to-peak voltage oscillations. The voltage plots also indicate system damping response and the expected bus voltage following the disturbance. Bus frequency plots provide expected magnitude and duration of post-disturbance frequency swings, as well as indicating possible over-frequency or under-frequency conditions. Additionally, IID utilizes a dynamic criteria EPCL script to assist in evaluating if monitored buses meet WECC regional criteria as shown in Figures 4 and 5. The selected critical contingencies listed below in Table 3 were simulated for the transient stability analysis. This contingency list contains the most severe internal and external contingencies.

| # | IID Critical Contingencies |
|---|---|
| 1 | P1 - Colorado River-Red Bluff 500kV Line Fault |
| 2 | P1 - Coachella Valley-Mirage 230kV Line Fault |
| 3 | P1 - Coachella Valley-Ramon 230kV Line Fault |
| 4 | P1 - Devers-Mirage 230kV Line Fault |
| 5 | P1 - Devers-Red Bluff 500kV Line Fault |
| 6 | P1 - EL Centro Bank#4 |
| 7 | P1 - Eco-Miguel 500kV Line Fault |
| 8 | P1 - El Centro-Mall 92kV Line Fault |
| 9 | P1 - El Centro Steam #2 |
| 10 | P1 - Hassayampa-Hoodoowash 500kV Line Fault |
| 11 | P1 - Hassayampa-North Gila 500kV Line Fault |
| 12 | P1 - Imperial Valley-Eco 500kV Line Fault |
| 13 | P1 - Midway-Coachella Valley 230kV Circuit 1 Line Fault |
| 14 | P1 - Midway 1 Tap-Midway 92kV Circuit 1 Line Fault |
| 15 | P1 - N. Gila-Imperial Valley 500kV Line Fault |
| 16 | P1 - Paloverde-Colorado River 500kV Line Fault |
| 17 | P1 - Ramon Bank #1 |
| 18 | P1 - Ramon-Mirage 230kV Line Fault |
| 19 | P1 - El Centro-Imperial Valley Data Center 230kV Line Fault |
| 20 | P1 - Imperial Valley Data Center-Imperial Valley 230kV Line Fault |
| 21 | P2 - Ave. 58 161kV Bus Fault |
| 22 | P2 - Colorado River Bus Fault |
| 23 | P2 - El Centro Bus #1 92kV Bus Fault |
| 24 | P2 - El Centro Bus #2 92kV Bus Fault |

| 25 | P2 - Midway 230kV Bus Fault |
| 26 | P6 - Coachella Valley-Mirage & Ramon-Mirage 230kV Line Fault |
| 27 | P7 - Devers-Mirage Circuit 1&2 230kV Line Fault |
| 28 | P7 - Coachella Valley-Mirage & Coachella Valley-Ramon 230kV Line Fault |
| 29 | P7 - Coachella Valley-Midway #1 and #2 230kV Line Fault |

TABLE 3: CRITICAL CONTINGENCIES USED FOR TRANSIENT AND POST-TRANSIENT ANALYSIS

### 3.2.3 Post-Transient Analysis (Reactive Margin)

Post-transient stability analysis was performed on selected buses in the IID transmission system following selected, most severe, and critical outages. Moreover, governor power flow tools were used for the analysis. For each bus assessed, a synchronous condenser was modeled to determine the highest reactive power margin available on that bus. All BES and non-BES buses were monitored.

During post-transient simulations, the following assumptions were used:

- Loads were modeled as constant MVAs, during the post-transient time frame
- Reactive power output of the system swing generator was limited to its maximum capability
- No manual operator intervention was allowed to increase generator MVAR flow
- Remedial actions, such as generator dropping, load shedding, or blocking of automatic generator control were not considered for single outages

Positive reactive margin is desired at all of the buses. For the IID transmission system, the post-transient stability analysis criteria are the following:

- For transfer paths, all P0-P1 events shall demonstrate a positive reactive power margin at a minimum of 105 percent of transfer path flow.
- For transfer paths, all P2-P7 events shall demonstrate a positive reactive power margin at a minimum of 102.5 percent of transfer path flow.
- For load areas, all P0-P1 events shall demonstrate a positive reactive power margin at a minimum of 105 percent of forecasted peak load.
- For load areas, all P2-P7 events shall demonstrate a positive reactive power margin at a minimum of 102.5 percent of forecasted peak load.

Selected critical contingencies listed above in Table 3 were simulated for post-transient stability analysis. These contingencies included the most severe internal and external contingencies.

### 3.3    MODELING

The following section document the modeling methods used to represent the project in steady state and dynamics analyses.

### 3.3.1    Power Flow Modeling

Equivalent load of project:

- A 250MW equivalent load on the 230kV IVCM data center bus.



### 3.3.2 Dynamic Models

WECC approved models from the GE PSLF library was used to represent the Project. For this Project, dynamic stability models included models for the following:

- Commercial and Industrial Load
  - WECC Composite Load Model: **cmpldw**

### 3.3.3 Remedial Action Scheme Modeling

Various Remedial Action Schemes (RAS) were modeled in conjunction with the various projects included in the base cases. A summary of the internal automatic actions taken are described below:

- South R-Line RAS: Open breaker "RNO" at Dixieland will send a trip signal to Ocotillo Wells Solar.
- North R-Line RAS: Loss of Anza to Oasis and Ave 58 will send a trip signal to Seville 3.
- "K" line SPS: Loss of the "K" line, "N" Line, and the loss of the Niland 92/161kV transformer will send a trip signal to Colgreen.
- Path 42 RAS:
  - Loss of the 230kV "KN" line between Coachella Valley and Mirage and the 230kV "KS" line between Coachella Valley and Ramon will send a trip signal to the identified generation.
  - Loss of the 230kV "KN" line between Coachella Valley and Mirage and the 230kV "KS" line between Ramon and Mirage will send a trip signal to the identified generation.
  - Devers-Mirage 1 & 2: Loss of circuit numbers 1 and 2 will send a trip signal to the identified generation.
- Path 42 RAS N-1:
  - Loss of the 230kV "KN" line between Coachella Valley and Mirage will send a trip signal to the identified generation.
  - Loss of the 230kV "KS" line between Coachella Valley and Ramon will send a trip signal to the identified generation.
  - Loss of the 230kV "KS" line between Ramon and Mirage will send a trip signal to the identified generation.
  - Loss of the 230kV "KN" line between Coachella Valley and Midway will send a trip signal to the identified generation.
  - Loss of the 230kV "KS" line between Coachella Valley and Midway will send a trip signal to the identified generation.
- Coachella Valley – Midway RAS:
  - Loss of the 230kV "KN" line between Coachella Valley and Midway will send a trip signal to the identified generation.
  - Loss of the 230kV "KS" line between Coachella Valley and Midway will send a trip signal to the identified generation.
- Midway Transformer RAS N-1:
  - Loss of either bank #1 or bank #2 92/230kV Transformer at Midway will send a trip signal to the identified generation.
- El Centro 161kV Bus RAS N-1:
  - Loss of the 161kV Bus at El Centro Switching will send a trip signal to the identified generation.

## 3.4 SYSTEM UPGRADES/MITIGATIONS

- Southern 92kV R-Line Upgraded – Q2 2026 (Ocotillo Mitigation)
- Coachella Valley Switching Station Upgrade – Q2 2026 (TPL-001)
- Ramon-Mirage 230kV Circuit 2 – Q4 2028 (TPL-001)
- 135MVAR Reactive Support at Ramon 230kV – Q2 2026 (IPP Mitigation)
- ECSS RAS N-1 – Q3 2025 (IPP Mitigation)
- Northern 92kV R-Line Upgraded – Q4 2026 (IPP Mitigation)
- Midway Transformer RAS – Q4 2025 (IPP Mitigation)

## 4. STUDY CRITERIA

Grid Reliability Criteria, which incorporates the WECC and NERC planning criteria, was used for this assessment. IID's standards and procedures were followed during the study process.

## 4.1 NERC RELIABILITY STANDARDS

The need for transmission upgrades and additions was determined in accordance with NERC Reliability Standards. These standards set forth criteria for system performance requirements, which must be met under specific set of operating conditions. The following NERC Reliability Standards are applicable to the Transmission Operators (TOs) as registered NERC Planning Authorities, Transmission Planners, and are the primary standards for the interconnection of new facilities and system performance:

- FAC-001: Facility Connection Requirements
- FAC-002: Coordination of Plans for New Facilities
- TPL-001-5.1: Transmission System Planning Performance Requirements

## 4.2 WECC RELIABILITY CRITERIA

The WECC TPL system performance criteria, TPL-001-WECC-CRT-4, sets forth additional requirements that must be met under various, but specific set of operating conditions and may be applicable to the TOs as Planning Authorities.

## 4.3 STEADY STATE STUDY CRITERIA

The system performance, with the addition of the Project, was evaluated under normal conditions and following losses of a single or multiple Bulk Electric System (BES) element(s), as defined by the applicable reliability standards and criteria.   Figure 4: Listing of TPL-001-5.1 P1-P7 contingency descriptions summarizes the contingencies per NERC Reliability Standards, and WECC Regional Criteria.



| Category | Initial Condition | Event [1] | Fault Type [2] | BES Level [3] | Interruption of Firm Transmission Service Allowed [4] | Non-Consequential Load Loss Allowed |
|---|---|---|---|---|---|---|
| **P0** No Contingency | Normal System | None | N/A | EHV, HV | No | No |
| **P1** Single Contingency | Normal System | Loss of one of the following: 1. Generator 2. Transmission Circuit 3. Transformer [5] 4. Shunt Device [6] | 3Ø | EHV, HV | No[5] | No[12] |
| | | 5. Single Pole of a DC line | SLG | | | |
| **P2** Single Contingency | Normal System | 1. Opening of a line section w/o a fault [7] | N/A | EHV, HV | No[5] | No[12] |
| | | 2. Bus Section Fault | SLG | EHV | No[5] | No |
| | | | | HV | Yes | Yes |
| | | 3. Internal Breaker Fault [8] (non-Bus-tie Breaker) | SLG | EHV | No[5] | No |
| | | | | HV | Yes | Yes |
| | | 4. Internal Breaker Fault (Bus-tie Breaker) [8] | SLG | EHV, HV | Yes | Yes |
| **P3** Multiple Contingency | Loss of generator unit followed by System adjustments[9] | Loss of one of the following: 1. Generator 2. Transmission Circuit 3. Transformer [5] 4. Shunt Device [6] | 3Ø | EHV, HV | No[5] | No[12] |
| | | 5. Single pole of a DC line | SLG | | | |
| **P4** Multiple Contingency *(Fault plus stuck breaker[10])* | Normal System | Loss of multiple elements caused by a stuck breaker [10](non-Bus-tie Breaker) attempting to clear a Fault on one of the following: 1. Generator 2. Transmission Circuit 3. Transformer [5] 4. Shunt Device [6] 5. Bus Section | SLG | EHV | No[5] | No |
| | | | | HV | Yes | Yes |
| | | 6. Loss of multiple elements caused by a stuck breaker[10] (Bus-tie Breaker) attempting to clear a Fault on the associated bus | SLG | EHV, HV | Yes | Yes |
| **P5** Multiple Contingency *(Fault plus relay failure to operate)* | Normal System | Delayed Fault Clearing due to the failure of a non-redundant relay[13] protecting the Faulted element to operate as designed, for one of the following: 1. Generator 2. Transmission Circuit 3. Transformer [5] 4. Shunt Device [6] 5. Bus Section | SLG | EHV | No[5] | No |
| | | | | HV | Yes | Yes |
| **P6** Multiple Contingency *(Two overlapping singles)* | Loss of one of the following followed by System adjustments.[9] 1. Transmission Circuit 2. Transformer [5] 3. Shunt Device[6] 4. Single pole of a DC line | Loss of one of the following: 1. Transmission Circuit 2. Transformer [5] 3. Shunt Device [6] | 3Ø | EHV, HV | Yes | Yes |
| | | 4. Single pole of a DC line | SLG | EHV, HV | Yes | Yes |
| **P7** Multiple Contingency *(Common Structure)* | Normal System | The loss of: 1. Any two adjacent (vertically or horizontally) circuits on common structure [11] | SLG | EHV, HV | Yes | Yes |
| | | 2. Loss of a bipolar DC line | | | | |

FIGURE 4: *LISTING OF TPL-001-5.1  P1-P7 CONTINGENCY DESCRIPTIONS*

### 4.3.1 Normal Overloads

Normal overloads are those that exceed 100 percent of normal facility rating under NERC Category P0 conditions (no contingencies). Normal overloads are identified in the Reliability Study power flow analysis, in accordance with the Reliability Standard, TPL-001-5.1. It is required that loading of all transmission system facilities be within their normal ratings under NERC Category P0 conditions.

### 4.3.2 Emergency Overloads

Emergency overloads are those that exceed 100 percent of emergency ratings under NERC and WECC Category P1-P7 contingency conditions. Emergency overloads are identified in the Reliability Study power flow analysis in accordance with Reliability Standards, TPL-001-5.1. It is required that loading of all transmission system facilities be within their emergency ratings under the Category P1-P7 contingency conditions.


### 4.3.3 Voltage Criteria

A voltage criteria violation occurs if a bus within the transmission system, of each TO, fails to meet the requirements defined in Table 4. For Voltage Criteria, bus voltages are relative to the nominal bus voltages of the system under study.

| Voltage Level | Normal Conditions (P0) | | Contingency Conditions (P1-P7) | | Voltage Deviation | |
|---|---|---|---|---|---|---|
| | VMIN (p.u.) | VMAX (p.u.) | VMIN (p.u.) | VMAX (p.u.) | Load Buses (P1) | Non-Load (P1) & All Buses (P2-P7) |
| ≤200kV | 0.95 | 1.05 | 0.9 | 1.1 | ≤8% | ≤10% |
| ≥200kV | 0.95 | 1.05 | 0.9 | 1.1 | ≤8% | ≤10% |
| ≥500kV | 0.95 | 1.05 | 0.9 | 1.1 | ≤8% | ≤10% |

*TABLE 1: VOLTAGE CRITERIA*

The maximum total voltage deviation for P3 and P6 events will be measured from the voltage that exists after the initial condition and therefore takes into consideration only voltage deviation due to the second event. Buses within the IID controlled grid that cannot meet the requirements in Table 4 will be further investigated.

### 4.3 TRANSIENT STABILITY DATA

Transient stability analysis is a time-based simulation that assesses the performance of the power system shortly before, during, and quickly following a contingency. Transient stability studies were performed to verify the stability of the system following a system fault. Transient stability analysis was performed based on the WECC Disturbance-Performance Criteria, for selected system contingencies, using Version 23.0.8.2 of the GE PSLF software. Transient stability contingencies were simulated for a minimum of 10 seconds, including 1 second of pre-disturbance data. Unless specified, all faults were modeled as 3-phases with 4 cycles of breaker clearing time. System damping was assessed visually with the aid of stability plots.

### 4.4.1 Bus Voltage

Bus voltage plots provide a means of detecting out-of-step conditions and are useful to assess the magnitude and duration of post-disturbance voltage dips and peak-to-peak voltage oscillations. The voltage plots also indicate system damping response and the expected bus voltage following the disturbance. WECC Regional Criteria, TPL-001-WECC-CRT-4, requires that the following criteria be applied:

- Following fault clearing, the voltage shall recover to 80% of the pre-contingency voltage within 20 seconds of the initiating event for all P1 through P7 events, and for each applicable BES bus serving load.
- Following fault clearing and voltage recovery above 80%, voltage at each applicable BES bus serving load shall neither dip below pre-contingency voltage, for more than 30 cycles, nor remain below 80% of pre-contingency voltage for more than 2 seconds, for all P1 through P7 events.
- For contingencies without a fault (P2.1 category event), voltage dips at each applicable BES bus serving load shall neither dip below 70% of pre-contingency voltage, for more than 30 cycles, nor remain below 80% of pre-contingency voltage for more than two seconds.
- All oscillations that do not show positive damping within 30-seconds, after the start of the studied event, shall be deemed unstable.


- Figure 5 and 6 represent the acceptable recovery trajectory.



FIGURE 5: *WECC DIAGRAM REPRESENTING ADEQUATE VOLTAGE RECOVERY (DELAYED)*



FIGURE 6: *WECC DIAGRAM REPRESENTING ADEQUATE VOLTAGE RECOVERY (NORMAL)*



### 4.4.2 Bus Frequency

Bus frequency plots provide expected magnitude and duration of post-disturbance frequency swings, and possible over-frequency or under-frequency conditions. WECC Regional Criteria, TPL-001-WECC-CRT-4, requires that the following be applied:

- All oscillations that do not show positive damping, within 30-seconds, after the start of the studied event, shall be deemed unstable.

### 4.5 REACTIVE MARGIN CRITERIA

Post-transient stability analysis was performed on selected buses in the IID transmission system, following selected critical outages. For each bus assessed, a synchronous condenser was modeled to extract reactive power, until the point where voltage collapse occurs. The maximum reactive power consumed prior to the voltage collapse is determined. Positive reactive margin is desired at all buses.

## 5. STUDY RESULTS

This System impact study modeled the new load with a total of 250MW for summer and light spring scenarios. The following analysis tested the impact of the load addition on the reliability of IIDs electrical system.

### 5.1 POWER FLOW ANALYSIS:

Power flow analysis was performed using the base cases identified in Table 1, under Section 3. System thermal and voltage performance were tested during normal and emergency (contingency) conditions, in order to compare pre-Project and post-Project scenarios. Identified impacts, if any, are caused solely by this Project.

Thermal and voltage performance of the system was evaluated for base cases under normal, (P0), single element outage, (P1, P2), and selected multiple element outages, (P3-P7). Thermal loadings were reported when a model transmission component was loaded above 95% of its continuous MVA rating, (P0), and above 95% of its emergency rating, (P1-P7). Generally, the concerns are raised when an element is found loaded above 100% of its normal or emergency rating; however, 95% was chosen to identify circuits that are also at the edge of an overload. Moreover, such circuits need to be closely monitored and can be placed as potential candidates for future upgrades.

Transmission voltage violations for normal, (P0), conditions were reported when per unit voltages were less than 0.95 or greater than 1.05. Transmission voltage violations, following single or multiple outages, were reported when per unit voltages were less than 0.90 or greater than 1.1. Voltage deviations were recorded whenever these deviations were greater than 8% for load serving buses and 10% non-load serving buses.

The steady state study results for each of the cases is described in the following sections, while the complete results can be found in Appendix B.



### 5.1.1 (2027) Heavy Summer Peak
*5.1.1.1 Voltage and Thermal Performance*
- The project did not cause any buses in the base case to experience voltage exceedances or deviations with respect to the criteria on Table 4.
- The project did not cause thermal violations in IID's system.

### 5.1.2 (2027) Heavy Summer Peak Solar Reduced 20%
*5.1.2.1 Voltage and Thermal Performance*
- The project did not cause any buses in the base case to experience voltage exceedances or deviations with respect to the criteria on Table 4.
- The project did not cause thermal violations in IID's system.

### 5.1.3 (2027) Light Spring Solar Reduced 40%
*5.1.3.1 Voltage and Thermal Performance*
- The project did not cause any buses in the base case to experience voltage exceedances or deviations with respect to the criteria on Table 4.
- The project did not cause thermal violations in IID's system.

## 5.2 TRANSIENT STABILITY ANALYSIS

Transient stability was performed on the Heavy Summer and Light Spring pre- and post- Project base cases.

### 5.2.1 (2027) Heavy Summer Transient Stability Results
These simulation results show that the Project did not cause impacts on IID system stability under any of the simulated contingencies.
Refer to Appendix C for the 2027 Heavy Summer Transient pre and post stability plots.

### 5.2.2 (2027) Heavy Summer Solar Reduced Transient Stability Results
These simulation results show that the Project did not cause impacts on IID system stability under any of the simulated contingencies.
Refer to Appendix D for the 2027 Heavy Summer Solar Reduced transient pre and post stability plots.

### 5.2.3 (2027) Light Spring Solar Reduced Transient Stability Results
These simulation results show that the Project did not cause impacts on IID system stability under any of the simulated contingencies.
Refer to Appendix E for the 2027 Light Spring Solar Reduced transient pre and post stability plots.

## 5.3 POST TRANSIENT STABILITY AND REACTIVE POWER MARGIN: HEAVY SUMMER
Post-transient stability was performed on selected buses in IID transmission system following selected critical outages. Results show that the Project did not cause impacts on IID System reactive margin under any of the simulated contingencies

Refer to Appendix F for complete post-transient voltage (reactive margin) results.



## 6. CONCLUSION

The System Impact Study modeled the new load with a total of 250MW for summer and light spring scenarios. The following analysis tested the impact of the load addition on the reliability of IID's electrical system. The Project's POI is located on the 230kV 'S' Line between IID's El Centro substation and SDG&E's Imperial Valley substation. The study evaluated different seasons and generation scenarios for the Project's target year, using Heavy Summer and Light Spring cases. Below are the findings and results for this loading scenario:

**250 MW load**
- Results showed there were no thermal violations in IID's transmission system under P0-P7 contingencies. Project did not cause any buses to experience voltage exceedances or deviations.
- Results showed there were no transient stability violations in IID's transmission system under any of the simulated contingencies.

Study results show that this project can be deemed feasible. Please note that IID currently does not have the capability to reliably support a large-scale load requiring continuous 24-hour service. As such, this report does not represent a commitment by IID to serve the amount of requested load.

IID-792 (R1 6/29)



## <u>Customer Project Development Services</u>





## Customer Project Application for Services of 34.5 kV and Above

**Coachella Valley**
Mail/Physical Address: 81-600 Avenue 58, La Quinta, CA 92253
Office Hours: 7:00 a.m. - 5:00 p.m. (closed every other Friday) 760-398-5841

**Imperial Valley**
333 S. Waterman Ave., El Centro, CA
Mail: Customer Project Dev., PO Box 937, Imperial, CA 92251
Office Hours: 7:30 a.m. - 5:30 p.m. (closed every other Friday) 760-482-3300

**Submit completed form to the above corresponding addresses.**
**EMAIL:  Submit completed and signed form or address any questions or**
**concerns to: TCSP@iid.com**



**Developer Customer Account Application**
**Customer Development Operations**
**333 South Waterman • El Centro, CA   92243 • (800) 303-7756**
**Electrical Services**

☒ New Account    ☐ Account Transfer/Change of Name    ☐ Existing Account

| Project Information |
|---|
| Name: IMPERIAL VALLEY HYPERSCALE DATA CENTER |
| Service Address: 2300-2360 Imperial Avenue and 219-269 West Aten Road |

| City: Imperial | State: California | Zip Code: 92243 |
|---|---|---|

| Valley (Imperial or Coachella): Imperial |
|---|

| Applicant Information |
|---|
| Name: Imperial Valley Computer Manufacturing, LLC |
| Doing Business As (DBA): |
| Street Address: 16400 Pacific Coast Highway, Suite 212 |
| Mailing Address (if different): |

| Phone: (562) 901-0199 | E-mail: Sebastian@RucciLaw.com | Fax: (562) 249-6910 |
|---|---|---|
| City: Huntington Beach | State: CA | Zip Code: 92649 |

| Affiliation to Project: Equitable Owner of Land (Owner Under Contract) |
|---|

| Account Information |
|---|

| Contract Account No: | Business Partner No: |
|---|---|
| Mail Bill Attention To: Sebastian Rucci | Address: 16400 Pacific Coast Highway, Suite 212 |

| City: Huntington Beach | State: CA | Zip Code: 92649 | Phone: (562) 901-0199 |
|---|---|---|---|

| Affiliation to Project: Equitable Owner of Land (Owner Under Contract) |
|---|
| If Account was Previously Under Another Name, please list here: |
| Is there  Proof of Dissolution for Previous Account Holder : ☐ Yes  ☒ No   If Yes, please attach: |

| Commercial Information |
|---|
| Is this Business A Sole Proprietorship? (If Yes, please include name): |
| Is this Business a Corporation: ☒ Yes  ☐ No |
| If Yes, Please indicate State of Incorporation:  California |
| If No, Business Entity Type: |

| President/Member: Sebastian Rucci | Signature: *Sebastian Rucci* |
|---|---|
| Vice-President : | Signature: |
| Secretary: Sebastian Rucci | Signature: *Sebastian Rucci* |

| ☒ Articles of Incorporation/Entity Formation Docs.: (please attach): |
|---|

| Place of Business: Imperial Valley | Type of Business: Data Center Development |
|---|---|
| Federal Tax ID No. 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 | ☒ Letter of Authorization (please attach): |

| *Sebastian Rucci* | Sebastian Rucci | 03/05/2025 |
|---|---|---|
| Authorized Signature | Print Name | Date |

2

lib792 (Rv 6/25)



# SYSTEM PLANNING
## *IID SYSTEM IMPACT STUDY DATA REQUIREMENTS*

A typical System Impact Study includes Power Flow, Transient Stability, Post-Transient Stability, and Short Circuit Analysis. Depending on project characteristics IID System Planning may recommend expanding or reducing the scope of the study.

IID uses the last version of **G.E. PSLF** software approved by WECC to perform Power Flow, Transient Stability and Post-Transient Stability analyses. For the Short Circuit analysis the latest version of **ASPEN** software will be used.

### Power Flow (project's data)
Please provide the following information. (Additional sheets or documents can be added)

1. Project Name: <u>IMPERIAL DATA CENTER CAMPUS #2</u>
   What is the name of the project? (please provide three different alternative names)

   a. Alternative 1: _____

   b. Alternative 2: _____

   c. Alternative 3: _____

   **Note:** If the name of the project represents a potential conflict for IID's staff, IID will suggest/request a new name for your project to prevent the potential concern. This is not intended to create any legal or commercial issues on the development of your project.

2. Project One-Line Diagram and Project Site Plan
   Please provide a simplified one-line diagram and site plan in (PDF) of the facility(ies) to be studied.

3. Provide a Google Earth map (.kmz file) with geographical location of the new project requiring IID service.

4. Will this project be completed in phase? Yes ☒    No ☐
   If Yes, provide a description and estimate timelines for each phase.

5. Provide proof of site control.

6. Provide the in-service date for the total completion of the project or per phase.

   Date: <u>03/05/2027</u>

3

7. The System Planning group usually studies the Heavy Summer (PEAK) and Light Winter (OFF-PEAK) conditions to determine the most critical operating conditions for the IID System. Do you consider the need for studying another season or year for your project?

Yes ☐    No ☒

Which season or year?: _____

Reason?: _____

**Note:** Notice that any additional season or year to be studied for a new generation project would potentially represent additional costs for the study.

8. Propose Point of Interconnection (POI) to the IID System. The POI is the electrical point where you propose to connect your project to the existing IID grid. Provide the Station's Name or Line's Name and kV. IID may provide/propose a different POI if the orginal location is deemed problematic for project development.

Station name or line's name: 92 kV Line at Southern Property Line    kV: 92

Include APN# 044220046

9. Is your project load conforming or non-conforming? If non-conforming, please provide a description of planned operation.

Data Center (Permitted Use in Existing Zone)

10. Provide the company owner's name:

Imperial Valley Computer Manufacturing, LLC

11. Total MW input/service required of your project? 80

12. System Step-Down Transformer

| Low Side Voltage (kV) | 34.5 | High Side Voltage (kV) | 92 |
|---|---|---|---|
| MVA Base (MVA) | 60 | Reactance (p.u.) or % | 0.099944 pu |
| Continuous Normal Rating (MVA) | 100 | Emergency Rating (MVA) | 100 |
| Number of Tranformers | 2 | Winding Config. (Delta, Y, etc.) | Delta-WYE-GND |

4

13. Please provide project models in .epc format (PSLF) that accurately represents the electical configuration of your project. Models must include, but not limited to the following:
    a. Bus data
    b. Transformer data
    c. Load data
    d. Generator data, if applicable (behind the meter)

14. Please provide dynamic model representation via a WECC approved composite load model that accurately represents the dynamic behavior of your project. Projects must use the WECC composite load model (cmpldw). *See Attachment A for instructions.*

15. Provide the contact person name, telephone number and email address for questions on the Power Flow analysis data provided.

    a. Name:  Chris Goulet

    b. Title:  Transmission Planning

    c. Company:  Power Engineers, Inc.

    d. Address:  1060 Maitland Center Commons Blvd., Maitland, Florida 32751

    e. Telephone:  (913) 408-5311

    f. Email:  Christopher.Goulet@PowerEng.com

**A hard copy or scanned document of the completed template should be provided back to IID including data, and signed by the person(s) responsible for the data provided.**

Responsible Person Signature:  *Sebastian Rucci*

Responsible Person Name:  Sebastian Rucci

Responsible Person Title:  Managing Member        Date: 03/05/2025

If you have any questions regarding the data requested, please contact Jesus Martinez, Imperial Irrigation District System at (760) 339-0574.



# CUSTOMER PROJECT DEVELOPMENT SERVICES
## *REGULATIONS GOVERNING SALE AND USE OF ELECTRIC ENERGY*

**Excerpts from Regulation No. 6**

The customer shall, at his own risk and expense, furnish, install and keep in good and safe condition  all electric wires, lines, machinery and apparatus of any sort which may be required for receiving electric energy from the District, and for applying and utilizing such energy, including all necessary protective appliances and suitable housing therefor. The District shall not be responsible for any loss or damage occasioned or caused by the negligence or want of proper care or wrongful act of the customer or any of his agents, employees or licensees on the part of the customer in installing, maintaining, using, operating or interfering with any such wires, lines, machinery or apparatus.

**Excerpts from Regulation No. 11**

The district shall, at its option, have the right to disconnect its services until the customer has complied with all the terms of the agreement and of the District's regulation.

**Excerpts from Regulation No. 15**

The District will construct, own, operate and maintain lines only along public streets, roads and highways which the District has the legal right to occupy and on public lands and private property across which rights-of-way satisfactory to the District may be obtained without cost or condemnation by the District.

All Imperial Irrigation District Regulations Governing the Sale and Use of Electric Energy are available for viewing at all IID Division Offices, Imperial Operating Headquarters and online at www.iid.com.

☒    I have read and agree to the Regulations listed above.

Signature: *Sebastian Rucci*          Title: Managing Member

Print Name: Sebastian Rucci          Date: 03/05/2025

6



ib792 (Ri 6/29)

# CONTRACTOR INFORMATION SHEET

If applicable, please select the level of authorization for communication with your contractor.

| |
|---|
| Contractor Name: |
| Contractor Address: |
| Contact person: |
| Contractor Contact Phone: |
| Contractor Email Address: |

☐ Attend meetings and/or respond to correspondence regarding this project.

☐ Receive electronic files for this project, including energy account information.

☐ Obtain approvals, to complete this project.

Signature: _____    Title: _____

Print Name: _____    Date: _____

7

IID-792 (R1 07-23)



# PROJECT DEVELOPMENT SERVICES
## *TERMS & CONDITIONS*

### Indemnification Agreement

In consideration for the provision of electrical utility service by IID for the development project identified in the Standards Specifications and Contractor Information Sheet, Applicant and IID agree as follows: The provision of electric utility service to Applicant is conditioned on compliance by Applicant with all applicable laws including the Imperial Irrigation District Regulations Governing the Sale and Use of Electric Energy and Rate Schedules.

Applicant shall defend and indemnify IID, from any: liability, claims, suite or actions; losses, expenses, fees, or costs of any kind, so long as such things are in relation to, as a consequence of, arising out of, or in any way attributable  actually, allegedly or impliedly, in whole or in part, to the provision of electrical service by IID to Applicant for the development project identified in the Standards Specifications and Contractor Information Sheet; however, Applicant shall not be required to indemnify and hold harmless IID as set forth above for liability attributable to the sole fault of IID.

*Customer Initials* _____

### Environmental Impact Information

The work IID has to undertake to provide the electric service requested may cause impacts to the environment. Since the work is customer-driven and not a system upgrade, it is IID's policy that any environmental impacts created by new, relocated, modified or reconstructed IID facilities (which can include, but are not limited to, substations, transmission and distribution lines, IID-owned canals and drains, etc.) required to provide electric service to the customer need to be assessed in accordance with the California Environmental Quality Act and National Environmental Policy Act, if applicable, and, if required, mitigated. Failure to comply with such requirements will result in the postponement of the service requested until the appropriate environmental documentation is obtained by the customer from the lead agency having jurisdiction to permit the customer's project and the environmental impacts are fully assessed and mitigated. Any and all mitigation necessary as a result of the impacts on the environment caused by the construction, relocation and/or update of the IID facilities is the responsibility of the customer.At its discretion IID will verify, via its field crews and project inspectors, if impacts are being mitigated  per customer's environmental document and if customer is providing on-site mitigation monitoring. If not, customer will be advised of this and IID work will be halted until the appropriate mitigation measures and monitoring are in place.

*Customer Initials* _____

### Engineering Fee

I acknowledge that failure to complete and return all pertinent  forms to IID could cause a delay in electric service. I agree and understand that the Engineering Fee will be paid to begin engineering a project and will be applied as a credit toward the construction cost of the project. The Engineering Fee is non-refundable. Any design changes that result in the redesign of the project, and therefore alters prior schedule IID commitments will require an additional non- refundable Engineering Fee and may cause delays in construction schedules(s).

*Customer Initials* _____

Signature: *Sebastian Rucci*

Title: Managing Member

Print Name: Sebastian Rucci

Date: 03/05/2025

8



# SYSTEM PLANNING
## *WECC COMPOSITE LOAD MODEL EXAMPLE*
## (ATTACHMENT A)

| | |
|---|---|
| **Model Name:** | cmpldw |
| **Description** | WECC Composite load model |
| **Prerequisites:** | Load in load flow solved case |
| **Inputs:** | Voltage at bus to which the composite load is connected |
| **Invocation:** | cmpldw [<n>] {<name> <kv>} <id> : #rmva=<mvabase> |

**Parameters:**

| *EPCL Variable (see Note b)* | *Default Data* | *Description* |
|---|---|---|
| Bss | 0.0 | Substation shunt capacitor susceptance, p.u. |
| Rfdr | 0.0 | Feeder equivalent resistance, p.u. |
| Xfdr | 0.0 | Feeder equivalent reactance, p.u. |
| Fb | 0.0 | Fraction of feeder shunt capacitance at substation bus end |
| Xxf | 0.0 | Substation transformer reactance, p.u. |
| Tfixhs | 1. | Transformer high side fixed tap, p.u. |
| Tfixls | 1. | Transformer low side fixed tap, p.u. |
| LTC | 0 | = 1 for automatic tap adjustment (low side variable tap) |
| Tmin | 0.9 | Minimum variable tap, p.u. |
| Tmax | 1.1 | Maximum variable tap, p.u. |
| step | 0.00625 | Variable tap step size, p.u. |
| Vmin | 1.02 | Minimum low-side voltage, p.u. |
| Vmax | 1.04 | Maximum low-side voltage, p.u. |
| Tdel | 30. | Time delay to initiate tap adjustment, sec. |
| Ttap | 5. | Time delay between tap steps, sec. |
| Rcmp | 0.0 | Transformer LTC compensating resistance, p.u. |
| Xcmp | 0.0 | Transformer LTC compensating reactance, p.u. |
| FmA | 0.0 | Motor A fraction of load P |
| FmB | 0.0 | Motor B fraction of load P |
| FmC | 0.0 | Motor C fraction of load P |
| FmD | 0.0 | Motor D fraction of load P |
| Fel | 0.0 | Electronic load fraction of load P |
| PFel | 0.0 | Electronic load power factor |
| Vd1 | 0.0 | Voltage below which electronic load decreases, p.u. |
| Vd2 | 0.0 | Voltage below which electronic load is zero, p.u. |
| frcel | 0.0 | Fraction of electronic load that recovers from low voltage trip **(see note n)** |
| PFs | 0.8 | Power factor of static load component |
| P1e | 1.0 | Static load – exponent of first P term |
| P1c | 1.0 | Static load – coefficient of first P term |
| P2e | 2.0 | Static load – exponent of second P term |

9

| | | |
|---|---|---|
| P2c | 0.0 | Static load – coefficient of second P term |
| Pfrq | 0.0 | Frequency sensitivity factor for P |
| Q1e | 1.0 | Static load – exponent of first Q term |
| Q1c | 0.0 | Static load – coefficient of first Q term |
| Q2e | 2.0 | Static load – exponent of second Q term |
| Q2c | 1.0 | Static load – coefficient of second Q term |
| Qfrq | 0.0 | Frequency sensitivity factor for Q |
| Mtypa | 0.0 | First motor type: = 3 -- three-phase motor |
| | | = 1 -- 1-phase air conditioner |
| Mtypb | 0.0 | Second motor type |
| Mtypc | 0.0 | Third motor type |
| Mtypd | 0.0 | Fourth Motor type |

The following motor parameters must be included (**see Note a**) for each motor with Fm > 0.:
    For Type 3 motor, the following parameters must be input: (see below for Type 1)

| | | |
|---|---|---|
| LFm$n$ | 0.8 | Motor g lfoaacdtoinr |
| R$an$ | 0.02 | Stator resistance, p.u. |
| Ls$n$ | 2.0 | Ssynchronous reactance, p.u. |
| Lp$n$ | 0.2 | Transient reactance, p.u. |
| Lpp$n$ | 0.2 | Subtransient reactance, p.u. |
| Tpo$n$ | 0.16 | Transient open circuit time constant, sec. |
| Tppo$n$ | 0.02 | Subtransient open circuit time constant, sec. |
| H$n$ | 0.3 | Inertia constant, sec. |
| Etrq$n$ | 2.0 | Mechanical torque exponent |
| Vtr1$n$ | 0.0 | First low ge tvroiplt alevel, p.u. V |
| Ttr1$n$ | 9999. | First low gev torlitpa delay time, sec. |
| Ftr1$n$ | 0.0 | First low ge tvroiplt faraction |
| Vrc1$n$ | 9999. | First low gev oreltcaonnection level, p.u. V |
| Trc1$n$ | 9999. | First low gev oreltcaonnection delay time, sec. |
| Vtr2$n$ | 0.0 | Second low voltage trip level, p.u. V |
| Ttr2$n$ | 9999. | Second low voltage trip delay time, sec. |
| Ftr2$n$ | 0.0 | Second low voltage trip fraction |
| Vrc2$n$ | 9999. | Second low voltage reconnection level, p.u. V |
| Trc2$n$ | 9999. | Second low voltage reconnection delay time, sec. |

    For Type 1 A/C load, the following parameters must be input:

| | | |
|---|---|---|
| LFm$n$ | 1.0 | Motor g lfoaacdtoinr |
| CompPF$n$ | 0.97 | Power rfacto |
| Vstall$n$ | 0.6 | Stall voltage, p.u. |
| Rstall$n$ | 0.124 | Stall resistance, p.u. |
| Xstall$n$ | 0.114 | Stall reactance, p.u. |
| Tstall$n$ | 0.033 | Stall time delay, sec. |
| Frst$n$ | 0.5 | Fraction of load that can restart after stalling |
| Vrst$n$ | 0.6 | Voltage at which restart can occur, p.u. |
| Trst$n$ | 0.4 | Restart time delay, sec. |
| Fuvr$n$ | 0. | Fraction of load with undervoltage relay protection |
| Vtr1$n$ | 0.0 | First undgeer tvroiplt alevel, p.u. |
| Ttr1n | 0.2 | First undervoltage trip delay time, sec. |
| Vtr2n | 0.0 | Second undervoltage trip level, p.u. |
| Ttr2n | 5.0 | Second undervoltage trip delay time, sec. |

10

IID-792 (R1 07-23)

| Vc1offn | 0.5 | Contactor voltage at which tripping starts, p.u. |
| Vc2offn | 0.4 | Contactor voltage at which tripping is complete p.u. |
| Vc1onn | 0.6 | Contactor voltage at which reconnection is complete, p.u. |
| Vc2onn | 0.5 | Contactor voltage at which reconnection starts, p.u. |
| Tthn | 20. | Thermal time constant, sec. |
| Th1tn | 0.7 | Thermal protection trip start level, p.u. temperature |
| Th2tn | 1.3 | Thermal protection trip completion level, p.u. temperature |
| Tvn | .05 | Voltage measurement lag, sec. |

**Note**: Input parameters through **Mtypd** must be included. If, at any point after that, the remaining parameters are omitted, the default values shown in the table will be used.

**Note**: If a motor is to be omitted, but a motor after it is to be included, the motor fraction, e.g. Fmc, must be set to a non-zero value <= 0.0001. If it is set to zero, data for the later model(s) will not be read.

**Notes:**

a) The following global (dypar) parameters have been added in V21 of PSLF:

| | Default values | | **cmpldw** model will not be used if: |
|---|---|---|---|
| **dypar.cmp_pmin** | 0 MW | | Pload < dypar.cmp_pmin |
| **dypar.cmp_pqmin** | 0.0 | | Pload / Qload < dypar.cmp_pqmin |
| **dypar.cmp_vmin** | 0.0 p.u. | | System bus V < dypar.cmp_vmin |

Warning messages are written if any of these conditions occur. The values of these parameters can be changed by entering different values in the javaini.p file.

b) For all motor input parameters, the trailing "*n*" is to be replaced by "a", "b", "c", or "d" corresponding to the motor fractions Fma, Fmb, Fmc, Fmd. If Fm*n* = 0., the data for that motor must be omitted. If it is desired to include motor data for a motor with Fm*n* = 0., Fm*n* must be set to a small positive value (<= 0.0001) – the data will be read, but the motor fraction will be set to zero.

c) To reference the motor parameters in the epcl functions **getmodpar** and **setmodpar**, both names (if different), separated by a underscore, must be used. For example, for the first motor, the following are the parameter names:

LFma
Raa_CompPFa
Lsa_Vstalla
Lpa_Rstalla
Lppa_Xstalla
Tpoa_Tstalla
Tppoa_Frsta
Ha_Vrsta
Etrqa_Trsta
Ftr1a_Fuvra
Vtr1a
Ttr1a
Vtr2a

11

Ttr2a
Ftr2a_Vc1offa
Vrc1a_Vc2offa
Trc1a_Vc1ona
Vrc2a_Vc2ona
Trc2a_Ttha
Th1ta
Th2ta
Tva

For PSLF version 17.0_07 and later, capitalization is optional (getmodpar/setmodpar are no longer case sensitive). For previous versions, the parameters must be entirely lower case.

d) The composite load model is represented by a load in the load flow solution. After initialization, all the load P and Q are included in the cmpldw model and are shown in the Pmot, Qmot columns of the load table. The original load values are set to zero.

e) During initialization, the low-side bus and far-end bus are added to the system Y matrix and are given numbers equal to the original (high-side) bus plus 800,000 and 900,000, respectively. If more than one load is connected to the same high-side bus, the bus numbers for the second and subsequent loads will have (n-1) * 1,000,000 added. After initialization, the new buses and added transformer, feeder, and shunts can be viewed with SCAN. **Note: A history (sav) file should not be saved after initialization. The load flow program will not recognize the new buses.**

f) The MVA base for the elements (transformer, equivalent feeder, shunt capacitors) in the load model depends on the value entered for "**mva=<mvabase>**" as follows:

    1) If **<mvabase> > 0.**, the entered value is used as the MVA base.
    2) If **<mvabase> < 0.**, the entered value is used as a "loading factor". The MVA base is set equal to the load P divided by the loading factor.
    3) If **<mvabase> = 0.** or if "mva=<mvabase>" is omitted, a loading factor of 0.8 is assumed. That is, the MVA base is set equal to the load P / 0.8.

Note: The input value of **mvabase** is shown in the edmd table as **MbaseR** and may be modified there prior to initialization. The **Mbase** column in edmd shows the acutal MVA base used for the load, e.g. if a "loading factor" was entered, **Mbase** is the computed value of MVA base. This is set by the model during initialization.

g) The static load model uses the following formulas:

$$P = Po*(P1c*V/Vo^{P1e}+P2c*V/Vo^{P2e}+P3)*(1+Pf*\Delta f)$$

$$Q = Qo*(Q1c*V/Vo^{Q1e}+Q2c*V/Vo^{Q2e}+Q3)*(1+Qf*\Delta f)$$

$$Po = Pload(1.-Fma-Fmb-Fmc-Fmd)$$

$$Qo = Po*tan(acos(PFs)) = Po*sqrt(PFs^{-2}-1.)$$

$$P3 = 1.-P1c-P2c$$

$$Q3 = 1.-Q1c-Q2c$$

h) The electronic load model is constant P, Q with the power factor **Pfel**. The P and Q are decreased linearly to zero between voltages **Vd1** and **Vd2**. If **frcel** is greater than zero, that fraction of the load that was tripped will be reconnected linearly as the voltage recovers.

i) Any of the four motors can be represented by an equivalent of a group of three-phase motors or by an equivalent of a group of single-phase air conditioners:

12

1) The three-phase motor model uses the same electrical flux model as the **motorw** model in the PSLF dynamic model library. The mechanical torque is computed using the following formula:

$$\mathbf{Tm = Tmo*\omega^{Etrq}}$$

2) The single-phase air conditioner model in the composite load model uses essentially the same model as the **ld1pac** model in the PSLF dynamic model library. Some of the parameters of that model are hard-wired to the following values:

| | | |
|---|---|---|
| Tv = 0.02 | voltage sensing time constant, sec. | |
| Tf = 0.05 | frequency sensing time constant, sec. | |
| Kp1 = 0. | real power coefficient for runing state 1, pu W/ pu V | |
| Np1 = 1.0 | real power exponent for runing state 1 | |
| Kq1 = 6.0 | reactive power coefficient for runing state 1, pu VAr/ pu V | |
| Nq1 = 2.0 | reactive power exponent for runing state 1 | |
| Kp2 = 12.0 | real power coefficient for runing state 2, pu W/ pu V | |
| Np2 = 3.2 | real power exponent for runing state 2 | |
| Kq2 = 11.0 | reactive power coefficient for runing state 2, pu VAr/ pu V | |
| Nq2 = 2.5 | reactive power exponent for runing state 2 | |
| CmpKpf = 1.0 | real power frequency sensitivity, pu W / pu freq. | |
| CmpKqf = -3.3 | reactive power frequency sensitivity, pu VAr / pu freq. | |
| Trstrt = 0.4 | restart delay time, sec. | |
| Lfadj = 0. | stall voltage sensitivity to loading factor | |

j) If the transformer reactance (**Xxf**) is less than the jumper threshold, the transformer is omitted. If the transformer is included and **Vmax** > **Vmin** + 2***step**, the (low- side) variable tap will be adjusted to set the low-side voltage at approximately the mid-point of **Vmin** -- **Vmax** unless **Tmin** or **Tmax** is exceeded. If **LTC** = 1, The transformer tap moves in discrete steps during the dynamic simulation to control the low-side voltage. If the voltage is less than **Vmin** or greater than **Vmax** for a time period greater than **Tdel**, the transformer tap moves in steps until the voltage is within range. **Ttap** is the delay time between successive tap step movements.

k) If **Xfdr** is less than the jumper threshold, the feeder equivalent is omitted.

l) If, during initialization, the far end voltage is computed to be less than 0.95 p.u., **Rfdr** and **Xfdr** are reduced to bring it above 0.95.

m) After the load components are initialized to determine their reactive power consumption, shunt capacitance is added to make the Q at the original load bus equal the value from the load flow solution. If **Fb** = 0., all of this capacitance is added at the far end of the feeder (**Bf2**). If this capacitance is negative (inductive), the substation capacitor (**Bss**) is reduced to make **Bf2** zero or slightly positive.

n) **Cmpldw** responds to the **load[ ].shed** signal from any of the load sheddding relay models as follows:
   1) Static and electronic load P and Q values are multiplied by **load[ ].shed**.
   2) Motor (Type 1 and 3) MVA bases are multiplied by **load[ ].shed** to reduce the motor MW without changing the internal variables.
   3) Feeder R and X values are increased by 1. / **load[ ].shed** and feeder B values decreased by **load[ ].shed** to simulate tripping of an equivalent fraction of the feeders from the substation.
   4) Transformer and substation shunt B values are not changed.
   5) The change in MW at the substation high side bus due to the load shedding action is recorded

13

in the variable **load[ ].pshed** for use by the **lsmon** model in accumlating MW shed for the system and by area.

o) The parameter **frcel** was added in Version 17.0_07. Earlier data sets must be updated to include this parameter in the specified location.

p) The output channels have been modified in V19 to include load trip MW values, which may be summed for areas, zones, etc. using the LDTRPMON model. See manual page for LDTRMON for definition of these outputs.

## Output Channels:

| Record Level | Name | Description |
|---|---|---|
| 1 | Pld | Total load active power at high side bus, MW |
| 1 | Qld | Total load reactive power at high side bus, MVAr |
| 2 | Vls | Voltage magnitude at substation low-side bus, p.u. |
| 2 | Vld | Voltage magnitude at far end bus, p.u. |
| 2 | xshn | Nominal value load shed, MW |
| 2 | xton | Nominal total load tripped, MW |
| 2 | xtoi | Instantaneous total load tripped, MW |
| 2 | Pst | Static load P, MW |
| 2 | Pel | Electronic load P, MW |
| 2 | xeln | Nominal electronic load tripped, MW |
| 2 | xeli | Instantaneous electronic load tripped, MW |

For each motor in use:

| | | |
|---|---|---|
| 2 | Pm$n$ | Motor $n$ P, MW |
| 2 | xm$n$n | Nominal motor $n$ load tripped, MW |
| 2 | xm$n$i | Instantaneous motor $n$ load tripped, MW |
| 3 | tap | transformer tap ratio |
| 3 | Qst | Static load Q, MVAr |
| 3 | Qel | Electronic load Q, MVAr |

For each motor in use:

| | | |
|---|---|---|
| 3 | Qm$n$ | Motor Q, MVAr For |

each Type 3 motor in use:

| | | |
|---|---|---|
| 4 | spd$n$ | Motor speed, p.u. |
| 4 | Tm$n$ | Motor mechanical torque, p.u. |
| 4 | Te$n$ | Motor electrical torque, p.u. |
| 4 | fuv$n$ | Fraction of motor not tripped by UV relay |
| 4 | fsh$n$ | Fraction of motor not tripped by load shedding relays |

For each Type 1 motor in use:

| | | |
|---|---|---|
| 4 | fuv$n$ | Fraction of motor not tripped by UV relay |
| 4 | fcn$n$ | Fraction of motor not tripped by contactor |
| 4 | crA$n$ | Current in non-restarting part of load, p.u. |
| 4 | crB$n$ | Current in restarting part of load, p.u. |
| 4 | fsh$n$ | Fraction of motor not tripped by load shedding relays |
| 9 | tmpA | "Temperature" in non-restarting part of load, p.u. |

14

| 9 | fthA | Fraction of non-restarting part of load not tripped by thermal prot. |
| 9 | tmpB | "Temperature" in restarting part of load, p.u. |
| 9 | fthB | Fraction of restarting part of load not tripped by thermal prot. |

Note: Most motor channel names have "a", "b", "c", or "d" added in place of "$n$" to indicate
which of the four motors they are associated with.


**Sample data record:**

cmpldw 1234 "XXXX" 115.00 "1": #1 mva=1.1 /
    "Bss"     0 "Rfdr" 0.04 "Xfdr" 0.04 "Fb" 0.75/
    "Xxf" 0.08 "TfixHS" 1 "TfixLS" 1 "LTC" 0  "Tmin"    0.9 "Tmax" 1.1 "step" 0.00625 /
    "Vmin"    1.025 "Vmax" 1.04 "Tdel" 30  "Ttap"    5 "Rcomp" 0 "Xcomp" 0 /
    "Fma"    0.146246 "Fmb" 0.147222 "Fmc" 0.036521 "Fmd"0.367004 "Fel" 0.106286  /
    "PFel" 1 "Vd1" 0.7 "Vd2" 0.5 "Frcel" 0.8 /
    "Pfs"    -0.99771 "P1e" 2 "P1c" 0.557361 "P2e" 1 "P2c"    0.442639 "Pfreq" 0 /
                "Q1e" 2 "Q1c" -0.5 "Q2e" 1 "Q2c"      1.5 "Qfreq" -1 /
"MtpA" 3 "MtpB" 3 "MtpC" 3 "MtpD" 1 /
"LfmA" 0.75 "RsA" 0.04 "LsA" 1.8 "LpA" 0.12 "LppA"    0.104 /
    "TpoA" 0.095 "TppoA" 0.0021 "HA"    0.1 "etrqA" 0 /
    "Vtr1A" 0.7 "Ttr1A" 0.02 "Ftr1A" 0.2 "Vrc1A" 1 "Trc1A" 99999 /
    "Vtr2A" 0.5 "Ttr2A" 0.02 "Ftr2A" 0.7 "Vrc2A" 0.7 "Trc2A" 0.1 /
"LfmB" 0.75 "RsB" 0.03 "LsB" 1.8 "LpB" 0.19 "LppB"    0.14 /
    "TpoB" 0.2 "TppoB" 0.0026 "HB"    0.5 "etrqB" 2 /
    "Vtr1B" 0.6 "Ttr1B" 0.02 "Ftr1B" 0.2 "Vrc1B" 0.75 "Trc1B" 0.05 /
    "Vtr2B" 0.5 "Ttr2B" 0.02 "Ftr2B" 0.3 "Vrc2B" 0.65 "Trc2B" 0.05 /
"LfmC" 0.75 "RsC" 0.03 "LsC" 1.8 "LpC" 0.19 "LppC"    0.14 /
    "TpoC" 0.2 "TppoC" 0.0026 "HC"    0.1 "etrqc" 2 /
    "Vtr1C" 0.65 "Ttr1C" 0.02 "Ftr1C" 0.2 "Vrc1C" 1 "Trc1C" 9999 /
    "Vtr2C" 0.5 "Ttr2C" 0.02 "Ftr2C" 0.3 "Vrc2C" 0.65 "Trc2C" 0.1 /
"LfmD" 1 "CompPF" 0.98 /
    "Vstall" 0.56 "Rstall" 0.1 "Xstall" 0.1 "Tstall" 0.03  /
    "Frst" 0.2 "Vrst" 0.95 "Trst" 0.3 /
    "fuvr" 0.1 "vtr1" 0.6 "ttr1" 0.02 "vtr2" 1 "ttr2" 9999 /
    "Vc1off" 0.5 "Vc2off" 0.4 "Vc1on" 0.6 "Vc2on" 0.5 /
    "Tth" 15 "Th1t" 0.7 "Th2t" 1.9 "tv" 0.025

15

IID-792 (R1 07-23)

**Schematic Diagram:**



16



IID-693 (10-08)
SYSTEM IMPACT STUDY AGREEMENT

**Imperial Irrigation District**

*Protecting the flow of progress.*

# IMPERIAL IRRIGATION DISTRICT
## System Impact Study Agreement
### Imperial Data Center #2 - 80 MW

**THIS AGREEMENT** is made and entered into this 15th day of April, 2025 by and between Imperial Valley Computer Manufacturing, LLC, a company organized and existing under the laws of the State of Delaware and registered to do business in the state of California ("Interconnection Customer"), and the Imperial Irrigation District an irrigation district organized under the Water Code of the State of California, ("Transmission Provider"). Interconnection Customer and Transmission Provider each may be referred to as a "Party" or collectively as the "Parties."

## RECITALS

**WHEREAS,** Interconnection Customer is proposing to develop a Generating Facility or generating capacity addition to an existing Generating Facility consistent with the Interconnection Request submitted by Interconnection Customer dated March 3, 2025; and

**WHEREAS,** Interconnection Customer desires to interconnect the Generating Facility with Transmission Provider's Transmission System or Distribution System; and

**WHEREAS,** Transmission Provider has completed a Scoping Meeting with Interconnection Customer; and

**WHEREAS,** Interconnection Customer has requested Transmission Provider to perform an Interconnection System Impact Study to assess the impact of interconnecting the Generating Facility to the Transmission System or Distribution System.

**NOW, THEREFORE,** in consideration of and subject to the mutual covenants contained herein the Parties agree as follows:

    1.0    When used in this Agreement, unless otherwise defined herein, terms with initial capitalization shall have the meaning specified in the Transmission Provider's Tariff.

CRITICAL BUSINESS & REGULATORY AFFAIRS
P.O. BOX 937, IMPERIAL, CA 92251
TEL: (760) 482-34547 REV 6/9/2017



IID-693 (10-08)
SYSTEM IMPACT STUDY AGREEMENT

**Imperial Irrigation District**
*Protecting the flow of progress.*

2.0    Interconnection Customer requests that Transmission Provider prepare an Interconnection System Impact Study consistent with Section 7 of the GIP in accordance with the Tariff. At Transmission Provider's option, Interconnection Customer's Interconnection Request may be studied serially or in a cluster with Interconnection Requests submitted by other Interconnection Customers.

3.0    The Interconnection System Impact Study will be based upon the results of the Scoping Meeting and the technical information provided by Interconnection Customer in the Interconnection Request, subject to any modifications in accordance with Sections 4.4.1 and 7.2 of the GIP. When Clustering is used to perform the Interconnection System Impact Study, the Interconnection System Impact Study also will be based upon the results of Scoping Meetings and technical information provided by other interconnection customers in their Interconnection Requests, subject to any modifications in accordance with Sections 4.4.1 and 7.2 of the GIP. Transmission Provider has the right to request additional technical information from Interconnection Customer that Transmission Provider determines is reasonably necessary, consistent with Good Utility Practice, during the course of the Interconnection System Impact Study.  Upon request by Transmission Provider, Interconnection Customer shall provide such additional information to Transmission Provider within seven (7) Calendar Days.

4.0    Transmission Provider's non-binding, good faith estimate for the time of completion of the Interconnection System Impact Study is December 2024 and Transmission Provider's non-binding, good faith estimate of the cost for completing the Interconnection System Impact Study is $50,000.00.

5.0    If Interconnection Customer, or any other interconnection customer with an Interconnection Request in the same study cluster as the Interconnection Customer's Interconnection Request, modifies its designated Point of Interconnection,

CRITICAL BUSINESS & REGULATORY AFFAIRS
P.O. BOX 937, IMPERIAL, CA 92251
TEL: (760) 482-34547 REV 6/9/2017



Imperial Irrigation District

*Protecting the flow of progress.*

Interconnection Request, or the technical information provided therein is modified, the time to complete the Interconnection System Impact Study may be extended. Similarly, if the Interconnection Request of another interconnection customer is withdrawn from Transmission Provider's queue or removed from the cluster, the time to complete the Interconnection System Impact Study may be extended.

6.0 Following the completion of the Interconnection System Impact Study, the Transmission Provider shall provide an Interconnection System Impact Study report to Interconnection Customer. Subject to the confidentially provisions of Section 13.1 of the GIP, this report shall provide the following information:

– identification of any circuit breaker short circuit capability limits exceeded as a result of the interconnection or, when Clustering is used, as a result of the interconnections of the group of Generating Facilities studied in the cluster;

– identification of any thermal overload or voltage limit violations resulting from the interconnection or, when Clustering is used, resulting from the interconnections of the group of Generating Facilities studied in the cluster;

– identification of any instability or inadequately damped response to system disturbances resulting from the interconnection or when Clustering is used, resulting from the interconnections of the group of Generating Facilities studied in the cluster; and

– a description and non-binding, good faith estimate of the cost and time to construct facilities projected to be required to interconnect the Generating Facility to the Transmission System or Distribution System, or, when Clustering is used, to interconnect of the group of Generating Facilities studied in the cluster, and to address the identified short circuit, instability, and power flow issues.

CRITICAL BUSINESS & REGULATORY AFFAIRS
P.O. BOX 937, IMPERIAL, CA 92251
TEL: (760) 482-34547 REV 6/9/2017



**Imperial Irrigation District**

*Protecting the flow of progress.*

7.0    When the Interconnection System Impact Study report is provided to Interconnection Customer, Transmission Provider shall invoice Interconnection Customer for the actual costs of the Interconnection System Impact Study, including Transmission Provider's administrative costs, if any, that are in excess of the applicable deposit amount paid previously by Interconnection Customer in accordance with Section 3.3.1(b)of the GIP. Interconnection Customer shall pay such invoice within thirty (30) Calendar Days of its receipt of the invoice.

8.0    Transmission Provider's Interconnection System Impact Study shall not be construed as confirming or endorsing the design, or as any warranty of safety, durability, reliability or suitability of Interconnection Customer's Generating Facility or installation thereof for any use, including the use intended by Interconnection Customer.

9.0    This Agreement shall be interpreted and enforced in accordance with the substantive and procedural laws of the State of California. All actions or proceedings arising in connection with this Agreement shall be tried and litigated exclusively in State court located in the County of Imperial, California and/or Federal court located in the County of San Diego, California. The aforementioned choice of venue is mandatory, thereby precluding the possibility of litigation between the Parties with respect to or arising out of this Agreement in any jurisdiction other than that specified in this section. Each Party hereby waives any right it may have to assert the doctrine of *forum non conveniens* or a similar doctrine or to object to venue with respect to any proceeding brought in accordance with this section, and stipulates that the State court located in Imperial County, California, and/or a Federal court located in the Counties of Imperial and San Diego, respectively, California, shall have *in personam* jurisdiction and venue over each of them for the purpose of litigating any dispute or proceeding arising out of or related to this Agreement.   Each Party hereby authorizes service of process sufficient for personal jurisdiction



IID-693 (10-08)
SYSTEM IMPACT STUDY AGREEMENT

in any action against it at the address and in the manner for the giving of notice as set forth in this Agreement.

10.0 Interconnection Customer shall at all times indemnify, defend, and save Transmission Provider harmless from, any and all damages, losses, claims, including claims and actions relating to injury to or death of any person or damage to property, demands, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third parties, arising out of or resulting from Transmission Provider's performance of its obligations under this Agreement on behalf of    Interconnection   Customer,   except   in   cases   where Transmission Provider is solely negligent.

11.0 Transmission Provider shall not be considered to be in default of the provisions of this Agreement if delays in or failure of performance shall be due to uncontrollable forces, the effect of which, by the exercise of reasonable diligence, Transmission Provider could not avoid. The term uncontrollable forces shall mean any event which results in the prevention or delay of performance by Transmission Provider of its obligations under this   Agreement   and   which   is   beyond   the   control   of Transmission Provider. The term uncontrollable forces includes, but is not limited to, fire, acts of God, flood, earthquakes, storms,   lightning,   epidemic,   pandemic,   war,   riot,   civil disturbance, sabotage, inability to procure permits, licenses, or authorizations from any state, local, or federal agency, or person for any of the supplies, materials, accesses, or services required to be provided by Transmission Provider under this Agreement, strikes, work slowdowns, or other labor disturbances, and judicial constraint. The provisions of this section shall not be interpreted or construed to require Transmission Provider to prevent, settle, or otherwise avoid a strike, work slowdown, or other labor action. Transmission Provider shall give timely written notice to Interconnection Customer describing the circumstances of uncontrollable forces which prevent the fulfillment of obligation of this Agreement. Transmission Provider shall give timely written notice to the Interconnection

CRITICAL BUSINESS & REGULATORY AFFAIRS
P.O. BOX 937, IMPERIAL, CA 92251
TEL: (760) 482-34547 REV 6/9/2017



Imperial Irrigation District

*Protecting the flow of progress.*

Customer that the uncontrollable forces which prevented the fulfillment of obligations of this Agreement are no longer present and work has resumed on those obligations.

12.0    Each Party makes the following representations, warranties and covenants:

12.1    Such Party is duly organized, validly existing and in good standing under the laws of the state in which it is organized, formed, or incorporated, as applicable; that it is qualified to do business in the state or states in which it is located, and that it has the corporate power and authority to own its properties, to carry on its business as now being conducted and to enter into this Agreement and carry out the transactions contemplated hereby and perform and carry out all covenants and obligations on its part to be performed under and pursuant to this Agreement.

12.2    Such Party has the right, power and authority to enter into this Agreement, to become a Party hereto and to perform its obligations hereunder.  This Agreement is a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforceability is sought in a proceeding in equity or at law).

12.3    The execution, delivery and performance of this Agreement does not violate or conflict with the organizational or formation documents, or bylaws or operating agreement, of the Party, or any judgment, license, permit, order, material agreement or instrument applicable to or binding upon such Party or any of its assets.

6



**Imperial Irrigation District**
*Protecting the flow of progress.*

12.4 The Party has obtained each consent, approval, authorization, order, or acceptance by any Governmental Authority in connection with the execution, delivery and performance of this Agreement, and it will provide to any Governmental Authority notice of any actions under this Agreement that are required by Applicable Laws and Regulations.

13.0 All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing, unless otherwise agreed by the Parties, and shall be delivered in person or sent by certified mail, postage prepaid, by overnight delivery, or by electronic mail or electronic facsimile transmission with an original sent immediately thereafter by postage prepaid mail, and properly addressed as follows:

When delivered to Transmission Provider:

Energy Contracts
IMPERIAL IRRIGATION DISTRICT
333 Barioni Blvd.
P.O. Box 937
Imperial, CA 92251
Email: Energycontracts@iid.com

When delivered to Interconnection Customer:

Imperial Valley Computer Manufacturing, LLC
16400 Pacific Coast Highway, Suite 212
Huntington Beach, CA 92649
Email: sebastian@ruccilaw.com

14.0 Either Party may, from time to time, change its representative or address for the purpose of notices to that Party by a similar notice specifying a new representative or address, but no such change shall be deemed to have been given until such notice is actually received by the Party being so notified.

IID-693 (10-08)
SYSTEM IMPACT STUDY AGREEMENT

**Imperial Irrigation District**

*Protecting the flow of progress.*

15.0    Where authorized in accordance with Section 4.3 of the GIP, this Agreement may be assigned and, if so assigned, the Agreement, and the rights and obligations thereof, shall be binding upon and shall insure to the benefit of the successors and assigns of the Parties hereto.

16.0    This Agreement may be executed in two or more counterparts, by facsimile signature or an e-mail of a PDF signature, each of which is deemed an original but all constitute one and the same instrument.

17.0    The Parties may, by mutual agreement, amend this Agreement by a written instrument duly executed by the Parties.

18.0    This Agreement is subject to Transmission Provider's Tariff, as may be amended from time-to-time.

IN WITNESS THEREOF, the Parties have caused this Agreement to be duly executed by their duly authorized officers or agents on the day and year first above written.

**Imperial Irrigation District**

Signature: _____

Print Name:    Jesus Martinez

Title:    Supt. Gen. of System Planning and Engineering

Date:    04/28/2025

8



**Imperial Irrigation District**
*Protecting the flow of progress.*

IID-693 (10-08)
SYSTEM IMPACT STUDY AGREEMENT

### Imperial Valley Computer Manufacturing, LLC

Signature: *Sebastian Rucci*

Print Name: Sebastian Rucci

Title: Managing Member

Date: 4-15-2025

CRITICAL BUSINESS & REGULATORY AFFAIRS
P.O. BOX 937, IMPERIAL, CA 92251
TEL: (760) 482-34547 REV 6/9/2017



VERSION: FINAL

OCTOBER 3, 2025



# IMPERIAL VALLEY COMPUTER MANUFACTURING LLC, (DATA CENTER #2) SYSTEM IMPACT STUDY

TRANSMISSION PLANNING



## TABLE OF CONTENTS

1.    Executive Summary .................................................................................................................. 4

2.    Project Description ................................................................................................................... 5

3.    Study Data Assumptions and Methodology ............................................................................ 7

    3.1 Base Cases and Assumptions .............................................................................................. 7

    3.2        Methodology ................................................................................................................ 8

        3.2.1        Steady State Contingency Analysis ......................................................................... 8

        3.2.2 Transient Stability Analysis ....................................................................................... 8

        3.2.3 Post-Transient Analysis (Reactive Margin) ............................................................. 10

        3.3.1        Power Flow Modeling ........................................................................................... 11

        3.3.2 Dynamic Models ...................................................................................................... 11

        3.3.3 Remedial Action Scheme Modeling .......................................................................... 11

    3.4 System Upgrades/Mitigations ............................................................................................ 12

4.    Study Criteria ........................................................................................................................ 12

    4.1 NERC Reliability Standards ................................................................................................. 12

    4.2 WECC Reliability Criteria .................................................................................................... 12

    4.3 Steady State Study Criteria ................................................................................................ 12

        4.3.1 Normal Overloads .................................................................................................... 13

        4.3.2 Emergency Overloads .............................................................................................. 13

        4.3.3 Voltage Criteria ....................................................................................................... 14

    4.3 Transient Stability Data ..................................................................................................... 14

        4.4.1 Bus Voltage .............................................................................................................. 14

        4.4.2 Bus Frequency ......................................................................................................... 16

    4.5 Reactive Margin Criteria .................................................................................................... 16

5. Study Results ............................................................................................................................. 16

    5.1 Power Flow Analysis: ......................................................................................................... 16

        5.1.1 (2027) Heavy Summer Peak .................................................................................... 16

        5.1.2 (2027) Heavy Summer Peak Solar Reduced 20% .................................................... 17

        5.1.3 (2027) Light Spring Solar Reduced 40% .................................................................. 17

    5.2 Transient Stability Analysis ................................................................................................ 17

        5.2.1 (2027) Heavy Summer Transient Stability Results .................................................. 17

        5.2.2 (2027) Heavy Summer Solar Reduced Transient Stability Results ........................... 17

        5.2.3 (2027) Light Spring Solar Reduced Transient Stability Results ............................... 17

    5.3 Post Transient Stability and Reactive Power Margin: Heavy Summer ........................... 17

6.    Conclusion .................................................................................................................... 18



## 1. EXECUTIVE SUMMARY

The Imperial Irrigation District (IID) received a request from Imperial Valley Computer Manufacturing LLC (Customer) for the interconnection of their Imperial Data Center Campus #2 (Project) in the Imperial Valley. The facility's proposed Point of Interconnection (POI) to the IID System is at the 92kV 'R' line between IID's El Centro switching station (ECSS) and Central substation. As part of this study, IID evaluated the interconnection of 80 MW of load to assess potential system impacts and infrastructure requirements. Commercial Operation Date (COD) is planned to be in service by the year 2027.

IID's Transmission Planning Department performed a System Impact Study (SIS) to evaluate the potential impact of integrating this Project into the IID transmission system. The study included power flow (steady-state), transient stability, and post-transient stability analysis. The scope of the analyses is to identify the transmission system impacts caused solely by the addition of the project and reinforcements necessary to mitigate the adverse impact of the Project under different system operating conditions. The following scenarios were studied accordingly:

- ➢ 2027 Heavy Summer
- ➢ 2027 Heavy Summer (Solar reduced)
- ➢ 2027 Light Spring (Early morning solar reduced)

Each scenario includes two versions, a pre-case and a post-case including the project load. All cases include all generation with an executed Generation Interconnection Agreement (GIA), planned IID transmission upgrades, as well as anticipated distribution projects as identified in the IID 2024-33 Capital Investment plan. The project was modeled as a new load with a value of 80 MW for the year 2027. The analysis tested the impact of the load addition on the reliability of IID's electrical system.

**Note:** IID Transmission Planning assumed that the majority of the power required to serve this load would be imported for the purposes of this study. IID currently does not have the capability to reliably support a large-scale load requiring continuous 24-hour service with existing resources. As such, this report does not represent a commitment by IID to serve the requested load.



## 2.  PROJECT DESCRIPTION

The proposed Project consists of a large-scale data center campus, upwards of 80MW, that is to be placed in a land parcel near the 92kV 'R' line between IID's El Centro switching station and Central substation, which will serve as the POI for the Project. The Project had an assumed power factor of 0.99. The Figures 1, 2, & 3 below indicate the single line diagram, geographical location, and site plan of the Project.



**FIGURE 1: PROJECT SINGLE LINE DIAGRAM**





FIGURE 2: PROJECT GEOGRAPHICAL LOCATION



FIGURE 3: PROJECT SITE PLAN



## 3. STUDY DATA ASSUMPTIONS AND METHODOLOGY

### 3.1 BASE CASES AND ASSUMPTIONS

Various base cases were developed for this assessment with the intent to cover all critical operating scenarios, and to document all potential impacts that could be caused by the implementation of the Project. Any generation that had an executed Generation Interconnection Agreement (GIA), a Power Purchase Agreement (PPA), or a Tolling Agreement with the IID, and the project is in accordance with section 4.0 of IID's Planning Standards was included in the base cases. Distribution projects were included with either an executed Joint Power Agreement (JPA) or a finalized system impact study. The base cases were developed to represent the Heavy Summer operating conditions, representing high load with high generation output. A Heavy Summer sensitivity during the time frame of 1900-2100, representing high load with reduced solar output. Finally, Light Spring sensitivity, during the time frame of 0600-0800, representing moderate load with reduced solar output.

Table 1 below lists the WECC approved base cases that were used to model the IID system:

| WECC Seed Case | PSLF Base Case Name | Description |
|---|---|---|
| Heavy Summer Peak Scenarios | | |
| 25HS4a.sav | 27HS_IVCM_Peak_pre.sav | 2027 Heavy Summer without Project (pre-case) |
| | 27HS_IVCM_80MW_Peak.sav | 2027 Heavy Summer with Project (80MW) |
| Heavy Summer Solar Reduced Scenarios | | |
| 25HS4a.sav | 27HS_IVCM_Solar_Reduced_pre.sav | 2027 Heavy Summer without Project (pre-case); 20% solar |
| | 27HS_IVCM_80MW_Solar_Reduced.sav | 2027 Heavy Summer with Project (80MW); 20% solar |
| Light Spring Early Morning Solar Reduced Scenarios | | |
| 26LSP1Sa.sav | 27LSP_IVCM_Solar_Reduced_pre.sav | 2027 Light Spring without Project (pre-case); 40% solar |
| | 27LSP_IVCM_80MW_Solar_Reduced.sav | 2027 Light Spring with Project (80MW); 40% solar |

TABLE 1: SUMMARY OF BASE CASES ANALYZED

The GE PSLF version 23.0.8.2 software was used to analyze the pre and post Project study cases, with respect to the North American Electric Reliability Corporation (NERC) revised NERC TPL-001-5.1 standard, reflecting the use of P0-P7 outage categories and the corresponding WECC system performance criteria. GE PSLF was also used to check for system performance criteria violations in each of the post-Project cases when comparing to the corresponding pre-Project case. GE ProvisoHD was utilized to accumulate the power flow results in order to facilitate the comparison between pre and post Project cases. The base cases developed are designed to reflect the IID electrical system via loads, resources, topology and conditions expected when the project starts operation. While it is impossible to study all the IID transmission system flows and generation levels during all seasons, these pre-Project base cases represent extreme generation and transmission flows that will potentially expose any transmission constraints at the POI. However, the IID cannot guarantee that the Project can operate at its maximum rating year-round without impacting the transmission system, during times and seasons not studied.



## 3.2   METHODOLOGY

Steady state, transient stability and post-transient reactive margin analysis were performed for this assessment. Table 2 describes the type of analysis completed on each base case.

| PSLF Base Case Name | Steady State | Transient Stability | Post Transient |
|---|---|---|---|
| 27HS_IVCM_Peak_pre.sav | X | X | X |
| 27HS_IVCM_80MW_Peak.sav | X | X | |
| 27HS_IVCM_80MW_Peak_Mit.sav | X | X | X |
| 27HS_IVCM_Solar_Reduced_pre.sav | X | X | |
| 27HS_IVCM_80MW_Solar_Reduced.sav | X | X | |
| 27HS_IVCM_80MW_Solar_Reduced_Mit.sav | X | X | |
| 27LSP_IVCM_Solar_Reduced_pre.sav | X | X | |
| 27LSP_IVCM_80MW_Solar_Reduced.sav | X | X | |
| 27LSP_IVCM_80MW_Solar_Reduced_Mit.sav | X | X | |

TABLE 2: DESCRIPTION OF THE ANALYSIS COMPLETED ON DEVELOPED BASE CASES VIA PSLF

### 3.2.1   Steady State Contingency Analysis

The assessment considered all of IIDs credible single and multiple contingencies, as well as the most severe multiple contingencies within the IID system. External contingencies that are known to cause the most severe impacts to the IID transmission system were analyzed also. The scope of the steady-state analysis consisted of thermal, voltage magnitude and angle difference violations. The full suite of NERC standard TPL-001-5.1 contingency sets, P1-P7, was analyzed.

### 3.2.2 Transient Stability Analysis

Transient stability analysis is a time-based simulation that assesses the performance of the power system shortly before, during, and after a transient disturbance. Initial conditions are characterized by the power flow case and model equations are used to simulate expected behavior from dynamic elements, such as generators and loads over time. Bus voltage and frequency plots are developed with an emphasis on all BES buses, and various non-BES buses in the IID system.  These buses are the following:

➢ **BES Buses**
- Alhambra Switching Station 161kV
- Arkansas Switching Station 161kV
- Avenue 58 161kV
- Calipatria Switching Station 230kV
- Coachella Switching 92kV
- Coachella Valley 92kV
- Coachella Valley 161kV
- Coachella Valley 230kV
- El Centro Switching Station 161kV
- El Cento Switching Station 230kV
- El Centro Switching Station 92kV

- Highline 230kV
- Hudson Ranch 230kV
- Midway 230kV
- Midway 92kV
- Nelson Switching Station 230kV
- Niland 161kV
- Pilot Knob 161kV
- Ramon 230kV
- Sonora Switching Station 230kV
- Yucca 161kV



- **Non-BES Buses**
  - Ave 42 92kV
  - Niland 92kV
  - Ramon 92kV
  - Ave. 58 92kV
  - El Centro 34.5kV
  - Blythe 161kV

Bus voltage plots provide a means of detecting out-of-step conditions and are useful to assess the magnitude and duration of post-disturbance voltage dips and peak-to-peak voltage oscillations. The voltage plots also indicate system damping response and the expected bus voltage following the disturbance. Bus frequency plots provide expected magnitude and duration of post-disturbance frequency swings, as well as indicating possible over-frequency or under-frequency conditions. Additionally, IID utilizes a dynamic criteria EPCL script to assist in evaluating if monitored buses meet WECC regional criteria as shown in Figures 4 and 5. The selected critical contingencies listed below in Table 3 were simulated for the transient stability analysis. This contingency list contains the most severe internal and external contingencies.

| # | IID Critical Contingencies |
|---|---|
| 1 | P1 – Miguel - Eco 500kV Line Fault |
| 2 | P1 – Imperial Valley – N. Gila 500kV ck 1 Line Fault |
| 3 | P1 – Suncrest – Ocotillo 500kV ck 1 Line Fault |
| 4 | P1 – Imperial Valley – Ocotillo 500kV ck 1 Line Fault |
| 5 | P1 – Devers - Red Bluff 500kV Line Fault |
| 6 | P1 – Colorado River – Palo Verde 500kV Line Fault |
| 7 | P1 – Devers - Mirage 230kV Line Fault |
| 8 | P4 – Stuck Breaker # 8, Fault at N. Gila 500kV |
| 9 | P4 – Stuck Breaker # 9, Fault at N. Gila 500kV |
| 10 | P1 - Imperial Valley Data Center - Imperial Valley 230kV Line Fault |
| 11 | P1 - El Centro SS. - Imperial Valley Data Center 230kV Line Fault |
| 12 | P1 – Ramon Bank #1 92/230kV – Bus Fault / Loss of Transformer |
| 13 | P1 – Ramon - Mirage 230kV Line Fault |
| 14 | P1 - Coachella Valley - Mirage 230kV Line Fault |
| 15 | P1 - Coachella Valley - Midway 230kV Line Fault |
| 16 | P1 - Coachella Valley - Ramon 230kV Line Fault |
| 17 | P1 – El Centro Bank #1 161/230kV – Bus Fault / Loss of Transformer |
| 18 | P1 – El Centro Bank #4 92/230kV – Bus Fault / Loss of Transformer |
| 19 | P1 – El Centro Bank #5 92/230kV – Bus Fault / Loss of Transformer |
| 20 | P2 – Avenue 58 161kV – Bus Fault |
| 21 | P2 – Stuck Breaker El Centro S.S. (CKTB H40) 230kV |
| 22 | P2 – Stuck Breaker El Centro S.S. (CKTB H50) 230kV |
| 23 | P2 – Stuck Breaker El Centro S.S. (CKTB S10) 230kV |
| 24 | P2 – Stuck Breaker El Centro S.S. (CKTB S20) 230kV |



| 25 | P2 – Stuck Breaker El Centro S.S. (CKTB AOB, MOB, H20) 161kV |
|----|---|
| 26 | P2 – Stuck Breaker El Centro S.S. (CKTB X1EO, LOB) 161kV |
| 27 | P2 – Stuck Breaker El Centro S.S. (CKTB X1WO) 161kV |
| 28 | P5 – Delayed Fault Clearing at El Centro Steam REPU2 |
| 29 | P5 – Delayed Fault Clearing at El Centro Steam REPU2 GSU |
| 30 | P5 – Delayed Fault Clearing at El Centro S. S. 161kV |
| 31 | P6 - Coachella Valley-Mirage & Ramon-Mirage 230kV Line Fault |
| 32 | P7 - Devers-Mirage Circuit 1&2 230kV Line Fault |
| 33 | P7 - Coachella Valley-Mirage & Coachella Valley-Ramon 230kV Line Fault |

TABLE 3: CRITICAL CONTINGENCIES USED FOR TRANSIENT AND POST-TRANSIENT ANALYSIS

### 3.2.3 Post-Transient Analysis (Reactive Margin)

Post-transient stability analysis was performed on selected buses in the IID transmission system following selected, most severe, and critical outages. Moreover, governor power flow tools were used for the analysis. For each bus assessed, a synchronous condenser was modeled to determine the highest reactive power margin available on that bus. All BES and non-BES buses were monitored.

During post-transient simulations, the following assumptions were used:

- Loads were modeled as constant MVAs, during the post-transient time frame
- Reactive power output of the system swing generator was limited to its maximum capability
- No manual operator intervention was allowed to increase generator MVAR flow
- Remedial actions, such as generator dropping, load shedding, or blocking of automatic generator control were not considered for single outages

Positive reactive margin is desired at all of the buses. For the IID transmission system, the post-transient stability analysis criteria are the following:

- For transfer paths, all P0-P1 events shall demonstrate a positive reactive power margin at a minimum of 105 percent of transfer path flow.
- For transfer paths, all P2-P7 events shall demonstrate a positive reactive power margin at a minimum of 102.5 percent of transfer path flow.
- For load areas, all P0-P1 events shall demonstrate a positive reactive power margin at a minimum of 105 percent of forecasted peak load.
- For load areas, all P2-P7 events shall demonstrate a positive reactive power margin at a minimum of 102.5 percent of forecasted peak load.

Selected critical contingencies listed above in Table 3 were simulated for post-transient stability analysis. These contingencies included the most severe internal and external contingencies.

### 3.3    MODELING

The following section document the modeling methods used to represent the project in steady state and dynamics analyses.



### 3.3.1   Power Flow Modeling

Equivalent load of project:

- A 80MW equivalent load on the 92kV IVCM data center bus.

### 3.3.2 Dynamic Models

WECC approved models from the GE PSLF library was used to represent the Project. For this Project, dynamic stability models included models for the following:

- Commercial and Industrial Load
  - WECC Composite Load Model: **cmpldw**

### 3.3.3 Remedial Action Scheme Modeling

Various Remedial Action Schemes (RAS) were modeled in conjunction with the various projects included in the base cases. A summary of the internal automatic actions taken are described below:

- South R-Line RAS: Open breaker "RNO" at Dixieland will send a trip signal to Ocotillo Wells Solar.
- North R-Line RAS: Loss of Anza to Oasis and Ave 58 will send a trip signal to Seville 3.
- "K" line SPS: Loss of the "K" line, "N" Line, and the loss of the Niland 92/161kV transformer will send a trip signal to Colgreen.
- Path 42 RAS:
  - Loss of the 230kV "KN" line between Coachella Valley and Mirage and the 230kV "KS" line between Coachella Valley and Ramon will send a trip signal to the identified generation.
  - Loss of the 230kV "KN" line between Coachella Valley and Mirage and the 230kV "KS" line between Ramon and Mirage will send a trip signal to the identified generation.
  - Devers-Mirage 1 & 2: Loss of circuit numbers 1 and 2 will send a trip signal to the identified generation.
- Path 42 RAS N-1:
  - Loss of the 230kV "KN" line between Coachella Valley and Mirage will send a trip signal to the identified generation.
  - Loss of the 230kV "KS" line between Coachella Valley and Ramon will send a trip signal to the identified generation.
  - Loss of the 230kV "KS" line between Ramon and Mirage will send a trip signal to the identified generation.
  - Loss of the 230kV "KN" line between Coachella Valley and Midway will send a trip signal to the identified generation.
  - Loss of the 230kV "KS" line between Coachella Valley and Midway will send a trip signal to the identified generation.
- Coachella Valley – Midway RAS:
  - Loss of the 230kV "KN" line between Coachella Valley and Midway will send a trip signal to the identified generation.
  - Loss of the 230kV "KS" line between Coachella Valley and Midway will send a trip signal to the identified generation.
- Midway Transformer RAS N-1:
  - Loss of either bank #1 or bank #2 92/230kV Transformer at Midway will send a trip signal to the identified generation.
- El Centro 161kV Bus RAS N-1:
  - Loss of the 161kV Bus at El Centro Switching will send a trip signal to the identified generation.



## 3.4 SYSTEM UPGRADES/MITIGATIONS

- Southern 92kV R-Line Upgraded – Q2 2026 (Ocotillo Mitigation)
- Coachella Valley Switching Station Upgrade – Q2 2026 (TPL-001)
- 45MVAR Reactive Support at Ramon 230kV – Q2 2026 (IPP Mitigation)
- ECSS RAS N-1 – Q3 2025 (IPP Mitigation)
- Midway Transformer RAS – Q4 2025 (IPP Mitigation)

## 4.  STUDY CRITERIA

Grid Reliability Criteria, which incorporates the WECC and NERC planning criteria, was used for this assessment. IID's standards and procedures were followed during the study process.

### 4.1 NERC RELIABILITY STANDARDS

The need for transmission upgrades and additions was determined in accordance with NERC Reliability Standards. These standards set forth criteria for system performance requirements, which must be met under specific set of operating conditions. The following NERC Reliability Standards are applicable to the Transmission Operators (TOs) as registered NERC Planning Authorities, Transmission Planners, and are the primary standards for the interconnection of new facilities and system performance:

- FAC-001: Facility Connection Requirements
- FAC-002: Coordination of Plans for New Facilities
- TPL-001-5.1: Transmission System Planning Performance Requirements

### 4.2 WECC RELIABILITY CRITERIA

The WECC TPL system performance criteria, TPL-001-WECC-CRT-4, sets forth additional requirements that must be met under various, but specific set of operating conditions and may be applicable to the TOs as Planning Authorities.

### 4.3 STEADY STATE STUDY CRITERIA

The system performance, with the addition of the Project, was evaluated under normal conditions and following losses of a single or multiple Bulk Electric System (BES) element(s), as defined by the applicable reliability standards and criteria.  Figure 4: Listing of TPL-001-5.1 P1-P7 contingency descriptions summarizes the contingencies per NERC Reliability Standards, and WECC Regional Criteria.



| Category | Initial Condition | Event [1] | Fault Type [2] | BES Level [3] | Interruption of Firm Transmission Service Allowed [4] | Non-Consequential Load Loss Allowed |
|---|---|---|---|---|---|---|
| P0 No Contingency | Normal System | None | N/A | EHV, HV | No | No |
| P1 Single Contingency | Normal System | Loss of one of the following: 1. Generator 2. Transmission Circuit 3. Transformer [5] 4. Shunt Device [6] | 3Ø | EHV, HV | No[9] | No[12] |
| | | 5. Single Pole of a DC line | SLG | | | |
| P2 Single Contingency | Normal System | 1. Opening of a line section w/o a fault [7] | N/A | EHV, HV | No[9] | No[12] |
| | | 2. Bus Section Fault | SLG | EHV | No[9] | No |
| | | | | HV | Yes | Yes |
| | | 3. Internal Breaker Fault [8] (non-Bus-tie Breaker) | SLG | EHV | No[9] | No |
| | | | | HV | Yes | Yes |
| | | 4. Internal Breaker Fault (Bus-tie Breaker) [8] | SLG | EHV, HV | Yes | Yes |
| P3 Multiple Contingency | Loss of generator unit followed by System adjustments[9] | Loss of one of the following: 1. Generator 2. Transmission Circuit 3. Transformer [5] 4. Shunt Device [6] | 3Ø | EHV, HV | No[9] | No[12] |
| | | 5. Single pole of a DC line | SLG | | | |
| P4 Multiple Contingency (Fault plus stuck breaker[10]) | Normal System | Loss of multiple elements caused by a stuck breaker [10](non-Bus-tie Breaker) attempting to clear a Fault on one of the following: 1. Generator 2. Transmission Circuit 3. Transformer [5] 4. Shunt Device [6] 5. Bus Section | SLG | EHV | No[9] | No |
| | | | | HV | Yes | Yes |
| | | 6. Loss of multiple elements caused by a stuck breaker[10] (Bus-tie Breaker) attempting to clear a Fault on the associated bus | SLG | EHV, HV | Yes | Yes |
| P5 Multiple Contingency (Fault plus relay failure to operate) | Normal System | Delayed Fault Clearing due to the failure of a non-redundant relay[13] protecting the Faulted element to operate as designed, for one of the following: 1. Generator 2. Transmission Circuit 3. Transformer [5] 4. Shunt Device [6] 5. Bus Section | SLG | EHV | No[9] | No |
| | | | | HV | Yes | Yes |
| P6 Multiple Contingency (Two overlapping singles) | Loss of one of the following followed by System adjustments.[9] 1. Transmission Circuit 2. Transformer [5] 3. Shunt Device[6] 4. Single pole of a DC line | Loss of one of the following: 1. Transmission Circuit 2. Transformer [5] 3. Shunt Device [6] | 3Ø | EHV, HV | Yes | Yes |
| | | 4. Single pole of a DC line | SLG | EHV, HV | Yes | Yes |
| P7 Multiple Contingency (Common Structure) | Normal System | The loss of: 1. Any two adjacent (vertically or horizontally) circuits on common structure [11] | SLG | EHV, HV | Yes | Yes |
| | | 2. Loss of a bipolar DC line | | | | |

FIGURE 4: *LISTING OF TPL-001-5.1   P1-P7 CONTINGENCY DESCRIPTIONS*

## 4.3.1 Normal Overloads

Normal overloads are those that exceed 100 percent of normal facility rating under NERC Category P0 conditions (no contingencies). Normal overloads are identified in the Reliability Study power flow analysis, in accordance with the Reliability Standard, TPL-001-5.1. It is required that loading of all transmission system facilities be within their normal ratings under NERC Category P0 conditions.

## 4.3.2 Emergency Overloads

Emergency overloads are those that exceed 100 percent of emergency ratings under NERC and WECC Category P1-P7 contingency conditions. Emergency overloads are identified in the Reliability Study power flow analysis in accordance with Reliability Standards, TPL-001-5.1. It is required that loading of all transmission system facilities be within their emergency ratings under the Category P1-P7 contingency conditions.



### 4.3.3 Voltage Criteria

A voltage criteria violation occurs if a bus within the transmission system, of each TO, fails to meet the requirements defined in Table 4. For Voltage Criteria, bus voltages are relative to the nominal bus voltages of the system under study.

| Voltage Level | Normal Conditions (P0) | | Contingency Conditions (P1-P7) | | Voltage Deviation | |
|---|---|---|---|---|---|---|
| | VMIN (p.u.) | VMAX (p.u.) | VMIN (p.u.) | VMAX (p.u.) | Load Buses (P1) | Non-Load (P1) & All Buses (P2-P7) |
| ≤200kV | 0.95 | 1.05 | 0.9 | 1.1 | ≤8% | ≤10% |
| ≥200kV | 0.95 | 1.05 | 0.9 | 1.1 | ≤8% | ≤10% |
| ≥500kV | 0.95 | 1.05 | 0.9 | 1.1 | ≤8% | ≤10% |

*TABLE 1: VOLTAGE CRITERIA*

The maximum total voltage deviation for P3 and P6 events will be measured from the voltage that exists after the initial condition and therefore takes into consideration only voltage deviation due to the second event. Buses within the IID controlled grid that cannot meet the requirements in Table 4 will be further investigated.

### 4.3 TRANSIENT STABILITY DATA

Transient stability analysis is a time-based simulation that assesses the performance of the power system shortly before, during, and quickly following a contingency. Transient stability studies were performed to verify the stability of the system following a system fault. Transient stability analysis was performed based on the WECC Disturbance-Performance Criteria, for selected system contingencies, using Version 23.0.8.2 of the GE PSLF software. Transient stability contingencies were simulated for a minimum of 10 seconds, including 1 second of pre-disturbance data. Unless specified, all faults were modeled as 3-phases with 4 cycles of breaker clearing time. System damping was assessed visually with the aid of stability plots.

### 4.4.1 Bus Voltage

Bus voltage plots provide a means of detecting out-of-step conditions and are useful to assess the magnitude and duration of post-disturbance voltage dips and peak-to-peak voltage oscillations. The voltage plots also indicate system damping response and the expected bus voltage following the disturbance. WECC Regional Criteria, TPL-001-WECC-CRT-4, requires that the following criteria be applied:

- Following fault clearing, the voltage shall recover to 80% of the pre-contingency voltage within 20 seconds of the initiating event for all P1 through P7 events, and for each applicable BES bus serving load.
- Following fault clearing and voltage recovery above 80%, voltage at each applicable BES bus serving load shall neither dip below pre-contingency voltage, for more than 30 cycles, nor remain below 80% of pre-contingency voltage for more than 2 seconds, for all P1 through P7 events.
- For contingencies without a fault (P2.1 category event), voltage dips at each applicable BES bus serving load shall neither dip below 70% of pre-contingency voltage, for more than 30 cycles, nor remain below 80% of pre-contingency voltage for more than two seconds.
- All oscillations that do not show positive damping within 30-seconds, after the start of the studied event, shall be deemed unstable.



- Figure 5 and 6 represent the acceptable recovery trajectory.



FIGURE 5: *WECC DIAGRAM REPRESENTING ADEQUATE VOLTAGE RECOVERY (DELAYED)*



FIGURE 6: *WECC DIAGRAM REPRESENTING ADEQUATE VOLTAGE RECOVERY (NORMAL)*



### 4.4.2 Bus Frequency

Bus frequency plots provide expected magnitude and duration of post-disturbance frequency swings, and possible over-frequency or under-frequency conditions. WECC Regional Criteria, TPL-001-WECC-CRT-4, requires that the following be applied:

- All oscillations that do not show positive damping, within 30-seconds, after the start of the studied event, shall be deemed unstable.

### 4.5 REACTIVE MARGIN CRITERIA

Post-transient stability analysis was performed on selected buses in the IID transmission system, following selected critical outages. For each bus assessed, a synchronous condenser was modeled to extract reactive power, until the point where voltage collapse occurs. The maximum reactive power consumed prior to the voltage collapse is determined. Positive reactive margin is desired at all buses.

## 5. STUDY RESULTS

This System impact study modeled the new load with a total of 80MW for summer and light spring scenarios. The following analysis tested the impact of the load addition on the reliability of IIDs electrical system.

### 5.1 POWER FLOW ANALYSIS:

Power flow analysis was performed using the base cases identified in Table 1, under Section 3. System thermal and voltage performance were tested during normal and emergency (contingency) conditions, in order to compare pre-Project and post-Project scenarios. Identified impacts, if any, are caused solely by this Project.

Thermal and voltage performance of the system was evaluated for base cases under normal, (P0), single element outage, (P1, P2), and selected multiple element outages, (P3-P7). Thermal loadings were reported when a model transmission component was loaded above 95% of its continuous MVA rating, (P0), and above 95% of its emergency rating, (P1-P7). Generally, the concerns are raised when an element is found above 100% of its normal or emergency rating; however, 95% was chosen to identify circuits that are also at the edge of an overload. Moreover, such circuits need to be closely monitored and can be placed as potential candidates for future upgrades.

Transmission voltage violations for normal, (P0), conditions were reported when per unit voltages were less than 0.95 or greater than 1.05. Transmission voltage violations, following single or multiple outages, were reported when per unit voltages were less than 0.90 or greater than 1.1. Voltage deviations were recorded whenever these deviations were greater than 8% for load serving buses and 10% non-load serving buses.

The steady state study results for each of the cases is described in the following sections, while the complete results can be found in Appendix B.

### 5.1.1 (2027) Heavy Summer Peak
#### 5.1.1.1 Voltage and Thermal Performance

- The project caused buses in the base case to experience voltage exceedances or deviations with respect to voltage criteria on Table 4.


- The project caused thermal violations in IID's system. Thermal issues were found under P-1 and P-2 contingencies. The impacted elements include the following:
  - ➢ 92kV 'R' Line Dixieland Prison to Central
  - ➢ 92kV 'R' Line Dixieland to Dixieland Prison

### 5.1.2 (2027) Heavy Summer Peak Solar Reduced 20%
*5.1.2.1 Voltage and Thermal Performance*
- The project caused buses in the base case to experience voltage exceedances or deviations with respect to voltage criteria on Table 4.
- The project caused thermal violations in IID's system. Thermal issues were found under P-1 and P-2 contingencies. The impacted elements include the following:
  - ➢ 92kV 'R' Line Dixieland Prison to Central
  - ➢ 92kV 'R' Line Dixieland to Dixieland Prison

### 5.1.3 (2027) Light Spring Solar Reduced 40%
*5.1.3.1 Voltage and Thermal Performance*
- The project caused buses in the base case to experience voltage exceedances or deviations with respect to voltage criteria on Table 4.
- The project did not cause thermal violations in IID's system.

## 5.2 TRANSIENT STABILITY ANALYSIS

Transient stability was performed on the Heavy Summer and Light Spring pre- and post- Project base cases.

### 5.2.1 (2027) Heavy Summer Transient Stability Results
Simulation results showed that the Project did not cause impacts on IID system stability under any of the simulated contingencies.
Refer to Appendix C for the 2027 Heavy Summer Transient pre and post stability plots.

### 5.2.2 (2027) Heavy Summer Solar Reduced Transient Stability Results
Simulation results showed that the Project did not cause impacts on IID system stability under any of the simulated contingencies.
Refer to Appendix D for the 2027 Heavy Summer Solar Reduced transient pre and post stability plots.

### 5.2.3 (2027) Light Spring Solar Reduced Transient Stability Results
Simulation results showed that the Project did not cause impacts on IID system stability under any of the simulated contingencies.
Refer to Appendix D for the 2027 Light Spring Solar Reduced transient pre and post stability plots.

## 5.3 POST TRANSIENT STABILITY AND REACTIVE POWER MARGIN: HEAVY SUMMER
Post-transient stability was performed on selected buses in IID transmission system following selected critical outages. Results show that the Project did not cause impacts on IID System reactive margin under any of the simulated contingencies

Refer to Appendix E for complete post-transient voltage (reactive margin) results.



## 6. CONCLUSION

The System Impact Study modeled the new load with a total of 80MW for summer and light spring scenarios. The following analysis tested the impact of the load addition on the reliability of IID's electrical system. The Project's POI is located on the 92kV 'R' Line between IID's El Centro substation and Central substation. The study evaluated different seasons and generation scenarios for the Project's target year, using Heavy Summer and Light Spring cases. The steady state, transient, and post-transient analyses indicated that the Project can be deemed feasible. Nevertheless, the addition of the Project causes P-1 and P-2 overloads in different sections of IID's system in Heavy Summer scenarios. Below are the findings and impacted elements for this loading scenario:

80 MW load:

- 92kV 'R' Line Dixieland Prison to Central
- 92kV 'R' Line Dixieland to Dixieland Prison

Due to these impacted elements, the Project can be deemed feasible with some transmission infrastructure upgrades. The following upgrades must be installed in the new IVCM substation:

- One static var device rated 75 MVAR, configured in three switching blocks of 25MVAR each for reactive power support and voltage stability.

 Please note that IID currently does not have the capability to reliably support a large-scale load requiring continuous 24-hour service. As such, this report does not represent a commitment by IID to serve the amount of requested load.



# IMPERIAL IRRIGATION DISTRICT
## Interconnection Facilities Study Agreement
Imperial Data Center #1 – 250 MW

**THIS AGREEMENT** is made and entered into this 11th day of September, 2025, by and between Imperial Valley Computer Manufacturing, LLC, a limited liability company organized and existing under the laws of the State of California, ("Interconnection Customer,") and the Imperial Irrigation District an irrigation district organized and existing under the Water Code of the State of California, ("Transmission Provider"). Interconnection Customer and Transmission Provider each may be referred to as a "Party," or collectively as the "Parties."

### RECITALS

**WHEREAS,** Interconnection Customer is proposing to develop a Facility or capacity addition to an existing Facility consistent with the submitted documentation by Interconnection Customer dated April 15, 2025; and

**WHEREAS,** Interconnection Customer desires to interconnect the Facility with Transmission Provider's Transmission System or Distribution System;

**WHEREAS,** Transmission Provider has completed an Interconnection System Impact Study (the "System Impact Study") and provided the results of said study to Interconnection Customer; and

**WHEREAS,** Interconnection Customer has requested Transmission Provider to perform an Interconnection Facilities Study to specify and estimate the cost of the equipment, engineering, procurement and construction work needed to implement the conclusions of the Interconnection System Impact Study in accordance with Good Utility Practice to physically and electrically connect the Facility or, when Clustering is used by the Transmission Provider, a group of Facilities, to the Transmission System or Distribution System.

**NOW, THEREFORE,** in consideration of and subject to the mutual covenants contained herein the Parties agreed as follows:

1



IID-691 (10-14)
INTERCONNECTION FACILITIES STUDY AGREEMENT

1.0    When used in this Agreement, unless otherwise defined herein, terms with initial capitalization shall have the meaning specified herein.

2.0    Interconnection Customer elects and Transmission Provider shall cause an Interconnection Facilities Study consistent with the terms of this Agreement.

3.0    At the time of execution of this Agreement, Interconnection Customer shall provide to Transmission Provider all data requested in the Transmission Customer Service Proposal (TCSP) Application. Transmission Provider has the right to request additional technical information from Interconnection Customer that Transmission Provider determines is reasonably necessary, consistent with Good Utility Practice, during the course of the Interconnection Facilities Study.  Upon request by Transmission Provider, Interconnection Customer shall provide such additional information to Transmission Provider within seven (7) Calendar Days.

4.0    The Interconnection Facilities Study will be based upon the results of the Interconnection System Impact Study and the technical information provided by Interconnection Customer. When Clustering is used to perform the Interconnection Facilities Study, the Interconnection Facilities Study also will be based upon technical information provided by other interconnection customers with Interconnection Requests in the cluster.

5.0    Transmission Provider's non-binding, good faith estimate for the time of completion of the Interconnection Facilities Study is 90 days and Transmission Provider's non-binding, good faith estimate of the cost for completing the Interconnection Facilities Study is $70,000 which is due upon execution of the Interconnection Facilities Study Agreement.

6.0    If Interconnection Customer, or any other interconnection customer with an Interconnection Request in the same study cluster as the

2



IID-691 (10-14)
INTERCONNECTION FACILITIES STUDY AGREEMENT

Interconnection Customer's Interconnection Request, modifies its designated Point of Interconnection, Interconnection Request, or the technical information provided therein is modified, the time to complete the Interconnection Facilities Study may be extended. Similarly, if the Interconnection Request of another interconnection customer is withdrawn from Transmission Provider's queue or removed from the cluster, the time to complete the Interconnection Facilities Study may be extended.

7.0     Following the completion of the Interconnection Facilities Study, the Transmission Provider shall provide an Interconnection Facilities Study report to Interconnection Customer.  This report: (i) shall provide a description, estimated cost, and estimated schedule for the construction of facilities projected to be required to interconnect the Facility or, when Clustering is used the group of Facilities to the Transmission System or Distribution System and (ii) shall address the short circuit, instability, and power flow issues identified in the Interconnection System Impact Study.

8.0     When the Interconnection Facilities Study report is provided to Interconnection Customer, Transmission Provider shall invoice Interconnection Customer for the actual costs of the Interconnection Facilities Study, including Transmission Provider's administrative costs, if any, that are in excess of the applicable deposit amount paid previously by Interconnection Customer. Interconnection Customer shall pay such invoice within thirty (30) Calendar Days of its receipt of the invoice

9.0     Transmission Provider's Interconnection Facilities Study shall not be construed as confirming or endorsing the design, or as any warranty of safety, durability, reliability or suitability of Interconnection Customer's Generating Facility or installation thereof for any use, including the use intended by Interconnection Customer.

3



IID-691 (10-14)
INTERCONNECTION FACILITIES STUDY AGREEMENT

10.0   This Agreement shall be interpreted and enforced in accordance with the substantive and procedural laws of the State of California. All actions or proceedings arising in connection with this Agreement shall be tried and litigated exclusively in State court located in the County of Imperial, California and/or Federal court located in the County of San Diego, California. The aforementioned choice of venue is mandatory, thereby precluding the possibility of litigation between the parties with respect to or arising out of this Agreement in any jurisdiction other than that specified in this section. Each Party hereby waives any right it may have to assert the doctrine of forum non conveniens or a similar doctrine or to object to venue with respect to any proceeding brought in accordance with this section, and stipulates that the State court located in Imperial County, California, and/or Federal court located in the Counties of Imperial and San Diego, respectively, California, shall have in personam jurisdiction and venue over each of them for the purpose of litigating any dispute or proceeding arising out of or related to this Agreement. Each Party hereby authorizes service of process sufficient for personal jurisdiction in any action against it at the address and in the manner for the giving of notice as set forth in this Agreement.

11.0   Interconnection Customer shall at all times indemnify, defend, and save Transmission Provider harmless from, any and all damages, losses, claims, including claims and actions relating to injury to or death of any person or damage to property, demands, suits, recoveries, costs and expenses, court costs, attorney fees, and all other obligations by or to third parties, arising out of or resulting from  Transmission Provider's performance of its obligations under this Agreement on behalf of the Transmission Customer, except in cases where Transmission Provider is solely negligent.

12.0   Transmission Provider shall not be considered to be in default of the provisions of this Agreement if delays in or failure of performance shall be due to uncontrollable forces, the effect of



**Imperial Irrigation District**

*Protecting the flow of progress.*

which, by the exercise of reasonable diligence, Transmission Provider could not avoid. The term uncontrollable forces shall mean any event which results in the prevention or delay of performance by Transmission Provider of its obligations under this Agreement and which is beyond the control of Transmission Provider. The term uncontrollable forces includes, but is not limited to, fire, acts of God, flood, earthquakes, storms, lightning, epidemic, war, riot, civil disturbance, sabotage, inability to procure permits, licenses, or authorizations from any state, local, or federal agency, or person for any of the supplies, materials, accesses, or services required to be provided by Transmission Provider under this Agreement, strikes, work slowdowns, or other labor disturbances, and judicial constraint. The provisions of this section shall not be interpreted or construed to require Transmission Provider to prevent, settle, or otherwise avoid a strike, work slowdown, or other labor action. Transmission Provider shall give timely written notice to Interconnection Customer describing the circumstances of uncontrollable forces which prevent the fulfillment of obligation of this Agreement. Transmission Provider shall give timely written notice to Interconnection Customer that the uncontrollable forces which prevented the fulfillment of obligations of this Agreement are no longer present and work has resumed on those obligations.

13.0 Each Party makes the following representations, warranties and covenants:

13.1 Such Party is duly organized, validly existing and in good standing under the laws of the state in which it is organized, formed, or incorporated, as applicable; that it is qualified to do business in the state or states in which it is located, and that it has the corporate power and authority to own its properties, to carry on its business as now being conducted and to enter into this Agreement and carry out the transactions contemplated hereby and perform and carry out all covenants and obligations on its part to be performed under and pursuant to this Agreement.

5



13.2     Such Party has the right, power and authority to enter into this Agreement, to become a Party hereto and to perform its obligations hereunder.  This Agreement is a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforceability is sought in a proceeding in equity or at law).

13.3     The execution, delivery and performance of this Agreement does not violate or conflict with the organizational or formation documents, or bylaws or operating agreement, of the Party, or any judgment, license, permit, order, material agreement or instrument applicable to or binding upon such Party or any of its assets.

13.4     The Party has obtained each consent, approval, authorization, order, or acceptance by any Governmental Authority in connection with the execution, delivery and performance of this Agreement, and it will provide to any Governmental Authority notice of any actions under this Agreement that are required by Applicable Laws and Regulations.

14.0     All notices, requests, demands, and other communications required or permitted under this Agreement shall be in writing, unless otherwise agreed by the Parties, and shall be delivered in person or sent by certified mail, postage prepaid, by overnight delivery, or by electronic mail or electronic facsimile transmission with an original sent immediately thereafter by postage prepaid mail, and properly addressed as follows:

6

When delivered to Transmission Provider:

Energy Contracts
IMPERIAL IRRIGATION DISTRICT
333 Barioni Blvd.
P.O. Box 937
Imperial, CA 92251
Email: Energycontracts@iid.com

When delivered to Interconnection Customer:

Imperial Valley Computer Manufacturing, LLC
16400 Pacific Coast Highway, Suite 212
Huntington Beach, CA 92649
Email: sebastian@ruccilaw.com

15.0    Either Party may, from time to time, change its representative or address for the purpose of notices to that Party by a similar notice specifying a new representative or address, but no such change shall be deemed to have been given until such notice is actually received by the Party being so notified.

16.0    This Agreement may be executed in two or more counterparts, each of which is deemed an original but all constitute one and the same instrument.

17.0    The Parties may, by mutual agreement, amend this Agreement by a written instrument duly executed by the Parties.

7



IID-691 (10-14)
INTERCONNECTION FACILITIES STUDY AGREEMENT



**Imperial Irrigation District**
*Protecting the flow of progress.*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their duly authorized officers or agents on the day and year first above written.

**Imperial Irrigation District**

Signature: _____   Digitally signed by Martinez, Jesus
Date: 2025.09.11 17:10:24 -07'00'

Print Name: _____Jesus Martinez_____

Title: _____Supt. Gen. System Planning and Engineering___

Date: _____9/11/2025_____

**Interconnection Customer Imperial Valley Computer Manufacturing, LLC**

Signature: _____Sebastian Rucci_____

Print Name: _____Sebastian Rucci_____

Title: _____Managing Member_____

Date: _____9-03-2025_____

8



The Law Office of
**SEBASTIAN RUCCI, P.C.**

Sebastian Rucci <sebastian@ruccilaw.com>

---

## Proposal for Temporary Supply of Load from CAISO Wholesale Market
1 message

**Sebastian Rucci** <sebastian@ruccilaw.com>                                    Thu, Oct 2, 2025 at 10:32 AM
To: Jamie Asbury <jlasbury@iid.com>
Cc: "Smelser, Matthew H" <mhsmelser@iid.com>, prodriguez@iid.com, "Hamilton, Timothy L" <TLHamilton@iid.com>,
"Gutierrez, Noe R" <NRGutierrez@iid.com>, "Ambriz, Jose-Said" <JAmbriz@iid.com>, "Martinez, Jesus"
<jamartinez@iid.com>, "Garcia, Matthew" <msgarcia@iid.com>, "Sampedro, Daniel" <dsampedro@iid.com>, "Olivo, Lauren"
<lolivo@iid.com>, Carl Stills <cestills@sbcglobal.net>, Tom DuBose <tom@dubosedesigngroup.com>

Dear Mrs. Asbury,

I've attached a proposal requesting that IID consider the possibility of temporarily supplying energy on a short-term basis
from CAISO markets (Day Ahead and/or Real-Time). We are not requesting direct procurement of energy outside of IID's
balancing authority. Under this proposal, IID faces no stranded investment risk, no credit risk, and no operational burden,
while being compensated for its services through a cost-plus framework.

We would set up a dedicated account for IID to draw from for paying for CAISO energy purchases, transmission charges,
and all related costs. This ensures no credit risk or exposure to IID. The draw account would be continuously replenished.
If energy is unavailable, we would meet the load with the on-site emergency generators.

The arrangement is a cost-plus model with upside for IID. IID will receive a fee for scheduling coordinator time and
expenses, the OATT transmission rate, and an administrative markup. We estimate this to be over $22 million in positive
annual revenue to IID. This is more than twice the cost to the data center if only the OATT rate were to apply. There is no
financial risk to IID. All economic and reliability risk is borne solely by the data center, which will absorb all energy,
capacity, and administrative costs. This allows the $10 billion data center to proceed while long-term PPAs are secured.
This will generate permanent jobs, tax revenue, and demand for future renewable generation in the valley.

If the numerous positive benefits of this arrangement meet with your approval. In that case, we request that IID approve a
temporary market-sourced supply arrangement under OATT § III.30.6, with all risks and costs to be borne by the data
center. If you agree, we are also requesting that IID conduct a sensitivity analysis to identify feasible import paths for
CAISO market energy and assess the available transmission import capability from geothermal areas. We are also
requesting that IID establish applicable markup, scheduling coordinator cost recovery, and administrative fees.

Carl Stills has arrived at this proposal, and if you have concerns, please let us know. We are confident that we can arrive
at a solution acceptable to IID. You have the power to make this data center a reality. We respectfully urge IID to adopt
this short-term bridging mechanism to enable the data center to proceed while long-term PPAs are secured.

Sincerely,

Sebastian Rucci
Imperial Valley Computer Manufacturing, LLC
Law Office of Sebastian Rucci, P.C.
16400 Pacific Coast Highway, Suite 212
Huntington Beach, CA 92649
Office: (562) 901-0199
Cell: (330) 720-0398
Fax: (562) 249-6910
Email: Sebastian@RucciLaw.com
Website: ImperialDataCenter.com

---

📄 **Memo Temporary Supply Energy from Wholesale Market.pdf**
66K

## TEMPORARY SUPPLY OF 330 MW LOAD FROM CAISO WHOLESALE MARKET

## EXECUTIVE SUMMARY

**PURPOSE**: Imperial Valley Computer Manufacturing (IVCM) is developing a 330 MW AI data center in Imperial County (Google as anchor tenant). Long-term power contracts with in-valley resources (e.g., geothermal, solar) will take several years to complete. This agreement provides a temporary bridge solution: IID procures energy from the CAISO market on IVCM's behalf, ensuring the project moves forward immediately.

### KEY FEATURES
- IID acts as Scheduling Coordinator and Load-Serving Entity
- Energy is bought from CAISO Day-Ahead or Real-Time markets
- IID delivers power to the data center under its balancing authority
- Generate new revenue for IID with zero risk

### ZERO RISK TO IID
- IVCM funds a draw account in advance.
- Draw account used to pay for all CAISO costs, transmission charges, and staff time.
- IVCM replenishes the account daily/weekly.

### RELIABILITY PROTECTION
- IID has no obligation to curtail other customers or assume reliability risk.
- If CAISO energy is unavailable, IVCM uses on-site BESS and emergency generators.
- IID maintain full control under its OATT authority

### REVENUE STREAM FOR IID (Full Cost Recovery + Markup)
- All CAISO energy costs
- IID's OATT transmission rate
- IID's Scheduling Coordinator costs
- Administrative markup (additional revenue for IID)

### BENEFITS TO IID & IMPERIAL VALLEY
- No Financial Exposure to IID, all costs are paid up front.
- IID collects transmission fees, scheduling charges, and markup.
- Creates demand for new geothermal and renewable generation in IID's service area.
- Support a transformational economic project. Enables a $10B+ data center project, with permanent jobs, tax revenue, and long-term load growth.

**BACKGROUND**: IVCM respectfully requests that IID examine the possibility of temporarily supplying energy on a short-term basis from CAISO markets (Day Ahead and/or Real Time). IVCM is not requesting to directly procure energy outside of IID's balancing authority. IID has the authority under its Open Access Transmission Tariff to secure arrangements for resources not physically interconnected with IID's transmission system. The proposal ensures IID faces no stranded investment risk, no credit risk, and no operational burden, while being compensated for its services through a cost-plus framework.

## PROPOSED COMMERCIAL STRUCTURE

### A. DRAW ACCOUNT MECHANISM

Continuously fund dedicated account is set up from which IID may draw to pay for CAISO energy purchases, transmission charges, and all related costs. This ensures no credit risk or exposure to IID. Dedicated draw account that is continuously replenished allows IID to pay:

- CAISO market purchases (energy and capacity, if applicable)
- Transmission charges
- Scheduling coordinator costs
- OATT Rate Application: IID's existing OATT transmission rate applied.
- Administrative Markup: IID may determine and impose an additional administrative premium for its role in facilitating the transaction.

### B. NO RELIABILITY BURDEN IS PLACED ON IID

- If CAISO energy is unavailable (a rare event, documented only once in the past three years), IVCM will meet load with on-site batteries and emergency generators.
- IID's system reliability is thus protected, and the arrangement cannot result in unserved load to IID's native customers.

### C. FULL COST RECOVERY + ADMINISTRATIVE PREMIUM

The arrangement is a cost-plus model with upside for IID.

- IID will receive a fee for scheduling coordinator time and expenses,
- IID will receive the OATT transmission rate, and
- IID will receive an administrative markup for handling

### D. BENEFITS TO IID AND IMPERIAL VALLEY

- No Financial Risk to IID. All financial and reliability risk is borne solely by data center which will absorb all energy, capacity, and administrative costs.
- Positive Revenue Stream to IID from the OATT rates, scheduling charges, and an administrative markup.

- The request is consistent with Section III.30.6's directive for IID to use "reasonable efforts" to assist network customers in arranging delivery of energy.
- The $10 billion data center will generate permanent jobs, tax revenue, and demand for future renewable generation. IID will benefit from expanded generation in-valley.

### REQUESTED ACTION

- Conduct Sensitivity Analyses: Identify feasible import paths for CAISO market energy and available transmission import capability from geothermal areas.
- Develop Rate Structure: Establish applicable markup, scheduling coordinator cost recovery, and administrative fees.
- Adopt Bridging Framework: Approve a temporary market-sourced supply arrangement under OATT § III.30.6, with all risks and costs borne by IVCM.

## GOVERNING LEGAL FRAMEWORK
### A. IID's OATT – Section III.30.6

Section III.30.6, Transmission Arrangements for Network Resources Not Physically Interconnected with the Transmission Provider, provides: "The Network Customer shall be responsible for any arrangements necessary to deliver capacity and energy from a Network Resource not physically interconnected with the Transmission Provider's Transmission System. The Transmission Provider will undertake reasonable efforts to assist the Network Customer in obtaining such arrangements …" This language contemplates exactly the present situation: a Network Customer seeking delivery from a non-interconnected resource, with the Transmission Provider tasked with reasonable assistance.

### B. IID's POLICY ON DIRECT ACCESS

IVCM acknowledges that IID does not permit Direct Access. The proposed arrangement does not constitute Direct Access. IID, as Load-Serving Entity and Balancing Authority, would remain the energy procurer of record, purchasing energy through CAISO markets (Day-Ahead or Real-Time) and delivering it under its balancing authority. IVCM bears all costs, ensuring IID's tariff integrity and avoiding a precedent that undermines IID's retail service exclusivity.

## CONCLUSION

IID has clear authority under its OATT to assist Network Customers in securing arrangements for non-interconnected resources. IVCM's proposal operationalizes this authority in a manner that is cost-neutral, risk-free, and beneficial to IID and the Imperial Valley community. We respectfully urge IID to adopt this short-term bridging mechanism to enable the Aten Road Data Center to proceed while long-term PPAs are finalized.

## APPENDIX – SUPPORTING AUTHORITIES AND FRAMEWORK

### A. IID OATT Excerpts

Section III.30.6 – Transmission Arrangements for Network Resources Not Physically Interconnected

> "The Network Customer shall be responsible for any arrangements necessary to deliver capacity and energy from a Network Resource not physically interconnected with the Transmission Provider's Transmission System. The Transmission Provider will undertake reasonable efforts to assist the Network Customer in obtaining such arrangements …"

Section III.28.2 – Designated Resources

> Provides that a Network Customer may designate Network Resources not physically interconnected with the Transmission Provider's Transmission System, subject to the Network Customer arranging delivery and the Transmission Provider assisting.

Section III.30.1 – General Principles

> Confirms that service is provided for the purpose of serving designated Network Load and that Transmission Provider must act in a manner consistent with OATT obligations.

### B. Risk Allocation Summary

- Financial Risk: 100% borne by IVCM.
- Credit Risk: Eliminated by draw account mechanism.
- Reliability Risk: None to IID (IVCM covers via on-site backup).
- Proposal is consistent with IID OATT § III.30.6; does not constitute Direct Access.

### C. Suggested IID Next Steps

1. Sensitivity Analysis:
- Map feasible CAISO import paths (Day-Ahead and Real-Time markets).
- Analyze import capability from geothermal area.
2. Rate Setting:
- Establish administrative markup percentage and scheduling coordinator cost schedule.
3. Formalize Bridging Agreement:
- Enter into a short-term "Bridging Energy Agreement" under OATT umbrella.

**Annual Revenue to IID**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Annual Energy | 330 | MW | x | 8,760 | hrs | = | 2,890,800 | MWhr |
| | | | | | | | | |
| IID OATT Rate | $3.38 | $/MWhr | x | 2,890,800 | MWhr | = | $9,770,904 | |
| Scheduling Coordinator Rate | $0.29 | $/MWhr | x | 2,890,800 | MWhr | = | $838,332 | |
| | | | Total Annual IID Revenue SCR + OATT | | | = | $10,609,236 | |
| | | | | | | | | |
| Avg Wholesale CAISO cost | $52.34 | $/MWhr | x | 2,890,800 | MWhr | = | $151,304,472 | |
| CAISO TAC cost | $14.08 | $/MWhr | x | 2,890,800 | MWhr | = | $40,702,464 | |
| | | | Total CAISO + TAC | | | = | $192,006,936 | |
| | | | | | | | | |
| IID Administrative Mark Up | 6.0% | | x | $192,006,936 | | = | $11,520,416 | |
| | | | **Total Annual IID Revenue** | | | **=** | **$22,129,652** | |



**The Law Office of**
**SEBASTIAN RUCCI, P.C.**

Sebastian Rucci <sebastian@ruccilaw.com>

## Proposal for Temporary Supply of Load from CAISO Wholesale Market

**Asbury, Jamie** <jlasbury@iid.com>                                        Tue, Oct 14, 2025 at 9:05 AM
To: Sebastian Rucci <sebastian@ruccilaw.com>
Cc: "Smelser, Matthew H" <mhsmelser@iid.com>, "Rodriguez, Paul" <prodriguez@iid.com>, "Hamilton, Timothy L"
<TLHamilton@iid.com>, "Gutierrez, Noe R" <NRGutierrez@iid.com>, "Ambriz, Jose-Said" <JAmbriz@iid.com>, "Martinez,
Jesus" <jamartinez@iid.com>, "Garcia, Matthew" <msgarcia@iid.com>, "Sampedro, Daniel" <dsampedro@iid.com>, "Olivo,
Lauren" <lolivo@iid.com>, Carl Stills <cestills@sbcglobal.net>, Tom DuBose <tom@dubosedesigngroup.com>, "Holbrook,
Geoffrey" <gpholbrook@iid.com>, "wstrumpfer@gmail.com" <wstrumpfer@gmail.com>

Dear Mr. Rucci:

Thank you for your recent energy service option proposal for the Imperial Valley
Computer Manufacturing, LLC data center project (Project). IID appreciates your
efforts to advance this initiative. However, the proposed service plan does not
comply with the IID Open Access Transmission Tariff (OATT). The IID OATT aligns
with the Federal Energy Regulatory Commission (FERC) regulations, specifically
Order No. 888, issued in 1996, which mandate non-discriminatory access to
transmission systems and standardized interconnection processes to ensure grid
reliability and fairness. These rules govern all interconnections to IID's transmission
system, including IID-owned facilities. The OATT ensures equitable treatment for all
interconnection requests, and IID is obligated to adhere to this standardized process
without exception.

The OATT requires project developers to secure sufficient transmission capacity to
serve wholesale loads within IID's network transmission system. Your reference to
Network Integration Transmission Service, Section 30.6, appears to be a
misinterpretation, as the OATT mandates arranging necessary transmission capacity
for your Project from a generation source to the load. Currently, over 3,000 MW of
transmission service reservations have been submitted and are being analyzed by
the IID, primarily for battery energy storage systems. These reservation requests are
in queue for access to the California Independent System Operator (ISO) system at
two separate inter-tie points with the IID. Most of these reservations are tied to
projects with executed generator interconnection agreements and approved
environmental entitlements. Short-term transmission service is available through
IID's Open Access Same-time Information System (OASIS) on a daily or weekly
basis, subject to securing capacities through a "first come-first serve" process.

It is critical to distinguish between wholesale and retail services in this context.
Wholesale services, governed by the OATT and FERC regulations, involve the
transmission of energy across IID's system to serve large-scale loads, such as your
data center, typically delivery of energy to other utilities or entities. These services
require adherence to standardized interconnection and transmission reservation
processes to ensure non-discriminatory access to the grid. In contrast, retail services

involve the direct sale and delivery of energy to end-use customers, such as residential or commercial consumers, and are managed under IID's retail tariffs, which are separate from OATT requirements.

Your Project, **as proposed**, is a large-scale load seeking interconnection to IID's transmission system, falls under wholesale services and must comply with OATT protocols. IID is legally obligated to treat all wholesale interconnection requests equitably, and we cannot circumvent these processes, as they are rooted in FERC mandates and industry standards for maintaining grid stability. Any generation impacting the Bulk Electric System must undergo rigorous studies to ensure grid reliability, consistent with industry standards for which IID is accountable.

The feasibility study for your Project identifies available capacity at the proposed point of interconnection to IID's transmission system, marking the initial step in the interconnection process. However, upon review of your interconnection application, we noted the omission of critical generator data. This omission constitutes a material modification, requiring reanalysis that includes the 300MW of behind the meter generation. This step is critical, as your proposed data center will interconnect to IID's Bulk Electric System, a vital component of the western electric grid.

To proceed with your amended request, IID will require (at a minimum) the following:

1. An updated interconnection application, including dynamic gas generation models in GE PSLF format.
2. A transmission service application specifying the generating facility's point of interconnection to the data center's load point of interconnection. This must be submitted via IID's OASIS platform, which manages transmission service requests in accordance with FERC orders. Upon submission, your request will be assigned a queue position and reference number for study purposes.
3. Generation interconnection request queue information designating the generation as a network resource serving your network load, accompanied by a written letter from the generation project owner confirming the transmission network configuration.
4. If a new generator interconnection application is required, the next study cycle opens in January 2026.

Your Project's development involves multiple phases, including load and generation planning. While environmental permitting is critical, securing transmission capacity and energy access is equally essential. Should your Project necessitate upgrades to IID's transmission network to serve a specific location, your organization is responsible for the associated environmental permitting of those facilities.

IID supports your data center Project and is committed to facilitating the interconnection process within the framework of FERC and OATT requirements. Upon receipt of the requested information, we will diligently process your application in accordance with OATT study timelines. For further assistance or to submit the

required materials, please contact Mrs. Lauren Olivo, Manager of Energy Business &
Regulatory Compliance Programs at (760) 482-3448 or lolivo@IID.com.

Best regards,



**Jamie L. Asbury**
**General Manager**
**IMPERIAL IRRIGATION DISTRICT**
333 E Barioni Blvd, Imperial CA 92251
(760) 339-9477  |  email: jlasbury@IID.com
Mobile (760) 791-7471

The foregoing electronic message, together with any attachments thereto, is confidential and may be legally privileged against disclosure other than to the intended recipient. It is intended solely for the addressee(s) and access to the message by anyone else is unauthorized. If you are not the intended recipient of this electronic message, you are hereby notified that any dissemination, distribution, or any action taken or omitted to be taken in reliance on it is strictly prohibited and may be unlawful. If you have received this electronic message in error, please delete and immediately notify the sender of this error.

**From:** Sebastian Rucci <sebastian@ruccilaw.com>
**Sent:** Thursday, October 2, 2025 10:32 AM
**To:** Asbury, Jamie <jlasbury@IID.com>
**Cc:** Smelser, Matthew H <mhsmelser@IID.com>; Rodriguez, Paul <prodriguez@IID.com>; Hamilton, Timothy L <TLHamilton@IID.com>; Gutierrez, Noe R <NRGutierrez@IID.com>; Ambriz, Jose-Said <JAmbriz@IID.com>; Martinez, Jesus <jamartinez@IID.com>; Garcia, Matthew <msgarcia@IID.com>; Sampedro, Daniel <dsampedro@IID.com>; Olivo, Lauren <lolivo@IID.com>; Carl Stills <cestills@sbcglobal.net>; Tom DuBose <tom@dubosedesigngroup.com>
**Subject:** Proposal for Temporary Supply of Load from CAISO Wholesale Market

<span style="color:red">[CAUTION]</span> This email originated from <span style="color:red">outside</span> of the <span style="color:red">IID</span>. Do not reply, click on any links or open any attachments unless you trust the sender and know the content is safe.

[Quoted text hidden]



The Law Office of
**SEBASTIAN RUCCI, P.C.**

Sebastian Rucci <sebastian@ruccilaw.com>

## Proposal for Temporary Supply of Load from CAISO Wholesale Market

**Sebastian Rucci** <sebastian@ruccilaw.com>              Tue, Oct 14, 2025 at 10:56 AM
To: "Asbury, Jamie" <jlasbury@iid.com>
Cc: "Smelser, Matthew H" <mhsmelser@iid.com>, "Rodriguez, Paul" <prodriguez@iid.com>, "Hamilton, Timothy L" <TLHamilton@iid.com>, "Gutierrez, Noe R" <NRGutierrez@iid.com>, "Ambriz, Jose-Said" <JAmbriz@iid.com>, "Martinez, Jesus" <jamartinez@iid.com>, "Garcia, Matthew" <msgarcia@iid.com>, "Sampedro, Daniel" <dsampedro@iid.com>, "Olivo, Lauren" <lolivo@iid.com>, Carl Stills <cestills@sbcglobal.net>, Tom DuBose <tom@dubosedesigngroup.com>, "Holbrook, Geoffrey" <gpholbrook@iid.com>, "wstrumpfer@gmail.com" <wstrumpfer@gmail.com>

Dear Mrs. Asbury,

As you mentioned in our previous meeting, the IID could provide approximately 50 MW. That is sufficient for a cloud storage data center. We could reduce the data center load, and it will become a small data center. Instead, we have made significant efforts—at considerable expense—to secure a larger capacity for an AI data center, which requires 250 MW. Our proposal to the IID eliminates financial risk to the district, as it comprehensively covers all associated costs. Per our calculation, this provides twice the payment to the IID than under the OATS. We estimate at least $22 million per year. We are not seeking special treatment; we aim to pay our way. We could be wrong, but the IID has the authority to establish special rates for large loads, should it wish to accommodate such a transformative project.

Regarding the concern about "omission of critical generator data" in our application, we have been engaged in discussions with IID and Power Engineers for over a year, through multiple studies and technical exchanges. At no point have the backup generators been tied to the grid—they never have been, and never will be. Likewise, the onsite batteries are not designed to export power to the grid. This project represents a large load only, and that is precisely how our application has been prepared, submitted, and processed by the IID. We therefore find it difficult to understand why a re-application would be necessary for backup equipment that is not grid-connected.

The proposed AI data center represents a $10 billion investment in the Imperial Valley, offering substantial economic and technological benefits to the region. If the IID, under your leadership, wishes to advance this opportunity, we would like to have another meeting to discuss a clear and positive path forward. Following our last meeting, we listened carefully to IID's concerns and submitted a proposal specifically designed to address them. If, however, there are other—perhaps unstated—reasons why such a transformative project is not desired in the Valley, it would be best to clarify that now, as we are concurrently advancing discussions to locate the data center on tribal land in other jurisdictions. As I stated previously, we are eager to address any concerns to IID's satisfaction.

We look forward to meeting at your convenience to work toward an outcome that benefits both IID and the Imperial Valley community. Speed of approval remains critical, as large-scale data center investments are rapidly moving to business-friendly states such as Texas and beyond.

Sincerely,

Sebastian Rucci
Imperial Valley Computer Manufacturing, LLC
Law Office of Sebastian Rucci, P.C.
16400 Pacific Coast Highway, Suite 212
Huntington Beach, CA 92649
Office: (562) 901-0199
Cell: (330) 720-0398
Fax: (562) 249-6910
Email: Sebastian@RucciLaw.com
Website: ImperialDataCenter.com

[Quoted text hidden]


The Law Office of
**SEBASTIAN RUCCI, P.C.**

Sebastian Rucci <sebastian@ruccilaw.com>

## Proposal for Temporary Supply of Load from CAISO Wholesale Market

**Asbury, Jamie** <jlasbury@iid.com>                                                    Fri, Oct 17, 2025 at 8:30 AM
To: Sebastian Rucci <sebastian@ruccilaw.com>
Cc: "Smelser, Matthew H" <mhsmelser@iid.com>, "Rodriguez, Paul" <prodriguez@iid.com>, "Hamilton, Timothy L"
<TLHamilton@iid.com>, "Gutierrez, Noe R" <NRGutierrez@iid.com>, "Ambriz, Jose-Said" <JAmbriz@iid.com>, "Martinez,
Jesus" <jamartinez@iid.com>, "Garcia, Matthew" <msgarcia@iid.com>, "Sampedro, Daniel" <dsampedro@iid.com>, "Olivo,
Lauren" <lolivo@iid.com>, Carl Stills <cestills@sbcglobal.net>, Tom DuBose <tom@dubosedesigngroup.com>, "Holbrook,
Geoffrey" <gpholbrook@iid.com>, "Strumpfer, Wayne K" <wkstrumpfer@iid.com>

Thank you for your email.  We look forward to your presentation to the IID board next week.

In the interim, the information below may be helpful.  My communication to you was based upon the proposal you recently
directed to my attention for IID's assessment that now contains a transmission component.  The OATT process is to
ensure reliability to both the IID system and your facilities in a manner that is fair and nondiscriminatory to other users of
the IID system.  In our prior discussion, IID made clear it is not subject to and would not allow direct access but that it
would facilitate a network resource/network load scenario.  That transactional scenario is governed by IID's OATT; your
import to the system requires transmission service- also governed by the OATT.  Further, IID analyzes all generators,
even behind the meter resources, to ensure our base cases are accurate and have all scenarios identified and mitigated.
There is no way to avoid the study process outlined in the tariff.  In fact, your proposal references the OATT in a number
of places; you acknowledge its importance and governance.

IID is not attempting to impede your progress, but your project has gone through a number of iterations and it has not
been formally analyzed in the current configuration you propose in your recent communication. IID has an obligation to
your project (and all other projects) that seek interconnection to the system. You propose to have the project served from
the high voltage system so the OATT does apply. There is no provision in the tariff that allows IID to provide preferential
treatment to your project or any other project.  To facilitate the proposal you submitted, IID would need to disregard higher
queued projects and allow your project to be accelerated to the top of the queue.  To do so could disrupt the plans of such
higher queued projects that have initiated the process, which have made financial commitments and deposits and are
following their own, tight development timelines.  IID follows the federal standard interconnection process which provides
for interconnections to utilities based on a queue process, and there is no precedent of which I am aware that allows IID
to take the action you propose.

All projects that seek interconnection have economic benefit to Imperial Valley and the IID has been and will continue to
be supportive of them; what we cannot do is circumvent the tariff process and subject IID – and your project – to
challenge.  Your suggestion that there is some unstated reason why we do not support your project is without basis and
not well received.  IID has an obligation to serve all of its customers in a fair and non-discriminatory manner. We are
merely asking that you follow the process that all other developers are required to follow to achieve commercial
operation.  The process requires more than a feasibility assessment; it requires an analysis of system impacts and
identification of necessary mitigations.

Staff are available to meet with you to finalize your project's technical parameters and perform the necessary studies.

Regards,



**Jamie L. Asbury**
**General Manager**
**IMPERIAL IRRIGATION DISTRICT**
333 E Barioni Blvd, Imperial CA 92251
(760) 339-9477  |  email: jlasbury@IID.com
Mobile (760) 791-7471

The foregoing electronic message, together with any attachments thereto, is confidential and may be legally privileged against disclosure other than to the intended recipient. It is intended solely for the addressee(s) and access to the message by anyone else is unauthorized. If you are not the intended recipient of this electronic message, you are hereby notified that any dissemination, distribution, or any action taken or omitted to be taken in reliance on it is strictly prohibited and may be unlawful. If you have received this electronic message in error, please delete and immediately notify the sender of this error.

**From:** Sebastian Rucci <sebastian@ruccilaw.com>
**Sent:** Tuesday, October 14, 2025 10:57 AM
**To:** Asbury, Jamie <jlasbury@IID.com>
**Cc:** Smelser, Matthew H <mhsmelser@IID.com>; Rodriguez, Paul <prodriguez@IID.com>; Hamilton, Timothy L <TLHamilton@IID.com>; Gutierrez, Noe R <NRGutierrez@IID.com>; Ambriz, Jose-Said <JAmbriz@IID.com>; Martinez, Jesus <jamartinez@IID.com>; Garcia, Matthew <msgarcia@IID.com>; Sampedro, Daniel <dsampedro@IID.com>; Olivo, Lauren <lolivo@IID.com>; Carl Stills <cestills@sbcglobal.net>; Tom DuBose <tom@dubosedesigngroup.com>; Holbrook, Geoffrey <gpholbrook@IID.com>; wstrumpfer@gmail.com
**Subject:** Re: Proposal for Temporary Supply of Load from CAISO Wholesale Market

---

[CAUTION] This email originated from **outside** of the **IID**. Do not reply, click on any links or open any attachments unless you trust the sender and know the content is safe.

---

Dear Mrs. Asbury,

[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]

[Quoted text hidden]



**Jamie L. Asbury**
**General Manager**
**IMPERIAL IRRIGATION DISTRICT**
333 E Barioni Blvd, Imperial CA 92251
(760) 339-9477  |  email: jlasbury@IID.com
Mobile (760) 791-7471

[Quoted text hidden]



The Law Office of
**SEBASTIAN RUCCI, P.C.**

Sebastian Rucci <sebastian@ruccilaw.com>

---

# Proposal for Temporary Supply of Load from CAISO Wholesale Market

**Sebastian Rucci** <sebastian@ruccilaw.com>                                                Fri, Oct 17, 2025 at 2:14 PM
To: "Asbury, Jamie" <jlasbury@iid.com>
Cc: "Smelser, Matthew H" <mhsmelser@iid.com>, "Rodriguez, Paul" <prodriguez@iid.com>, "Hamilton, Timothy L"
<TLHamilton@iid.com>, "Gutierrez, Noe R" <NRGutierrez@iid.com>, "Ambriz, Jose-Said" <JAmbriz@iid.com>, "Martinez,
Jesus" <jamartinez@iid.com>, "Garcia, Matthew" <msgarcia@iid.com>, "Sampedro, Daniel" <dsampedro@iid.com>, "Olivo,
Lauren" <lolivo@iid.com>, Carl Stills <cestills@sbcglobal.net>, Tom DuBose <tom@dubosedesigngroup.com>, "Holbrook,
Geoffrey" <gpholbrook@iid.com>, "Strumpfer, Wayne K" <wkstrumpfer@iid.com>, "Dockstader, Gina Nicole"
<gndockstader@iid.com>, "Cardenas, Alex" <aacardenas@iid.com>, lapacheco@iid.com, Bari Bean
<baribean@co.imperial.ca.us>

Dear General Manager Asbury:

This letter is submitted to clarify the procedural record of the Imperial Valley Computer Manufacturing, LLC ("IVCM") data
center project, to correct several factual and procedural misstatements recently raised by you, and to request IID's prompt
completion of its contractual obligations under the Open Access Transmission Tariff ("OATT"). The project has no
transmission component and properly falls under Part III of the OATT (Large Load), not Part II (Generation
Interconnection). IID's recent position represents a late-stage and unsupported deviation from over a year of technical and
procedural consensus.

## 1. PROJECT SCOPE AND APPLICABILITY OF THE OATT

The IVCM Data Center does not generate power for sale or transmission through IID's grid. The project consists of a load
served by IID under Part III of the OATT, not generation subject to Part II. The OATT applies to transmission and network
load service, not to backup generators that are not connected to the grid.

In prior correspondence, IID staff, including Lauren Olivo, in her February 11, 2025, email at 1:27 p.m., explicitly
confirmed that IID would "remove references to the GIP as this project does not fall under the OATT." No IID employee,
during more than a year of meetings and written exchanges, has ever indicated that the data center's backup generators
required OATT review or interconnection procedures.

## 2. CHRONOLOGY OF IID STUDIES AND APPROVALS

<u>Feasibility Study</u>: Following Power Engineers' Load Injection Memorandum confirming summer load capacity of 557.8
MW on the 230 kV S-Line (Exhibit A), IVCM submitted its application for a feasibility study (Exhibit B). IVCM paid the
$50,000 fee, IID executed the study agreement, and on May 22, 2025, IID issued its Feasibility Study Report confirming:
"No thermal violations and no exceedances or deviations observed at any buses." (Exhibit C).

<u>System Impact Study (S-line)</u>: On June 3, 2025, IVCM submitted a completed System Impact Study application for a 250
MW load on the 230 kV S-Line. IID executed the agreement and received the $50,000 fee. On July 25, 2025, IID issued
its System Impact Study Report, concluding: "No thermal violations, no voltage exceedances or deviations at any
monitored buses, and no transient stability violations observed under any simulated contingencies. Study results show
that this project can be deemed feasible." (Exhibit D).

<u>System Impact Study (R-Line)</u>: On March 5, 2025, IVCM submitted a System Impact Study application for an 80 MW data
center on the 92 kV R-Line (Exhibit E). IID received the $50,000 fee and executed the study agreement. On September
23, 2025, IID's System Impact Study Report concluded: "The Project can be deemed feasible with some transmission
infrastructure upgrades at the new IVCM substation: one static var device rated 75 MVAR, configured in three switching
blocks of 25 MVAR each, for reactive power support and voltage stability." (Exhibit F).

<u>Facility Study</u>: On July 31, 2025, IID confirmed via email that the System Impact Study was approved and that IID would
proceed to perform the Facility Study for the 250 MW data center, estimating six weeks for completion. IID further stated
that the remaining $38,876 from the SIS budget would cover the facility study. IID executed the Facility Study Agreement
on August 6, 2025 (Exhibit G). This communication and subsequent agreement formally initiated the Facility Study phase,
consistent with OATT §19.4.

## 3. BACKUP GENERATORS – FULLY DISCLOSED AND NOT SUBJECT TO OATT

IID's recent claim that the backup generators were "a surprise" is demonstrably false. The approved System Impact Study Reports for both the S-Line and R-Line include graphics showing the backup generators and BESS as part of the project (Exhibit D, p. 6; Exhibit G, p. 6). The 16-page development plans repeatedly submitted to IID with our applications specify: "Backup generators will operate only during emergency blackouts. The generators will not connect to the grid and will not export electricity. Their sole purpose is to support the data center," and that the "BESS provides immediate support for short-term power disruptions. The BESS will not export electricity to the grid; its use is solely for the Data Center." (See Email on Jun 3, 2025 at 7:46 am to IID staff including Lauren Olivio).

OATT regulates the use of the Transmission System, not unconnected load-side backup systems. Nowhere in the OATT is there authority requiring a transmission provider to conduct studies for non-connected, non-exporting backup generators. To the extent IID now claims otherwise, please provide a specific citation within the OATT authorizing studies of generators not interconnected to the IID system.

If IID applies this position to IVCM, then all non-grid-connected backup generators within the District would be subject to identical studies and interconnection agreements. We are unaware of any such precedent, and selective enforcement would constitute discriminatory treatment in violation of the OATT, the Federal Power Act, and FERC precedent.

**4. FACILITY STUDY DELAY AND DISPARATE TREATMENT**

Pursuant to OATT § 19.4 Facilities Study Procedures: "If a System Impact Study indicates that additions or upgrades to the Transmission System are needed to supply the Eligible Customer's service request, the Transmission Provider, within thirty (30) days of the completion of the System Impact Study, shall tender to the Eligible Customer a Facilities Study Agreement."

OATT §19.4 requires that, upon completion of the System Impact Study, a Facility Study Agreement be issued within 30 days and completed within 60 days of execution. See OATT § 19.4 ("Upon receipt of an executed Facilities Study Agreement, the Transmission Provider will use due diligence to complete the required Facilities Study within a sixty (60) day period."). On July 31, 2025, IID stated via email that the facility study would proceed and that IID estimated "a time frame of 6 weeks to complete." IID executed the Facility Study Agreement on August 6, 2025 (Exhibit G).

However, on September 4, 2025, IID's upper management instructed staff to prioritize six projects from Z-Global. This put everything else aside, including our 10 billion data center project, which had completed all required technical studies with each study demonstrating technical feasibility, with no system violations. Because upper management prioritized six projects, which we later concluded were associated with Z-Global. This directive contradicts IID's previous written commitment and constitutes unequal treatment among applicants.

All IID studies for the data center confirmed feasibility, with no thermal, voltage, or stability violations. The subsequent delay, despite technical clearance, is inconsistent with the OATT's due diligence requirement and undermines confidence in IID's impartial administration of its tariff obligations.

**5. IMPROPER 15-YEAR PREPAYMENT REQUIREMENT**

During the meeting of September 16, 2025, you said that IID could not provide power service unless IVCM prepaid for 15 years of electricity. This demand has no basis under the OATT, which at Section §11 mandates only "reasonable credit review procedures in accordance with standard commercial practices." Section 17.3 further provides that credit assurance for firm transmission service may include a deposit equivalent to one month's charge, not a multi-year prepayment. The 15-year demand is therefore unsupported, commercially unreasonable, and discriminatory under the OATT, FERC, and federal law.

On August 22, 2025, IID's senior management canceled a meeting with the resource department. The email stated: "IID management [Jamie Asbury] has requested to cancel the meeting today due to the need to have some internal conversations before being ready to talk about power supply." This further delayed this process. When combined with project reprioritization in favor of Z-Global, these actions collectively suggest non-neutral administration of IID's tariff obligations.

**6. ECONOMIC AND PUBLIC INTEREST CONSIDERATIONS**

The IVCM Data Center represents a $10 billion investment that will generate over $22 million in annual net revenue to IID, directly benefitting IID's ratepayers—23.3% of whom live below the poverty line. Delaying or obstructing this project deprives the Imperial Valley of significant employment, technology investment, and economic uplift. The recent obstructions contradict IID's public mission and raise serious questions of governance and fairness.

**7. REQUESTED ACTION AND RESERVATION OF RIGHTS**

We respectfully request that IID:

(a) Finalize the Facility Study in accordance with the executed agreement (Exhibit G);
(b) Issue a letter confirming IID's commitment to serve the data center load; and
(c) Confirm that the OATT does not apply to non-grid-connected backup generation.

If IID persists in applying novel or discriminatory requirements. In that case, IVCM will exercise its rights under OATT §12.3 to initiate binding arbitration before a neutral arbitrator and will consider appropriate actions before FERC under the Federal Power Act and other applicable laws, including those governing antitrust and civil racketeering remedies.

We are ready to meet with the IID staff at any time to finish this process. However, further deviation from the OATT, established precedent, and IID's prior commitments will leave us no choice but to seek relief to protect our contractual and statutory rights.

Sincerely,
Sebastian Rucci
Imperial Valley Computer Manufacturing, LLC
Law Office of Sebastian Rucci, P.C.
16400 Pacific Coast Highway, Suite 212
Huntington Beach, CA 92649
Office: (562) 901-0199
Cell: (330) 720-0398
Fax: (562) 249-6910
Email: Sebastian@RucciLaw.com
Website: ImperialDataCenter.com

[Quoted text hidden]

---

**7 attachments**

📄 **Ex. A Load Injection Memo by Power Engineer (12-04-24).pdf**
1238K

📄 **Ex. B Application for Sensitivity for Data Center #1 (4-15-25)2.pdf**
3405K

📄 **Ex. C. IID Feasibility Study Report by IID for Data Center #1 (5-22-25).pdf**
1154K

📄 **Ex. D System Impact Study Report by IID for Data Center #1 (7-25-25).pdf**
1908K

📄 **Ex. E Application for System Impact Study for Data Center #2 (3-05-25).pdf**
1987K

📄 **Ex. F System Impact Suty Report by IID for Data Center #2 (9-23-25).pdf**
1088K

📄 **Ex. G Facilities Study Agreement (9-03-25).pdf**
309K

10/17/25, 3:48 PM
Case 3:26-cv-00128-JLS-BJW Document 1-43 Filed 01/09/26 PageID.382 Page 130 of 132
Rucci Law Mail - Proposal for Temporary Supply of Load from CAISO Wholesale Market



**The Law Office of**
**SEBASTIAN RUCCI, P.C.**

Sebastian Rucci <sebastian@ruccilaw.com>

## Proposal for Temporary Supply of Load from CAISO Wholesale Market

**Asbury, Jamie** <jlasbury@iid.com>                                                    Fri, Oct 17, 2025 at 2:50 PM
To: Sebastian Rucci <sebastian@ruccilaw.com>
Cc: "Smelser, Matthew H" <mhsmelser@iid.com>, "Rodriguez, Paul" <prodriguez@iid.com>, "Hamilton, Timothy L"
<TLHamilton@iid.com>, "Gutierrez, Noe R" <NRGutierrez@iid.com>, "Ambriz, Jose-Said" <JAmbriz@iid.com>, "Martinez,
Jesus" <jamartinez@iid.com>, "Garcia, Matthew" <msgarcia@iid.com>, "Sampedro, Daniel" <dsampedro@iid.com>, "Olivo,
Lauren" <lolivo@iid.com>, Carl Stills <cestills@sbcglobal.net>, Tom DuBose <tom@dubosedesigngroup.com>, "Holbrook,
Geoffrey" <gpholbrook@iid.com>, "Strumpfer, Wayne K" <wkstrumpfer@iid.com>, "Dockstader, Gina Nicole"
<gndockstader@iid.com>, "Cardenas, Alex" <aacardenas@iid.com>, "Pacheco, Lewis A" <lapacheco@iid.com>, Bari Bean
<baribean@co.imperial.ca.us>

Dear Mr. Rucci,

Thank you for your recent communication and the additional assertions you have made, which we will review thoroughly.

Your correspondence raises serious allegations against the district and its staff, as well as references to potential litigation
or legal remedies. We note that you hold yourself out as legal counsel for IVCM in your signature line. As such, we
request that all future communications be directed to the IID's General Counsel, Mr. Wayne Strumpfer.

Please be advised that IID and its staff are represented by legal counsel, and as such, we respectfully request that until
such time as these legal issues are resolved that you refrain from any further direct communication with IID staff.

[Quoted text hidden]



Sebastian Rucci <sebastian@ruccilaw.com>

---

## Proposal for Temporary Supply of Load from CAISO Wholesale Market

**Sebastian Rucci** <sebastian@ruccilaw.com>        Fri, Oct 17, 2025 at 3:43 PM
To: "Asbury, Jamie" <jlasbury@iid.com>
Cc: "Smelser, Matthew H" <mhsmelser@iid.com>, "Rodriguez, Paul" <prodriguez@iid.com>, "Hamilton, Timothy L" <TLHamilton@iid.com>, "Gutierrez, Noe R" <NRGutierrez@iid.com>, "Ambriz, Jose-Said" <JAmbriz@iid.com>, "Martinez, Jesus" <jamartinez@iid.com>, "Garcia, Matthew" <msgarcia@iid.com>, "Sampedro, Daniel" <dsampedro@iid.com>, "Olivo, Lauren" <lolivo@iid.com>, Carl Stills <cestills@sbcglobal.net>, Tom DuBose <tom@dubosedesigngroup.com>, "Holbrook, Geoffrey" <gpholbrook@iid.com>, "Strumpfer, Wayne K" <wkstrumpfer@iid.com>, "Dockstader, Gina Nicole" <gndockstader@iid.com>, "Cardenas, Alex" <aacardenas@iid.com>, "Pacheco, Lewis A" <lapacheco@iid.com>, Bari Bean <baribean@co.imperial.ca.us>

Dear General Manager Asbury:

This letter responds to your recent email asserting that IVCM's statement of intent to exercise its rights under OATT §12.3 somehow precludes us from communicating with IID staff. Respectfully, that interpretation is inconsistent with both the OATT and the First Amendment, and directly obstructs the ongoing development of a $10 billion data center project that has otherwise satisfied every technical and procedural requirement before IID.

### I. Exercise of Rights Under the OATT Does Not Suspend Communication

Our prior email stated: "If IID persists in applying novel or discriminatory requirements, IVCM will exercise its rights under OATT §12.3 to initiate binding arbitration before a neutral arbitrator, and will consider appropriate actions before FERC under the Federal Power Act and other applicable laws, including those governing antitrust and civil RICO remedies."

That statement is a lawful and protected notice of our intent to utilize dispute-resolution mechanisms expressly provided under the OATT, not a termination of dialogue. The OATT's §12.1 (Internal Dispute Resolution Procedures) and §12.2 (External Arbitration Procedures) specifically exist to resolve disagreements while allowing the applicant to continue working with staff in good faith.

Your unilateral decision to prohibit communication between IVCM and IID staff deprives us of the process guaranteed by the OATT and prevents us from advancing our project -- effectively using administrative authority to retaliate against a protected assertion of contractual and statutory rights.

### II. Denial of Access Constitutes Retaliation and Procedural Violation

Your directive obstructs a live project and represents government retaliation for protected speech. IID is a public agency, and we have a First Amendment right to petition our government regarding grievances, including the right to assert our intent to seek remedies before FERC, federal, or state courts.

If IID genuinely believes it possesses the authority to bar communication with its staff, it should seek a judicial injunction to that effect. Absent such an order, the IID has no legal or moral basis to obstruct our project or deny communication with engineering and planning personnel carrying out the IID's technical obligations.

### III. Public Interest and Harm to the Community

Your actions have direct and measurable consequences for the Imperial Valley. This project represents a $10 billion investment and will generate over $22 million in annual net revenue for IID, significantly benefiting ratepayers--23.3% of whom live below the poverty line. It will create high-quality technical employment and long-term infrastructure for the region. Your actions also impact IID's ratepayers from the potential $22 million in net annual revenue that IID would receive for providing power to our project.

Delaying or obstructing the project for reasons inconsistent with the OATT constitutes not just a contractual violation but a public harm--a deprivation of opportunity and economic growth for a county already suffering from elevated unemployment and systemic underinvestment.

### IV. Notice of Intent to Protect Project Rights

We reiterate that IVCM will continue to assert its rights through all appropriate forums, including arbitration under OATT

§12.3, administrative proceedings before FERC, and litigation in federal and state courts if necessary.

Your recent communications make clear that IID's conduct is not inadvertent but deliberate. As the law recognizes, "Even a dog knows the difference between being kicked and being stumbled over." This is no administrative stumble--it is a deliberate obstruction of a permitted and economically transformative project.

We will, therefore, continue to copy IID's General Counsel on all future correspondence and communications. Should you persist in preventing staff from fulfilling their technical responsibilities, we will seek judicial relief, including injunctive relief to restore lawful access and process. We also intend to inform the public and media of the material economic harm being inflicted upon the Valley's residents through these actions.

**V. Requested Action**

As previously stated, we respectfully request that IID:
1. Finalize the Facility Study in accordance with the executed agreement;
2. Issue a letter confirming IID's commitment to serve the data center load; and
3. Confirm in writing that the OATT does not apply to non-grid-connected backup generation.

We remain ready and willing to meet with IID staff immediately to resolve these matters professionally and transparently. We are also available to meet with IID's general counsel and seek a resolution of the issues we have identified in our recent emails.

Sincerely,

Sebastian Rucci
Imperial Valley Computer Manufacturing, LLC
Law Office of Sebastian Rucci, P.C.
16400 Pacific Coast Highway, Suite 212
Huntington Beach, CA 92649
Office: (562) 901-0199
Cell: (330) 720-0398
Fax: (562) 249-6910
Email: Sebastian@RucciLaw.com
Website: ImperialDataCenter.com

[Quoted text hidden]