Sebastian Rucci (State Bar #178114)
LAW OFFICES OF SEBASTIAN RUCCI, P.C.
16400 Pacific Coast Highway, Suite 212
Huntington Beach, CA 92649
Tel: (562) 901-0199
Cell: (330) 720-0398
Fax: (562) 249-6910
Sebastian@Rucci.Law
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

IMPERIAL VALLEY COMPUTER MANUFACTURING, LLC

   Plaintiff

vs.

CITY OF IMPERIAL, et. al.

   Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No: 26CV128 JLS BJW

Judge: Hon. Janis L. Sammartino

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Date: Thursday, April 9, 2026
Time: 1:30 p.m.
Courtroom: 4D

## TABLE OF CONTENTS

1. SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. LEGAL STANDARD FOR MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

 2.1 Factual Allegations as Accepted as True . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

 2.2 *Twombly* and *Iqbal* Plausibility Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3. LEGAL STANDARD GOVERNING CEQA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

 3.1 Legal Standards Governing Ministerial Projects . . . . . . . . . . . . . . . . . . . . . . . . . 3

 3.2 Legal Standards Governing CEQA Review Framework . . . . . . . . . . . . . . . . . . . . 4

 3.3 Data Center is "By-Right" Permissible Use and Statutorily Exempt from CEQA (Superior Court Order Feb. 27, 2026). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

4. COUNT 1: THE COMPLAINT PLAUSIBLY ALLEGES PROCEDURAL DUE PROCESS VIOLATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

 4.1 Site Plan Review Is Ministerial and Limited to Design Compliance . . . . . . . . . . 6

4.2    The Self-Executing 15-Day Deemed Approval Provisions Creates Vested Rights ... 7

4.3    Plaintiff Had a Protected Property Interest in the Deemed-Approved Site Plans . . 8

4.4    The City Arbitrarily Refused to Use Its Own Similarity-of-Use Procedure ...... 9

4.5    Complaint Alleges the Data Center Was Similar to Existing Permitted Uses ... 10

4.6    Defendants Deprived Plaintiff of a Property Interest Without Adequate Process 10

4.7    Exhaustion Is Not Required for a § 1983 Procedural Due Process Claims ..... 11

5.    COUNT 2: THE COMPLAINT PLAUSIBLY ALLEGES FIRST AMENDMENT

RETALIATION ...................................................... 11

5.1    Plaintiff Engaged in Protected Activity ................................ 12

5.2    Defendants and Imperial Irrigation District's Coordinated Campaign of

Obstruction and Misinformation Constituted Adverse Action. .............. 13

5.3    The Complaint Also Plausibly Alleges Coordination With CEQA "Greenmail"

Operatives as Part of the Retaliatory Scheme ........................... 14

5.4    *Noerr-Pennington* Does Not Bar the Claim Because the Complaint Plausibly

Alleges Sham Litigation.. ............................................ 15

5.5    The Complaint Plausibly Alleges Causation and Chilling Effect. ............ 16

6.    COUNT 3: THE COMPLAINT PLAUSIBLY ALLEGES A CLASS-OF-ONE EQUAL

PROTECTION VIOLATION. ............................................ 16

6.1    The Complaint Identifies Similarly Situated Comparators. ................ 17

6.2    The Complaint Plausibly Alleges Intentional Differential Treatment.......... 18

6.3    Defendants' Purported Rational Bases Are Plausibly Pretextual. ............ 18

6.4    Complaint Alleges Data Center Was Singled Out for Burdensome Treatment . . 19

6.5    The Complaint Plausibly Alleges No Rational Basis. .................... 19

7.    COUNT 4: THE COMPLAINT PLAUSIBLY ALLEGES MUNICIPAL LIABILITY

UNDER *MONELL*. .................................................. 20

8.    QUALIFIED IMMUNITY DOES NOT APPLY ............................ 22

8.1    The Complaint Plausibly Alleges Multiple Constitutional Violations. ........ 22

8.2    The Rights at Issue Were Clearly Established........................... 22

8.3    Defendants' Individual Arguments Do Not Support Immunity.............. 23

8.4    Reclaimed Water Interference Further Supports Plaintiff's Constitutional Claims ..... 24

9.    CONCLUSION..................................................... 24

1

TABLE OF AUTHORITIES

2

<u>CASES</u>

3  *Arizona Students' Ass'n v. Arizona Board of Regents*, 824 F.3d 858 (9th Cir. 2016) . . . . . . <u>14</u>, <u>16</u>

4  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>2</u>

5  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>2</u>

6  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>2</u>

7  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>2</u>

8  *Board of Regents v. Roth*, 408 U.S. 564 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>6</u>, <u>8</u>

9  *Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>22</u>, <u>23</u>

10  *Brosterhous v. State Bar*, 12 Cal.4th 315 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>11</u>

11  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999). . . . . . . . . . <u>17</u>, <u>19</u>

12  *Clark v. City of Hermosa Beach*, 48 Cal.App.4th 1152 (1996) . . . . . . . . . . . . . . . . . . . . . <u>6</u>

13  *Crawford-El v. Britton*, 523 U.S. 574 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>13</u>

14  *Del Monte Dunes at Monterey v. City of Monterey*, 920 F.2d 1496 (9th Cir. 1990) . . . . . <u>6</u>, <u>17</u>, <u>19</u>

15  *E. Rail. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) . . . . . . . . . . . . . . <u>15</u>

16  *Endy v. County of Los Angeles*, 975 F.3d 757 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . <u>21</u>

17  *Felder v. Casey*, 487 U.S. 131 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>11</u>

18  *Fuentes v. Shevin*, 407 U.S. 67 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>11</u>

19  *Gerhart v. Lake County, Mont.*, 637 F.3d 1013 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . <u>17</u>, <u>19</u>

20  *Groten v. California*, 251 F.3d 844 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>6</u>

21  *Harlow v. Fitzgerald*, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>22</u>

22  *Health First v. March Joint Powers Authority*, 174 Cal. App. 4th 1135 (2009) . . . . . . . . . . . . . <u>3</u>

23  *Hope v. Pelzer*, 536 U.S. 730 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>22</u>

24  *Horn v. County of Ventura*, 24 Cal.3d 605 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>22</u>, <u>23</u>

25  *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . <u>15</u>

26  *Las Lomas Land Co., LLC v. City of Los Angeles*, 177 Cal.App.4th 837 (2009). . . . . . . . . <u>8</u>, <u>24</u>

27  *Mahon v. Cnty. of San Mateo*, 139 Cal.App.4th 812 (2006) . . . . . . . . . . . . . . . . . . . . . . . <u>8</u>

28  *McCann v. City San Diego*, 70 Cal. App. 5th 51 (2021) . . . . . . . . . . . . . . . . . . . . . . . . . . <u>4</u>

*McCorkle E. Neig. Group v. City of St. Helena*, 31 Cal.App.5th 80 (2018) . . . . . . . . . . . . . . . . 3

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 24

*Nieves v. Bartlett*, 587 U.S. 391 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Pearson v. Callahan*, 555 U.S. 223 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Portman v. Cnty. of Santa Clara*, 995 F.2d 898 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . 6

*Preserve Poway v. City of Poway*, 245 Cal.App.4th 560 (2016) . . . . . . . . . . . . . . . . . . . . . . . 4

*Prof. Real Estate Investors v. Columbia Pict. Ind. Inc.*, 508 U.S. 49 (1993) . . . . . . . . . . . . . . . 15

*Prot. Our Water & Envtl. Res. v. Cnty. of Stanislaus* (2020) 10 Cal. 5th 479 . . . . . . . . . . . . . 3, 9

*Prot. Our Water & Envtl. Res. v. County of Stanislaus,* 10 Cal. 5th 479 (2020) . . . . . . . . . . . . . 3

*Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707 (9th Cir. 2022) . . . . . . . . . . . . . . . . 14, 16

*Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867 (9th Cir. 2022) . . . . . . . . . . . . . . . . . 20

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Stockton Citiz. for S. Pl. v. City of Stockton,* 48 Cal.4th 481 (2010) . . . . . . . . . . . . . . . . . . . . . 3

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Union of Med. Marij. Pat. v. City of San Diego*, 7 Cal. 5th 1171 (2019). . . . . . . . . . . . . . 4, 12, 23

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 22, 23

# MEMORANDUM  IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## 1.    SUMMARY OF ARGUMENT

The Complaint plausibly alleges that City officials ignored mandatory ministerial approval provisions, retaliated against protected petitioning activity, intentionally singled out Plaintiff for irrational treatment, and ratified that conduct at the highest levels of municipal government.

FIRST, the Complaint plausibly alleges a procedural due process violation. The City's Municipal Code requires ministerial site plan review and provides that applications are deemed approved if the City fails to act within fifteen days. Multiple site plan applications were deemed approved by operation of law. Defendants instead forced the project into discretionary review, arbitrarily disregarding vested land-use approvals.

SECOND, the Complaint plausibly alleges First Amendment retaliation. Plaintiff engaged in protected activity by insisting on lawful ministerial processing, petitioning Imperial County for approvals, speaking publicly about the project, and threatening litigation. Defendants responded with a coordinated campaign of obstruction--including regulatory delays, misinformation, interference with utilities, and litigation--intended to punish Plaintiff for asserting its legal rights.

THIRD, the Complaint plausibly alleges a class-of-one equal protection violation. The Complaint alleges that industrial users in the same zoning district routinely receive ministerial processing, while Defendants singled out Plaintiff's project for uniquely burdensome discretionary review without a rational basis. Such disparate treatment states a classic "class-of-one" claim.

FOURTH, the Complaint plausibly alleges municipal liability under *Monell*. Senior City officials--including the Planning Director, City Manager, City Attorney and City Council--directed, participated in, and ratified the actions at issue, including filing litigation designed to delay and undermine the project. Ratification by final policymakers is sufficient to establish municipal liability.

Defendants' remaining defenses fail as a matter of law at the pleading stage. Qualified immunity does not apply because the rights at issue have long been clearly established. *Noerr-Pennington* immunity does not bar Plaintiff's claims because the Complaint plausibly alleges that Defendants' litigation against the County was objectively baseless and filed for retaliatory and obstructive purposes to delay and undermine the project. Defendants' motion should be denied.

1    2.    **LEGAL STANDARD FOR MOTION TO DISMISS**.

2        The Supreme Court articulated the proper framework for a Rule 12(b)(6) motion in *Bell*

3    *Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

4    2.1    **Factual Allegations as Accepted as True**.

5        In evaluating the allegations under Rule 12(b)(6) the court does not consider whether the

6    factual allegations are probably true; instead the court must proceed "on the assumption that **all the**

7    **allegations in the complaint are true** (even if doubtful in fact)." *Twombly*, 550 U.S. at 555. The

8    "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof is

9    improbable." *Twombly*, 550 U.S. at 556. "Indeed it may appear on the face of the pleadings that a

10   recovery is very remote and unlikely but that is not the test." *Swierkiewicz v. Sorema*, 534 U.S. 506,

11   515 (2002). If a reasonable person can figure out from the face of the complaint why they are being

12   sued, and based on what occurrences or transactions, there is no basis for dismissal.

13   2.2    ***Twombly* and *Iqbal* Plausibility Standard**.

14       The court must "assume" the "veracity" of "well pleaded factual allegations" and "determine

15   whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "Plausibility,"

16   as used in *Twombly* and *Iqbal*, refers to whether the factual allegations "allow[] the court to draw

17   the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. A claim

18   has "facial plausibility" when the facts "allow[] the court to draw the reasonable inference that

19   [Defendant] is liable for the misconduct alleged." *Id.* at 678. The Ninth Circuit explained *Twombly*

20   and *Iqbal's* plausibility standard in *Starr v. Baca*, 652 F.3d 1202, 216 (9th Cir. 2011) as follows:

21       "If there are two alternative explanations, one advanced by defendant and the other
22       advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a
         motion to dismiss under Rule 12(b)(6). Plaintiff's complaint may be dismissed only
23       when defendant's plausible alternative explanation is so convincing that plaintiff's
         explanation is implausible."
24

25       *Iqbal* and *Twombly* require the court to weigh non-conclusory factual allegations to see if

26   they are sufficient to "nudge the claims across the line from conceivable to plausible." *Twombly*, 550

27   U.S. at 570. Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged

28   "enough facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 697.

3.    **LEGAL STANDARD GOVERNING CEQA**

3.1    **Legal Standards Governing Ministerial Projects**

Ministerial decisions involve little or no personal judgment and require only a determination of conformity with fixed standards (14 Cal. Code Regs. §§ 15357, 15369). Where a project is permitted by right in a zoning district and the City is merely verifying compliance with objective development standards -- like the Site Plan Review under § 24.19.500 -- the action is ministerial.

Ministerial projects are projects whose approval does not require an agency to exercise discretion. The California Supreme Court clarified in *Prot. Our Water & Envtl. Res. v. County of Stanislaus,* 10 Cal. 5th 479, 493-94 (2020), that not all discretion will trigger CEQA; only discretion that allows the agency to address environmental effects triggers CEQA review:

> "The statutory distinction between discretionary and purely ministerial projects implicitly recognizes that unless a public agency [is authorized to] shape the project in a way that would respond to concerns raised in an EIR, or its functional equivalent, environmental review would be a meaningless exercise. . . [E]ven if a statute grants an agency some discretionary authority over an aspect of a project, **the project is ministerial for CEQA purposes if the agency lacks authority to address environmental impacts**."

For example, in *McCorkle E. Neig. Group v. City of St. Helena*, 31 Cal.App.5th 80, 94 (2018) the power to conduct an aesthetic design review did not make a project discretionary because the agency "lack[ed]…any discretion to address environmental effects."

Many cases confirm if a project aligns with permitted uses I can proceed with a ministerial exemptions from CEQA. See *Health First v. March Joint Powers Authority*, 174 Cal. App. 4th 1135 (2009) (1,925,000 sq ft distribution center in industrial zone "exempt as a ministerial" because it complied with design guidelines); *Stockton Citiz. for S. Pl. v. City of Stockton,* 48 Cal.4th 481 (2010) (Wal-Mart supercenter held ministerial in conformity with objective criteria).

Consistent with these authorities, Plaintiff provided the City on June 6, 2025 with a 33-page memorandum documenting 25 data centers in California and other states that were approved ministerially ("as of right") due to their location on industrial land. (Compl. ¶ 47; Compl. Ex. 11; ECF No. 1-12.) Where a data center is a permitted use as of right in an industrial zone and complies with applicable site plan standards, its approval is ministerial and exempt from CEQA.

3.2    **Legal Standards Governing CEQA Review Framework**

Public Resources Code § 21080(b)(1) explicitly states that CEQA does not apply to "ministerial projects." Under 14 Cal. Code Regs. § 15268(a), "[m]inisterial projects are exempt from the requirements of CEQA." Determining whether CEQA applies follows a three-step framework:

> "CEQA proceeds by way of a multistep decision tree, which has been characterized as having three tiers. **First**, the agency must determine whether the proposed activity is subject to CEQA at all. **Second**, assuming CEQA is found to apply, **the agency must decide whether the activity qualifies for one of the many exemptions** that excuse otherwise covered activities from CEQA's environmental review. **Finally**, assuming no applicable exemption, the agency must undertake environmental review of the activity, the third tier."

*Union of Med. Marij. Pat. v. City of San Diego*, 7 Cal. 5th 1171, 1185 (2019). The Court explained:

> "If the lead agency concludes it is faced with a project, it must then decide 'whether the project is exempt from the CEQA review process under either a statutory exemption or a categorical exemption set forth in the CEQA Guidelines.' The statutory exemptions, created by the Legislature, are found in § 21080, subd. (b). **Among the most important exemptions is the first, for 'ministerial' projects**, which are defined generally as projects whose approval does not require an agency to exercise discretion. (Pub. Resources Code, §21080, subd. (b)(1).) . . . If the lead agency concludes a project is exempt from review, it must issue a notice of exemption citing the evidence on which it relied in reaching that conclusion. **The agency may thereafter proceed without further consideration of CEQA**."

*Union of Med. Marij. Pat. v. City of San Diego*, 7 Cal. 5th at 1186.

Defendants were repeatedly informed of this three-step framework but bypassed step two, proceeding directly to environmental review. However, step two--whether the project is exempt from CEQA--must be resolved before step three--determining what level of environmental review applies.

By skipped step two, Defendants convert a ministerial approval, exempt from CEQA, into a discretionary process driven by subjective community sentiment. "CEQA does not require an analysis of subjective psychological feelings or social impacts." *Preserve Poway v. City of Poway*, 245 Cal.App.4th 560, 579 (2016). Nor does controversy alter a project's CEQA status. "Indeed, it is entirely possible, if not **common, for a controversial or unpopular project to be exempt from CEQA**. Neighborhood sentiment is not an impact that must be directly considered in the environmental determination process." *McCann v. City San Diego*, 70 Cal. App. 5th 51, 86 (2021).

3.3 **Data Center is "By-Right" Permissible Use and Statutorily Exempt from CEQA (Superior Court Order Feb. 27, 2026)**.

The clearest illustration of the law applicable to a data center approved as of right is the February 27, 2026 decision of the Superior Court, which definitively confirmed the Project's "by-right" status in litigation filed by the City of Imperial against Imperial County. (Compl. ¶ 107.) In that case, the City alleged that the data center required discretionary approvals.

The February 27 Order was already part of the record when Defendants filed their request for judicial notice on March 2, 2026. Plaintiff therefore seek judicial notice of the February 27 Order, which expressly rejected the City's first cause of action alleging that the grading permit failed to comply with state law and the County's municipal code. The Court held:

"The first cause of action failed because **the Project is a 'by-rights' permissible use on industrial land** under the County Code and **no discretionary approvals are required** by state law or the County Code prior to issuing a grading permit." (2-27-26 Order Granting MJOP at 3).

The Superior Court likewise rejected the City's second cause of action challenging the County's determination that the project was statutorily exempt from CEQA. The City argued that discretionary rezoning and a conditional use permit were required. The Court disagreed, explaining that because the data center is a "by-right" use, the County's role was purely ministerial:

"The second cause of action failed because... **no discretionary approvals were required** so the County's determination that the **Project is statutorily exempt from CEQA review as ministerial** was correct as a matter of law." (2-27-26 Order Granting MJOP at 3).

Defendants were provided repeated notice that the project qualified as a ministerial, by-right industrial use under both City and County codes. (Compl. ¶113). Industry practice likewise recognizes that development permitted as of right and compliant with applicable standards proceeds ministerially and is exempt from CEQA. (Compl. ¶47). The Superior Court's ruling confirms that the data center, substation, and battery storage are permitted by right. These are the same arguments Plaintiff presented to Defendants. Consequently, the City's central allegations -- that a rezoning text amendment was required -- is squarely refuted by the Superior Court's February 27 Order.

4.    **COUNT 1: THE COMPLAINT PLAUSIBLY ALLEGES PROCEDURAL DUE PROCESS VIOLATION**.

To state a procedural due process claim, the Complaint must allege: (1) a protected liberty or property interest; (2) deprivation of that interest; and (3) inadequate process. *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). Property interests arise from state law when it creates a legitimate claim of entitlement. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

"Whether a property-holder possesses a legitimate claim of entitlement to a permit or approval turns on whether, under state and municipal law, the local agency lacks all discretion to deny issuance of the permit or to withhold its approval." *Clark v. City of Hermosa Beach*, 48 Cal.App.4th 1152, 1180 (1996). See also *Groten v. California*, 251 F.3d 844, 850 (9th Cir. 2001) (protected property interest existed where applicable law entitled the applicant to a license upon satisfaction of statutory requirements); *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990) (city council gave approval to 190 unit project, with conditions that plaintiff substantially met; yet the city council abruptly changed course and rejected the plan.")

Defendants argue that Plaintiff lacked a protected property interest in site plan approval, because the Planning Director retained discretion. (Mot; ECF No. 12-1 at 10–12.) The Complaint plausibly alleges that site plan review was ministerial, the City's failure to act within 15 days resulted in deemed approval of the site plan by operation of law.

4.1    **Site Plan Review Is Ministerial and Limited to Design Compliance**

Defendants argue that IMC § 24.19.550, entitled "Site Plan Review Procedure," gives the Planning Director discretion to "approve, deny or modify" site plan applications and therefore defeats any legitimate claim of entitlement. (Mot.; ECF No. 12-1 at 11.) That argument ignores both the self-executing deemed-approval provision and the ministerial nature of site plan review.

The Site Plan Review procedure focuses on "design principles." (IMC § 24.19.510, subd. B.) Its stated purposes include encouraging harmonious structures, signs, landscaping, parking areas, and streets (*id*., subd. B.2), addressing "concerns for the aesthetics of development" (*id*., subd. B.4), and ensuring that new developments do not have an adverse aesthetic effect on adjoining properties (*id*., subd. B.5). The Planning Director's task is not to make open-ended policy judgments, but to evaluate plans "for conformance with the site plan review standards." (§ 24.19.540, subd. A.)

Those standards are objective. The Industrial Zone Performance Standards require review of setbacks, ingress and egress, circulation, parking, landscaping, screening of HVAC units, and enclosure of outdoor storage areas. (See IMC §§ 24.07.130, subd. B.1–2, B.5; 24.07.140, subds. A, B, C, M.) In other words, the Director's role is to determine compliance with fixed criteria.

Defendants omit these allegations, even though the Complaint's exhibits show that Plaintiff expressly explained them to the City. The Court must consider exhibits attached to the complaint. *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). On May 15, 2025, Plaintiff submitted a nine-page letter explaining that site plan review "focuses mainly on aesthetic design principles" and detailing the objective review criteria governing the Director's obligations. (ECF No. 1-7 at 5-7.)

The exhibits attached to the Complaint reinforce that Plaintiff advised the City on May 14, 2025 that "the Site Plan Review Procedure, which focuses primarily on design principles, including aesthetics, is ministerial" and that, because the revised plans complied with all Site Plan Review requirements, they should be approved as submitted. (Compl. Ex. 6; ECF No. 1-7 at 10.)

Every ministerial review includes authority to deny an application that fails to satisfy objective requirements. The relevant question is whether the agency may deny approval after the objective criteria are met. The Complaint plausibly alleges that it may not.

4.2    **The Self-Executing 15-Day Deemed Approval Provisions Creates Vested Rights**.

Defendants likewise ignore the self-executing deadline in IMC § 24.19.550. Plaintiff alleged that, when they submitted revised site plans on May 15, 2025, they specifically informed the City that: "Failure of the Director to act within 15 days shall be deemed approval of the application." (Compl. ¶ 35.) The use of "shall" is mandatory, the Director "shall approve" or deny the application, and failure to act "shall be deemed approval." The Complaint alleges three separate applications, each of which was deemed approved when the City failed to act within the prescribed 15 day period.

As to the first application, Plaintiff allege the initial submission was made on March 4, 2025, and revised plans were submitted on May 15, 2025. (Compl. ¶¶ 28, 35; Exs. 3, 6.) City Planner Cordero sent an adverse site-plan letter and recalled it five minutes later. (Compl. ¶ 56.) On July 15, 2025, Director Mora stated he wanted a text amendment and CUP that would take "approximately 6 to 9 months." (Compl. ¶ 61.) By then, 61 days had elapsed since the revised submission, and the revised site plan had already been deemed approved by operation of law. (Compl. ¶¶ 41, 57.)

1    As to the second application, Plaintiff again reminded the City that site plan review required

2    action within 15 days. (Compl. ¶58.) Plaintiff submitted the second application on July 22, 2025.

3    (Compl. ¶ 64.) Director Mora rejected it on August 20, 2025, 29 days later. (Compl. ¶¶ 69–70.)

4    Therefore that application was deemed approved by operation of law before the City acted. (*Id.*)

5    As to the third application, Plaintiff submitted a scaled-down 80 MW data center on

6    September 9, 2025. (Compl. ¶ 76; Ex. 28.) At an October 16, 2025 meeting, City officials stated that

7    a public process was required for a data center. (Compl. ¶ 79.) But as of the filing of the Complaint

8    in this case, no written denial had ever been issued. (Compl. ¶ 80.) Hence, because the City failed

9    to act within 15 days, the third application also was deemed approved by operation of law. (*Id.*)

10    Thus, the Complaint alleges a concrete entitlement grounded in the Code itself: once the City

11    failed to act within the statutory period, approval occurred automatically. The first application on

12    March 19, 2025; the second on August 19, 2025; and the third on October 16, 2025. (Compl. ¶ 184.)

13    Whether every date is ultimately proven is not the issue at this stage; the issue is plausibility, and the

14    pleaded facts plausibly allege an entitlement created by mandatory law.

15    **4.3    Plaintiff Had a Protected Property Interest in the Deemed-Approved Site Plans**.

16    A land-use application implicates procedural due process when the applicant has a legitimate

17    claim of entitlement to approval. *Las Lomas Land Co., LLC v. City of Los Angeles*, 177 Cal.App.4th

18    837, 853 (2009). The Complaint plausibly alleges such an entitlement here.

19    Under IMC § 24.19.550, site plan review is ministerial and failure to act within 15 days

20    results in automatic approval. (Compl. ¶¶ 34, 40, 74.) That self-executing framework creates an

21    enforceable entitlement. The same principle is reflected in California's Permit Streamlining Act,

22    which provides that when an agency fails to approve or disapprove a development project within

23    applicable time limits, "the failure to act shall be deemed approval of the permit application for the

24    development project." (Gov. Code, § 65956, subd. (b).) See also Gov. Code, § 65957.

25    "To encourage prompt resolution of permit applications, the Act provides that an application

26    will be deemed approved if not acted upon within the statutory time period." *Mahon v. Cnty. of San

27    Mateo*, 139 Cal.App.4th 812, 818 (2006). Property interests arise when state law creates entitlements

28    "secured by existing rules or understandings." *Board of Regents v. Roth*, 408 U.S. at 577. The

Complaint alleges exactly that: approval was automatic upon the City's failure to act.

1    The Complaint alleges that on August 21, 2025, Plaintiff withdrew the second application.

2    (Compl. ¶ 71; Compl. Ex. 25; ECF No. 1-26.) But the second application had already been deemed

3    approved because the City's rejection came 29 days after submission. (Compl. ¶¶ 69–70.) Once

4    approval vested by operation of law, Defendants could not simply disregard it without due process.

5    Defendants also argue that building permits were not guaranteed by site plan approval. (Mot.;

6    ECF No. 12-1 at 11.) That misses the point. The deprivation alleged here is not the denial of a

7    building permit; it is Defendants' refusal to recognize and honor the site plan approvals that had

8    already vested by operation of law. In any event, building permits are generally presumed ministerial.

9    *Protect Our Water & Env. Res. v. County of Stanislaus*, 10 Cal.5th 479, 493 (2020).

10    The Complaint therefore plausibly alleges a protected property interest. If the Director fails

11    to act within 15 days, the application "shall be deemed approved." The City's review was ministerial,

12    limited to objective compliance with standards such as setbacks, landscaping, etc. The City lacked

13    discretion to withhold approval once the statutory period lapsed. Hence, Defendants refusal to

14    acknowledge the resulting deemed approvals deprived Plaintiff of a protected property interest.

15    **4.4    The City Arbitrarily Refused to Use Its Own Similarity-of-Use Procedure**.

16    Defendants argue that the data center did not qualify as a ministerial project in the I-2 zone

17    and therefore required CEQA review. (Mot.; ECF No. 12-1 at 11.) The Complaint plausibly alleges

18    that this position was arbitrary and contrary to both law and the City's own code. The City's zoning

19    code does not expressly prohibit data centers and provides a procedure for unlisted uses. Under IMC

20    §§ 24.19.220–250, an unlisted use "shall be deemed a permitted use" if the Planning Commission

21    determines it is similar to listed uses. (Compl. ¶18.) Plaintiff repeatedly asked the City to invoke that

22    procedure. (Compl. ¶¶ 58, 62, 72, 79.) Plaintiff also alleges that the City had historically used the

23    similarity-of-use process for other applicants. (Compl. ¶¶ 63, 202.)

24    Defendants refused to use that mandatory pathway for similarity of use and instead insisted

25    on a legislative text amendment that would take six to nine months. (Compl. ¶¶ 60, 202.) The

26    Complaint plausibly characterizes that refusal as arbitrary and an attempt to manufacture discretion

27    where the Code did not otherwise provide it. (Compl. ¶123.)

28

4.5    **Complaint Plausibly Alleges the Data Center Was Similar to Existing Permitted Uses**.

The Complaint also plausibly alleges that the proposed data center fell within the City's industrial-use scheme, or at minimum qualified for a similarity-of-use determination. Plaintiff repeatedly explained this to the City. On June 4, 2025, Plaintiff advised the City that contiguous property in Imperial County allowed data centers as a permitted use in the M-1 zone and attached a draft sketch plan for a related data center project. (Compl. ¶ 54; Compl. Ex. 10; ECF No. 1-11.)

On June 23, 2025, Plaintiff identified numerous companies who currently operate in the I-2 Zone despite not being expressly named in the zoning code:

- Alford Distributing (beverage distributor), 344 Crown Court
- Vilore Distributing (beverage distributor), 2421 Vilore Avenue
- Sellers Petroleum Products (petroleum distributor), 350 Aten Road
- VPE Inc. (petroleum equipment sales), 506 Industry Way
- Imperial Pre-Mix Company (fertilizer manufacturer), 422 Barioni Blvd
- Ferrellgas (propane supplier), 501 Barioni Blvd
- Dune Company (fertilizer supplier), 506 E. 2nd Street
- Imperial Truss and Lumber, 701 E. 2nd Street
- Blackman Plumbing (plumbing supplier), 542 Industry Way
- Imperial Valley Food Bank (food distributor), 486 Aten Road

Plaintiff also compared the data center to a wide range of expressly permitted I-2 uses, including distributors, showrooms, administrative offices, newspaper publishing, bottling plants, blueprinting and photocopying services, and other industrial and service-oriented operations. (Compl. Ex. 15; ECF No. 1-16.) Plaintiff emphasized on June 24, 2025, July 18, 2025, and July 21, 2025 that the Code's broad industrial-use language and similarity-of-use provision supported treating the data center as permitted uses subject only to site plan review. (Compl. Exs. 15, 18, 25.)

At the pleading stage, those allegations are more than sufficient to plausibly allege that Defendants arbitrarily refused to recognize a ministerial or similarity-based pathway to approval.

4.6    **Defendants Deprived Plaintiff of a Property Interest Without Adequate Process**.

The Complaint plausibly alleges deprivation and inadequate process. Defendants ignored deemed approvals, demanded CEQA review notwithstanding the project's ministerial status, insisted on unauthorized text amendments, and refused to use the applicable similarity-of-use procedure.

(Compl. ¶¶ 61, 69, 123, 202.) The Complaint alleges a pocket veto: City officials refused to timely act, refused to recognize the legal consequence of their inaction, and instead attempted to reroute the project into a discretionary process. That is sufficient to plead deprivation of a protected property interest without constitutionally adequate process. See *Fuentes v. Shevin*, 407 U.S. 67, 82 (1972).

4.7    **Exhaustion Is Not Required for a § 1983 Procedural Due Process Claims**.

Defendants also argue that Plaintiff was required to pursue state remedies before bringing their procedural due process claim in federal court. (Mot.; ECF No. 12-1 at 17.) "The Supreme Court has made it clear that a § 1983 plaintiff need not have exhausted alternative remedies before initiating a § 1983 action." *Brosterhous v. State Bar*, 12 Cal.4th 315, 336 (1995). Defendants' reliance on state remedial procedures is therefore misplaced.

Defendants separate argument that Plaintiff failed to appeal under IMC § 24.19.560 fares no better. That provision allows an applicant to appeal a "decision of the Director" to the Planning Commission within ten days. But The Complaint alleges deemed approvals by operation of law, not merely appealable denials. The Complaint's theory is that no timely valid denial existed because approval had already vested automatically under IMC § 24.19.550. An appeal provision governing express adverse decisions does not nullify a self-executing deemed-approval rule.

Moreover, the Complaint alleges there was no formal written denial to the third application, it was verbally rejected 37 days later after the application was filed. (Compl. ¶¶ 76, 79–80.) Plaintiff cannot appeal a denial that was untimely and never formally issued. In any event, administrative exhaustion is not required for a § 1983 claim. *Felder v. Casey*, 487 U.S. 131, 147 (1988).

In sum, Plaintiff plausibly allege that the City's site plan review was ministerial, that the applications were deemed approved by operation of law, that those approvals created a protected property interest, and that Defendants deprived Plaintiff of that interest without adequate process.

5.    **COUNT 2: THE COMPLAINT PLAUSIBLY ALLEGES FIRST AMENDMENT RETALIATION**

The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech or petitioning activity. "If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First

Amendment claim." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). A retaliation claim requires protected activity, adverse action that would chill a person of ordinary firmness, and a causal connection between the two. *Id.* The Complaint plausibly alleges each element.

5.1    **Plaintiff Engaged in Protected Activity**

The Complaint alleges that Plaintiff engaged in multiple forms of protected activity, including: (1) insisting on strict compliance with the City's ministerial review process; (2) petitioning Imperial County for land use approvals; (3) speaking publicly to counter the City's narrative about the project; and (4) threatening litigation in response to the City's delays and obstruction. (Compl. ¶ 191.) Each is protected by the First Amendment.

Defendants relying on Defendant Mora's letter, attached as Exhibit 17, reframe the dispute as a mere disagreement, and Mora's concerns about environmental impacts supplied a legitimate, non-retaliatory motive. (Mot.; ECF No. 12-1 at 18.) But that argument ignores Plaintiff's core allegation: CEQA requires a threshold exemption analysis and the project qualified for ministerial treatment, yet Defendants bypassed that step and insisted focused on environmental impacts.

As Plaintiff explained to Defendants on July 18, 2025, CEQA proceeds in stages and "[s]tep two is often overlooked, but it's very important because if a project is statutorily exempt or categorically exempt, there's no requirement for an environmental review under CEQA." (Compl. Ex. 18; ECF No. 1-19.) Plaintiff reiterated the point on July 21, 2025: "the second step in the CEQA process is to determine whether the project is exempt from CEQA . . . Environmental impacts (step three) are not considered where a statutory exemption applies." (Compl. Ex. 25; ECF No. 1-26.)

As the California Supreme Court explained, "[a]mong the most important exemptions is the first, for 'ministerial' projects," and if an agency determines that a project is exempt, it may proceed "without further consideration of CEQA." *Union of Med. Marij. Patients, Inc. v. City of San Diego*, 7 Cal.5th 1171, 1186 (2019). Thus, a project that is ministerial is exempt regardless of alleged environmental impacts; its exemption does not turn on the perceived magnitude of those impacts.

The Mora letter, supports Plaintiff's theory rather than Defendants. Mora jumped directly to environmental impacts without first addressing whether the project was exempt at step two. There is no allegation that Mora engaged the exemption question, despite Plaintiff's repeated explanations

and supporting authorities. Plaintiff also provided the City a memorandum documenting 25 data centers approved as of right on industrial land, reflecting an industry standard that such facilities may proceed ministerially where zoning permits them. (Compl. Ex. 11; ECF No. 1-12.)

The Complaint also alleges that Mora refused to use the City's own "Similar Use" procedure, even though Plaintiff repeatedly requested that route as the proper way to resolve any perceived ambiguity regarding whether the data center qualified as a permitted use. (Compl. ¶¶ 29, 62, 72, 79.)

At the pleading stage, Plaintiff's insistence on lawful ministerial processing, their petitioning of the County, and their public advocacy qualify as protected activity.

### 5.2 Defendants and Imperial Irrigation District's Coordinated Campaign of Obstruction and Misinformation Constituted Adverse Action.

Defendants argue they took no adverse action against Plaintiff. (Mot.; ECF No. 12-1 at 18.) The Complaint alleges the opposite in detail. Defendants "engaged in a parallel track of obstruction, misrepresentations, and harassment in concert with IID. Starting in late November 2025, the City and IID executed a coordinated media campaign of misinformation designed to incite public hostility and sabotage Plaintiff's data center project." (Compl. ¶125.) The campaign included obstructing project utilities, disseminating misleading information, inciting public opposition, and coordinating with outside actors to derail the project. (Compl. ¶¶ 3, 125–149, 192.)

The Complaint alleges that IID prioritized projects by Z-Global "a **direct competitor with a competing data center project**." (Compl. ¶¶127, 137.) Defendant Burnworth and IID Board member "Eugenio engaged in numerous discussions during November and December 2025 to coordinate the campaign against the data center." (Compl. ¶149.) These allegations support a plausible inference that City officials and allied actors were not neutrally applying the law but were instead lobbying against the project and coordinating opposition behind the scenes.

The Complaint also alleges retaliatory conduct by IID after Plaintiff's asserted legal rights. Plaintiff raised concerns regarding IID's favoritism toward Z-Global. (Compl. ¶143.) IID's General Manager responded by barring Plaintiff from communicating with IID staff. (Compl. ¶145.) By denying access to staff concerning an active application, IID retaliated for protected petitioning activity. (Compl. ¶146.) Retaliation of that kind threatens to inhibit the exercise of constitutional rights. See *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998).

The Complaint further alleges a synchronized public messaging campaign. IID held a public workshop on December 9, 2025. (Compl. ¶154.) Two days later, the City held its own workshop and made specific attacks on Plaintiff's data center. (Compl. ¶156.) The Complaint alleges that the City's false media campaign, disseminated through official government websites and social media, omitted the project's ministerial status and was designed to inflame public hostility. (Compl. ¶126.)

Defendants deny involvement in City-authored flyers and hostile social-media messaging. But the Complaint expressly alleges that Defendants "direct[ed] staff to circulate misleading flyers to incite public hostility" and post hostile messages on official City platforms in order to incite opposition and punish Plaintiff. (Compl. ¶¶ 3(a), 192(c).)

Taken together, the alleged obstruction, misinformation campaign, utility interference, public attacks, and coordinated conduct with IID easily qualify as adverse action that would chill a person of ordinary firmness from continuing to speak, petition, or threaten legal action.

## 5.3 The Complaint Also Plausibly Alleges Coordination With CEQA "Greenmail" Operatives as Part of the Retaliatory Scheme.

The Complaint further alleges that Defendants coordinated with Comité Cívico del Valle ("CCV") and its Executive Director, Luis Olmedo, to force the project into a discretionary CEQA posture and thereby create leverage for extortion settlement demands. (Compl. ¶¶160–170.) CCV and Olmedo have an established history of using CEQA litigation to halt or delay development and extract payments. (Compl. ¶¶160–162.) Defendant Burnworth and Olmedo met multiple times to coordinate opposition to force a ministerial project into a discretionary CEQA process. (Compl. ¶165.) Defendants joined CCV in trying to manufacture discretion. (Compl. ¶¶ 165, 169–172.) Threats and public opposition by CCV personnel were coordinated with Defendants. (Compl. ¶167.)

Plaintiff sought approval through the County because the City refused to follow its own code. Defendants responded by escalating their obstruction, coordinating outside opposition, filing a baseless lawsuit, and launching a public campaign to devalue and delay the project. (Compl. ¶¶ 170–172, 192.) Temporal proximity, combined with escalating obstruction, plausibly supports causation. See *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 721 (9th Cir. 2022) (pretext may support causal inference); *Arizona Students' Ass'n v. Arizona Board of Regents*, 824 F.3d 858, 867 (9th Cir. 2016) (retaliatory conduct that would chill speech satisfies the adverse-action element).

In short, the Complaint plausibly alleges that Defendants' professed environmental or procedural concerns were pretext, and that their actual objective was to punish Plaintiff for insisting on ministerial treatment, speaking publicly, petitioning other agencies, and threatening litigation.

5.4    ***Noerr-Pennington* Does Not Bar the Claim Because the Complaint Plausibly Alleges Sham Litigation**.

Defendants also invoke *Noerr-Pennington* immunity. That doctrine protects genuine petitioning activity, but not sham litigation. Petitioning loses immunity when it is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *E. Rail. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961). The sham-litigation exception applies where the litigation is objectively baseless and subjectively intended to interfere rather than to obtain legitimate relief. *Prof. Real Estate Investors v. Columbia Pict. Ind. Inc.*, 508 U.S. 49, 60 (1993). The Complaint plausibly alleges both elements.

First, the Complaint alleges that the City's lawsuit challenging the County's approval was objectively baseless. The City's original petition was 23 pages and 97 paragraphs; its first amended petition grew to 35 pages and 121 paragraphs; and its second amended petition, filed March 11, 2026, expanded to 68 pages and 294 paragraphs, with exhibits totaling 231 pages. Despite the expanding allegations, the court repeatedly found the pleadings legally insufficient and granted only limited leave to amend. Defendants argue that leave to amend defeats any claim of sham as a matter of law. Leave to amend does not establish merit, nor does it preclude a finding of objective baselessness. See *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643 (9th Cir. 2009).

Second, the Complaint alleges that no amendment could cure the basic legal defects because the City's theory contradicted the plain text of the County Code. The City's petition rested on demonstrably false claims that the data center required a CUP, and rezoning, even though the County Code permitted the data center and its ancillary uses by right. The City falsely claimed the battery energy storage system was prohibited in the M-2 zone and that the substation and BESS required CUPs, despite the County Code's text to the contrary. City Manager Morita verified those assertions under penalty of perjury even after receiving repeated notice and the County determined on September 4, 2025 that the data center and ancillary infrastructure were permitted uses. (Compl. ¶¶ 47, 75, 113; Compl. Ex. 27; ECF No. 1-28.)

Plaintiff also alleges that the City wrongly insisted that a lot merger required rezoning, despite County Code § 90501.01 expressly providing that parcels greater than 40 acres retain zoning district boundaries. The City filed the lawsuit to "delay and devalue a project outside the City's jurisdiction," convert a ministerial project into a discretionary one, and create leverage for opposition actors seeking financial or strategic advantage. (Compl. ¶¶ 169–172.) The alleged coordination with IID, Z-Global interests, and CCV further supports the inference that the litigation was part of a broader retaliatory and anti-competitive campaign.

For pleading purposes, if the City's petition was objectively baseless and filed for the purpose of burdening Plaintiff rather than securing relief on the merits, *Noerr-Pennington* does not apply.

5.5    **The Complaint Plausibly Alleges Causation and Chilling Effect**.

The Complaint adequately pleads causation. Retaliation escalated after Plaintiff insisted on ministerial processing, and pursued approvals through the County. Defendants responded with a series of escalating measures: refusing to recognize deemed approvals, demanding CEQA and text amendments, coordinating public opposition, obstructing utility processing, disseminating misinformation, and filing objectively baseless litigation. (Compl. ¶192.)

Those alleged actions would chill a person of ordinary firmness from engaging in protected advocacy, petitioning, or threatened legal action. See *Arizona Students' Ass'n*, 824 F.3d at 867. And where the government's stated justifications are plausibly pretextual, that pretext supports the inference of retaliatory motive. See *Riley's American Heritage Farms*, 32 F.4th at 721.

In sum, the Complaint plausibly alleges that Plaintiff engaged in protected activity, that Defendants responded with adverse actions designed to punish and chill that activity, and that those actions were causally connected to Plaintiff's petitioning.

6.    **COUNT 3: THE COMPLAINT PLAUSIBLY ALLEGES A CLASS-OF-ONE EQUAL PROTECTION VIOLATION**.

The Equal Protection Clause permits a "class of one" claim where the the Complaint alleges that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In *Olech*, the village demanded a 33-foot easement to connect to the public water supply, while requiring only a 15-foot easement from similarly situated owners. *Id.* at 563. The Supreme

1   Court held those allegations sufficient because the complaint alleged intentional differential

2   treatment that was "irrational and wholly arbitrary." *Id.* at 565.

3       Likewise, in *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999),

4   the Supreme Court upheld an equal protection claim where the Plaintiff alleged they received

5   treatment inconsistent with zoning decisions involving similar properties. *Id.* at 705. As the Ninth

6   Circuit explained in that case, the plaintiffs "were singled out to bear the burden of the City's attempt

7   to bring back the Smith's Blue Butterfly by creating a 'butterfly park' on plaintiffs land." *Del Monte*

8   *Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508–1509 (9th Cir. 1990). The same

9   basic theory is alleged here: Plaintiff was singled out for uniquely burdensome treatment that was

10  not imposed on similarly situated industrial users.

11      To state a class-of-one claim, a plaintiff must plausibly allege that Defendants: (1)

12  intentionally treated Plaintiff differently from others similarly situated; and (2) lacked a rational basis

13  for doing so. *Olech*, 528 U.S. at 564; *Gerhart v. Lake County, Mont*., 637 F.3d 1013, 1022 (9th Cir.

14  2011). A plaintiff need not show that defendants were motivated by subjective ill will. *Gerhart*, 637

15  F.3d at 1022. The Complaint plausibly alleges both disparate treatment and irrationality.

16  6.1    **The Complaint Identifies Similarly Situated Comparators**.

17      The Complaint expressly alleges that "Plaintiff is similarly situated to other property owners

18  and developers in the I-2 Rail-Served Industrial Zone." (Compl. ¶ 200.) Defendants attempt to recast

19  the claim by arguing Plaintiff failed to identify other data center applications that received

20  preferential treatment. (Mot.; ECF No. 12-1 at 20.) But that is not the pleading standard. A

21  class-of-one plaintiff need not identify an identical twin.

22      The question is whether the comparators are similarly situated in all material respects. Here,

23  the Complaint alleges that other substantial industrial users in the same I-2 zone were processed

24  ministerially under the same site-plan framework and broader industrial-use categories. Specifically,

25  The Complaint alleges that Vilore Foods, a 289,000-square-foot warehouse at 2421 Vilore Way, and

26  Alford Distributing, at 344 Crown Court, are large industrial facilities in the City that were approved

27  through the ministerial site plan review process. (Compl. ¶ 200.)

28

The Complaint also alleges that numerous other industrial operations currently function in the I-2 zone even though they are not expressly listed in the zoning code, including beverage distributors, petroleum-related businesses, fertilizer manufacturers and suppliers, plumbing supply businesses, lumber operations, and the Imperial Valley Food Bank. (Compl. Ex. 15; ECF No. 1-16.) The Complaint alleges these uses were permitted under broader industrial, service, manufacturing, or distribution categories, and that the City's code expressly provides that an unlisted use "shall be deemed a permitted use" based on similarity to listed uses. (*Id.*; see also IMC § 24.19.210.)

At the pleading stage, those allegations adequately identify a comparator class: other industrial users in the same zone who were allowed to proceed through ordinary ministerial or streamlined administrative review, including uses not expressly named in the zoning table.

6.2    **The Complaint Plausibly Alleges Intentional Differential Treatment**.

The Complaint plausibly alleges that Plaintiff was treated differently from those similarly situated industrial users. While comparable I-2 zone users were permitted to proceed through ministerial staff review, Defendant's singled out Plaintiff's data center and demanded a discretionary CUP process, legislative text amendments, and CEQA review. (Compl. ¶¶ 200–203.)

The Complaint further alleges that Plaintiff repeatedly asked the City to use the Municipal Code's "similarity of use" procedure to resolve any claimed ambiguity regarding whether the data center qualified as a permitted use. (Compl. ¶¶18, 202.) The Complaint alleges that Defendants had historically used that procedure for other applicants, yet refused to do so here. (Compl. ¶202.) Instead, Defendants insisted on a text amendment that would take six to nine months. (Compl. ¶ 60.)

The Complaint alleges that while similar uses received ministerial review, Plaintiff was forced into a uniquely burdensome discretionary and CEQA-heavy process. The Complaint plausibly alleges that this difference in treatment was intentional.

6.3    **Defendants' Purported Rational Bases Are Plausibly Pretextual**.

The Complaint also plausibly alleges the absence of a rational basis. First, Plaintiff expressly advised the City that CEQA proceeds in stages and that step two--whether the project is exempt-- must be decided before step three--what environmental review applies. (Compl. Ex. 18; ECF No. 1-19; Compl. Ex. 25; ECF No. 1-26.) Thus, the Complaint plausibly alleges that Defendants'

invocation of environmental concerns ignored the legal predicate question and served as a post hoc justification rather than a real basis for the differential treatment.

Second, the Complaint alleges that the City refused to use its own similarity-of-use procedure even though that procedure existed precisely to address unlisted uses. Plaintiff repeatedly requested that process; Defendants refused and instead demanded a far more burdensome discretionary route. (Compl. ¶¶ 60, 202.) That refusal supports the inference of irrationality.

Third, Defendants characterize the proposal as requiring six million gallons of reclaimed water per day. (Mot.; ECF No. 12-1 at 20.) This misstates the facts. The project would require 0.75 million gallons per day for cooling. (Compl. ¶101.) The City's sudden concern with environmental impacts was "a calculated pretext." (Compl. ¶103.) For pleading purposes, the allegations are enough to support the inference that Defendants' stated reasons were irrational, arbitrary, or pretextual.

**6.4    The Complaint Alleges the Data Center Was Singled Out for Burdensome Treatment**.

The Complaint alleges disparate treatment in Defendants' refusal to use the "Similarity of Use" provision. Defendants historically utilized that provision to classify unlisted uses as permitted when similar to listed uses. (Compl. ¶202.) Defendants refused the the "Similarity of Use" provision and insisted on the legislative text amendment process instead. (Compl. ¶202.) Those allegations are sufficient to plausibly allege that Plaintiff was singled out for uniquely burdensome treatment.

**6.5    The Complaint Plausibly Alleges No Rational Basis**.

The Complaint alleges that it was "irrational and wholly arbitrary to require a lengthy discretionary review and legislative amendment" for the data center while approving other high-impact industrial uses through ministerial procedures. (Compl. ¶203.) No rational basis existed for requiring CEQA review and discretionary approvals for a project that was permitted by right or, at minimum, subject to the code's similarity-of-use procedure. (Compl. ¶¶ 200–203.)

In *Gerhart v. Lake County*, the Ninth Circuit held that disparate land-use treatment may support a class-of-one claim where officials irrationally depart from ordinary treatment. *Id.* 637 F.3d at 1023. And in *Del Monte Dunes*, the Ninth Circuit recognized that even if a government objective is rational in the abstract, it may still be irrational to single out one parcel or applicant to bear the burden of that objective. *Del Monte Dunes,* 920 F.2d at 1509. The same principle applies here. Even

assuming the City could legitimately care about land use compatibility or environmental concerns, the Complaint plausibly alleges that it was irrational to impose extraordinary burdens on Plaintiff alone while processing comparable industrial uses ministerially.

The Complaint also alleges retaliation, misinformation, and administrative obstruction, which further support the inference that Defendants' conduct lacked a legitimate rational basis. Allegations of pretext and obstruction reinforce the plausibility of arbitrary treatment.

In sum, the Complaint plausibly alleges that Plaintiff was intentionally treated differently from other similarly situated industrial developers in the I-2 zone and that there was no rational basis for that difference in treatment. Other industrial users received ordinary ministerial or streamlined administrative processing. Plaintiff, by contrast, were denied the benefit of the same code provisions, denied access to the similarity-of-use process, and forced into a discretionary CEQA-heavy pathway that the code did not require. That is the essence of a class-of-one claim. Count 3 therefore states a plausible Equal Protection violation and survives Rule 12(b)(6).

7.    **COUNT 4: THE COMPLAINT PLAUSIBLY ALLEGES MUNICIPAL LIABILITY UNDER *MONELL*.**

Municipal liability under 42 U.S.C. § 1983 exists where a constitutional violation results from an official policy, custom, or practice of the municipality. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In the Ninth Circuit, municipal liability may also be established through ratification by a final policymaker, including in a single incident, where the policymaker knows of the subordinate's unconstitutional conduct and deliberately approves both the conduct and its basis. *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 885 (9th Cir. 2022).

At the pleading stage, the Court must accept well-pleaded factual allegations as true and draw reasonable inferences in Plaintiff's favor. Under that standard, the Complaint plausibly alleges municipal liability based on ratification and official policymaker conduct.

The Complaint alleges a coordinated course of action directed and approved by senior City officials, including Defendants Burnworth, Morita, Turner, and Mora. According to the Complaint, that course of conduct included: knowingly disregarding the City's own ministerial approval mandates under § 24.19.550; refusing to honor deemed approvals; breaching the reclaimed-water agreement after Plaintiff had incurred expenses; pressuring El Centro to terminate its agreement with

1   Plaintiff; partnering with IID to obstruct utility processing; disseminating misleading public

2   materials; coordinating with outside actors, including Z-Global and environmental groups, to extract

3   concessions; and filing objectively baseless sham litigation against the County to delay and devalue

4   the project outside the City's jurisdiction. (Compl. ¶¶ 4, 116–140, 171–180.)

5       The Complaint further alleges that these actions were taken after Plaintiff engaged in

6   protected activity, including insisting on lawful ministerial processing and shifting its efforts to

7   County approvals when the City refused to follow its own code. Read as a whole, the pleading

8   plausibly alleges that the City's response was not accidental or unauthorized, but an official

9   municipal course of conduct designed to punish Plaintiff for asserting its rights.

10      The Complaint also alleges specific involvement by officials with final policymaking

11  authority. Defendant Mora, as Planning Director, had final authority over site-plan decisions.

12  (Compl. ¶ 207(a).) Defendant Morita, as City Manager, authorized interference with water-related

13  arrangements. (Compl. ¶ 207(b).) Defendant Burnworth, through the Council, ratified a practice of

14  converting ministerial matters into discretionary processes when expedient. (Compl. ¶¶ 207–208.)

15  The Complaint also alleges that City resources were used to disseminate the challenged publications

16  and messaging, confirming they were official municipal communications. (Compl. ¶209.)

17      These allegations plausibly support ratification. Final policymakers knew of the challenged

18  conduct, approved it, participated in it, and continued it over time. That is sufficient at the Rule

19  12(b)(6) stage. See *Endy v. County of Los Angeles*, 975 F.3d 757, 769 (9th Cir. 2020) (municipal

20  policy may be established through acts of officials with final policymaking authority). Plaintiff is

21  only required at the pleading stage to allege facts making it plausible that the constitutional

22  violations were chargeable to the municipality. The Complaint does so.

23      Defendants' assertion that no municipal policy or custom has been alleged mischaracterizes

24  the pleading. The Complaint alleges deliberate municipal choices by senior officials, repeated over

25  time, and ratified at the highest levels of City government. Whether discovery will reveal additional

26  evidence of policymaker knowledge and approval is a matter for later stages. At this stage, the

27  Complaint easily crosses the plausibility threshold. Accordingly, Count 4 plausibly alleges municipal

28  liability under *Monell* and should survive the motion to dismiss.

8.    **QUALIFIED IMMUNITY DOES NOT APPLY**

Qualified immunity protects government officials if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts apply a two-step inquiry: (1) whether the facts alleged make out a violation of a constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

A right is "clearly established" when existing precedent places the constitutional question "beyond debate." Officials need not confront identical facts to have fair warning that their conduct is unlawful. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). At the pleading stage, the Court must accept the Complaint's well-pleaded allegations as true and draw all reasonable inferences in Plaintiff's favor. Under that standard, qualified immunity cannot be resolved in Defendants' favor.

8.1    **The Complaint Plausibly Alleges Multiple Constitutional Violations**.

The Complaint plausibly alleges violations of several clearly established constitutional rights: Procedural Due Process: Defendants refused to recognize vested approvals that arose by operation of law under the City's deemed-approval provision. (Compl. ¶¶34, 40, 74.) Vested land-use approvals constitute protected property interests that cannot be disregarded without due process. *Horn v. County of Ventura*, 24 Cal.3d 605, 616 (1979). First Amendment Retaliation: Defendants retaliated against Plaintiff for protected petitioning activity, including insisting on ministerial processing, petitioning Imperial County, and speaking publicly. Government retaliation for protected speech violates the First Amendment where retaliatory animus is a but-for cause of adverse action. *Boquist v. Courtney*, 32 F.4th 764, 778 (9th Cir. 2022). Equal Protection: Defendants intentionally treated Plaintiff differently from similarly situated industrial users without a rational basis. Such disparate treatment is prohibited under *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Taken together, these allegations plausibly establish constitutional violations sufficient to satisfy the first prong of the qualified immunity analysis.

8.2    **The Rights at Issue Were Clearly Established**.

The constitutional rights implicated here were clearly established long before the events alleged in the Complaint. First, the procedural structure of CEQA has been settled law for decades.

Agencies must determine whether a project is exempt before conducting environmental review. See *Union of Med. Marijuana Pat. v. City of San Diego*, 7 Cal.5th 1171, 1185 (2019). Plaintiff repeatedly explained this statutory framework to Defendants, including the City Attorney, yet Defendants ignored the exemption inquiry and forced the project into discretionary review.

Second, the City's own Municipal Code contains longstanding provisions governing ministerial site-plan review, deemed approvals, and similarity-of-use determinations. These provisions have existed for decades and impose mandatory duties on City officials. Reasonable officials are presumed to know and follow the governing law contained in their own municipal code.

Third, longstanding precedent clearly establishes that vested land-use approvals cannot be arbitrarily disregarded by government officials. *Horn*, 24 Cal.3d at 616.

Fourth, it has long been clearly established that officials may not retaliate against individuals for exercising their First Amendment rights. See *Boquist*, 32 F.4th at 778.

Finally, it has long been clearly established that government officials may not intentionally single out a property owner for irrational disparate treatment. *Olech*, 528 U.S. at 564.

Taken together, these authorities gave Defendants more than adequate notice that the conduct alleged in the Complaint would violate constitutional rights.

8.3    **Defendants' Individual Arguments Do Not Support Immunity**.

Defendants attempt to characterize their conduct as routine administrative decision-making. They argue that Defendant Burnworth "is not alleged to have taken any overt actions." (Mot. at 26.) But the Complaint alleges her participation in and ratification of the coordinated municipal response to Plaintiff's' project. At the motion-to-dismiss stage, those allegations must be accepted as true.

Defendants similarly contend that Defendant Turner's communications were "innocuous." (Mot. at 26.) Yet the Complaint alleges that senior City officials--including Turner--participated in the coordinated strategy that obstructed the project and ignored ministerial approval requirements.

Finally, Defendants argue that Defendant Mora was simply complying with California law. But the Complaint alleges the opposite--that Mora knowingly disregarded mandatory ministerial approval provisions and forced the project into discretionary review contrary to the City's own code.

1   Reasonable officials know that municipal codes governing ministerial approvals bind them.

2   See *Las Lomas Land Co., LLC v. City of Los Angeles*, 177 Cal.App.4th 837, 853 (2009).

3   Accordingly, Defendants are not entitled to qualified immunity at this stage.

4   **8.4    Reclaimed Water Interference Further Supports Plaintiff's Constitutional Claims**

5   Defendants argue that City Manager Dennis Morita merely obtained El Centro's will-serve

6   letter and therefore did not violate any constitutional right. (Mot.; ECF No. 12-1 at 25.) The

7   Complaint alleges far more. The City initially encouraged Plaintiff to pursue reclaimed water for the

8   data center and directed Plaintiff to retain a consultant to develop the project. (Compl. ¶¶ 29–30.)

9   City officials repeatedly confirmed that the requested recycled-water supply was "well within [the

10  City's] capabilities." (Compl. ¶48.) The City transmitted a feasibility report confirming the earlier

11  discussions. (Compl. ¶66; Compl. Ex. 21.) City officials repeatedly confirmed supplying reclaimed

12  water. (Compl. ¶¶ 73, 77–78.) On Nov. 20, 2025, City Manager Morita stated the City was preparing

13  a reclaimed-water will-serve agreement and that a draft would be provided shortly. (Compl. ¶88.)

14  These allegations provide additional evidence of Defendants' broader pattern of conduct--

15  encouraging Plaintiff to invest in project infrastructure, then obstructing the project after Plaintiff

16  insisted on ministerial approval and pursued approvals through Imperial County. Viewed in context,

17  the reclaimed-water allegations reinforce the plausibility of Plaintiff's constitutional claims,

18  including retaliation, arbitrary treatment, and interference with vested project rights.

19  **9.    CONCLUSION**

20  Accepting all allegations as true and drawing reasonable inferences in Plaintiff's favor, the

21  Complaint states claims for procedural due process violation, First Amendment retaliation, equal

22  protection under a "class of one" theory, and municipal liability under *Monell*. The Motion to

23  Dismiss should be denied in its entirety.

24   Respectfully submitted,

25

26   LAW OFFICES OF SEBASTIAN RUCCI, P.C.

27

28  Date: March 16, 2026    Sebastian Rucci (SBN 178114)
     Attorney for Plaintiff

1

ATTORNEY'S CERTIFICATE OF SERVICE BY E-MAIL

2      I hereby certify that on this 16th day of March, 2026, I electronically filed the

3  foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** with

4  the Clerk of the Court using the CM/ECF system which will send notification to all the

5  parties. I Further Certify That on March 16, 2026, the foregoing **PLAINTIFF'S**

6  **OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** was served electronically served

7  on Defendant's counsel Konrad Rasmussen, at kmr@mmr4law.com from my law office

8  email Sebastian@Rucci.Law. The transmission was complete and without error and I did not

9  receive an electronic notification to the contrary.

10

11                   LAW OFFICES OF SEBASTIAN RUCCI, P.C.

12 Date: January 15, 2026

13

14                  Sebastian Rucci (SBN 178114)
Attorney for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28